James S. Richter
MIDLIGE RICHTER LLC
121 Union Avenue
Middlesex, New Jersey 08846
(908) 626-0622
jrichter@midlige-richter.com

*Attorneys for Defendants Lupin Inc., and Lupin Pharmaceuticals, Inc.*

Rebekah Conroy
STONE CONROY LLC
25 A Hanover Road, Suite 301
Florham Park, NJ 07932
Tel: (973) 400-4181
Fax: (973) 498-0070
rconroy@stoneconroy.com

*Attorneys for Defendants Cipla Limited and Cipla USA, Inc.*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ARS PHARMACEUTICALS OPERATIONS, INC., and AEGIS THERAPEUTICS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LUPIN INC., and LUPIN PHARMACEUTICALS, INC., CIPLA USA, INC. and CIPLA LIMITED,<br><br>Defendants. | Civil Action No. 2:25-cv-15123 (JXN)(ADS)<br>(Consolidated) |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................1
II. BACKGROUND ....................................2
III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION ....................................7
IV. LEVEL OF ORDINARY SKILL IN THE ART ....................................8
V. DISPUTED CONSTRUCTIONS ....................................10
A. Defendants' Proposed Construction Is Consistent with the Controlling Case Law and the Specification ....................................12
B. Plaintiffs' Proposed Construction Ignores Controlling Precedent, and Is Contrary to the Specification ....................................17
VI. CONCLUSION ....................................19

## TABLE OF AUTHORITIES

**Authority** **Page(s)**

**CASES**

*Bristol-Meyers Squibb Co. v. Ben Venue Laby's, Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) ........ 8, 13

*E.I. DuPont de Nemours & Co. v. Monsanto*,
903 F. Supp. 680 (D. Del. 1995), *aff'd*, 92 F.3d 1208 (Fed. Cir. 1996) ........ 9

*Endo Pharms. Inc. v. Watson Labs., Inc.*,
C.A. No. 13-cv-192-JRG, 2014 U.S. Dist. LEXIS 84804 (E.D. Tex. June 23, 2014) ........ 8, 14

*In re Copaxone Consol. Cases*,
906 F.3d 1013 (Fed. Cir. 2018) ........ 8, 14

*In re Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ........ 8, 15

*Israel v. Cresswell*,
166 F.2d 153 (C.C.P.A. 1948) ........ 8

*Markman v. Westview Instrs., Inc.*,
517 U.S. 370 (1996) ........ 7

*Minton v. NASD, Inc.*,
336 F.3d 1373 (Fed. Cir. 2003) ........ 8, 13

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........ 7

*Sinorgchem Co. v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007) ........ 16

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
407 F.3d 1371 (Fed. Cir. 2005) ........ 8

*Takeda Pharm. Co. v. Actavis Labs. FL, Inc.*,
C.A. No. 15-451-RGA, 2016 U.S. Dist. LEXIS 73121 (D. Del. June 6, 2016) ........ 8

*Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*,
988 F.2d 1165 (Fed. Cir. 1993) ........ 8, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........ 16

**RULES**

L. Pat. R. 4.5(a) ........ 1

# TABLE OF EXHIBITS

| Exhibit | Document |
|---|---|
| A | U.S. Patent No. 10,682,414 (the "'414 Patent") |
| B | U.S. Patent No. 11,717,571 (the "'571 Patent") |
| C | U.S Patent No. 11,744,895 (the "'895 Patent") |
| D | U.S. Patent No. 11,918,655 (the "'655 Patent") |
| E | *Amphastar Pharmaceuticals, Inc. v. Aegis Therapeutics, LLC*, IPR2021-01324, Paper 43 (P.T.A.B. Feb. 7, 2023) (Final Written Decision) ("FWD") |
| F | '414 Patent File History, September 9, 2019 Office Action |
| G | '414 Patent File History, December 13, 2019 Response to Office Action |
| H | '414 Patent File History, February 5, 2020 Notice of Allowability |
| I | '571 Patent File History, January 25, 2023 Office Action |
| J | '571 Patent File History, April 28, 2023 Examiner Interview Summary |
| K | '571 Patent File History, May 24, 2023 Notice of Allowability |
| L | '895 Patent File History, June 29, 2023 Notice of Allowability |
| M | '655 Patent File History, October 26, 2023 Notice of Allowability |

## I. INTRODUCTION

Pursuant to L. Pat. R. 4.5(a), the Court's Scheduling Order (ECF No. 82), Defendants Lupin Inc. and Lupin Pharmaceuticals, Inc. (collectively, "Lupin") and Cipla USA, Inc. and Cipla Limited (collectively, "Cipla" and with Lupin, "Defendants") submit this Opening Claim Construction Brief in support of Defendants' proposed constructions for claims 3-6, 18-20 of U.S. Patent No. 10,682,414 (the "'414 Patent," attached as Ex. A); claims 1-30 of U.S. Patent No. 11,717,571 (the "'571 Patent," attached as Ex. B); claims 1-26 of U.S Patent No. 11,744,895 (the "'895 Patent," attached as Ex. C); and claims 1-43 of U.S. Patent No. 11,918,655 (the "'655 Patent," attached as Ex. D) (collectively the "Construed Patents").

Although there are five disputed claim terms at issue for construction, there is really only one issue for the Court to resolve: whether these five claim terms, which occur with minor variations in wording across the patents, are claim limitations at all. Defendants' proposed construction – that the disputed terms are non-limiting statements of intended result that do not make a manipulative difference in any active step of any of the claimed methods of treatment – is directly supported by binding Federal Circuit authority and the Construed Patents' shared specification.

Plaintiffs' contrary position is premised on a legally flawed, factually inconsistent, and non-precedential administrative decision. Plaintiffs ARS Pharmaceuticals Operations, Inc. ("ARS") and Aegis Therapeutics, LLC ("Aegis," collectively, with ARS, "Plaintiffs") rely primarily on a legally erroneous construction of one of the disputed terms by a panel of the United States Patent Trial and Appeals Board ("PTAB") in its Final Written Decision in *inter partes* review number IPR2021-01324, brought by Amphastar Pharmaceuticals, Inc. ("Amphastar") against the claims of the '414 Patent. As discussed in more detail below, the PTAB panel committed reversible legal error in finding that the disputed claim term, "wherein: intranasal

administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious" in claim 3 of the '414 Patent, limited the method of claim 1, which the same panel had already determined was invalid as anticipated. Although Amphastar appealed this erroneous construction, it subsequently voluntarily dismissed that appeal for reasons that appear to have been unrelated to the merits of its arguments.

As discussed below, the parties' dispute is a legal one. Specifically, the parties dispute whether certain "wherein" clauses incorporated directly or indirectly into the majority the claims asserted in this litigation are merely statements of intended result that do not yield any manipulative difference in performing the affirmative steps of the claimed methods of treatment.

For the reasons set forth below, Defendants respectfully request that the Court adopt Defendants' proposed constructions of the disputed terms.

## II. BACKGROUND

The Construed Patents, along with the other patents-in-suit not at issue in this claim construction process, are directed primarily to methods of treating various forms of type-1 hypersensitivity reactions, including anaphylaxis and severe allergic reactions, by administration of an intranasal formulation of epinephrine. There is nothing new about using epinephrine to treat these conditions – indeed it has been the first-line medication for severe type-1 hypersensitivity reactions for roughly a century.

All of the claims of the Construed Patents at issue in this dispute are method of treatment claims that require a single affirmative method step – administering a nasal spray pharmaceutical formulation containing epinephrine to a patient experiencing a type-1 hypersensitivity reaction. The various claims differ in details such as the amount of epinephrine administered per spray (*e.g.*, claim 25 of the '655 Patent specifies "between 0.1 mg and 4 mg of epinephrine" while claim 31

recites "about 1.0 mg to about 2.0 mg of epinephrine" per dose); what other compounds may be present in the spray (*e.g.*, claim 3 of the '414 Patent is silent as to excipients in the formulation, while claim 19 recites a composition that also comprises dodecyl maltoside, benzalkonium chloride, EDTA, sodium chloride, water, and "optional pH adjustment agents"); and the specific type of type-1 hypersensitivity reaction to be treated (*e.g.*, claim 1 of the '895 Patent is directed to any type-1 hypersensitivity reaction, while claim 4 specifies that the condition treated is urticaria (hives), and claim 18 recites treatment of "anaphylaxis or acute asthmatic attacks"). But despite these differences in the details of the method, the claims at issue here recite a single method step: in each case, the method consists entirely of administering the claimed nasal spray formulation in the claimed amounts to the patient.

The '414 Patent, through which all the other Construed Patents claim priority, was the subject of IPR2021-01324, during which the PTAB found that claims 1, 2, and 7-17 were anticipated by and/or obvious over the cited prior art. Ex. E, *Amphastar Pharmaceuticals, Inc. v. Aegis Therapeutics, LLC*, IPR2021-01324, Paper 43 (P.T.A.B. Feb. 7, 2023) (Final Written Decision) ("FWD") at 74. However, the PTAB found claims 3-6 and 18-20 (claims 4-6, and 18-20 depend directly or indirectly from claim 3) to be patentable. *Id.* This decision was primarily based on the panel's construction of the term "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis" as further limiting the invalid method of claim 1, and finding that this supposed "limitation" was not inherently present in the cited prior art. *See id.* at 14-15; 27-36. Specifically, the PTAB rejected Amphastar's position that this language was non-limiting because Amphastar "had not established that all of the claimed doses [recited in the anticipated claim 1, from which claim 3 depends] and

formulations would provide the claimed 'plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis' in all claimed mammals." *Id.* at 14.

This conclusion is directly contrary to binding Federal Circuit precedent and the express disclosure of the '414 Patent specification (which is shared by all of the Construed Patents). Independent claim 1 is directed to a method of treatment comprising a single step: administering an aqueous nasal spray comprising between "about 0.1 mg and about 2.4 mg of epinephrine." '414 Patent, claim 1. Claim 3, which depends from claim 1, then recites that the dose "provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis." '414 Patent, claim 3. While recognizing that claim 3 merely recites the result of claim 1's administration step, the PTAB reasoned that claim 3 limited the administration step to only those formulations that produced the recited result. FWD at 14.

The PTAB's decision ignores the express disclosures of the specification. The specification defines "therapeutically effective amount" broadly as a dose that elicits a "biological or medicinal response . . . that is being sought by a researcher, healthcare provider or individual" and "***may, <u>but need not necessarily</u>, eliminate one, more, or all symptoms*** of a disease, disorder, or condition being treated." '414 Patent at 40:61–41:2 (emphasis added). The '414 Patent further made clear that *all* disclosed formulations are "effective" as the patent defined the term. *See id.* at 41:63–67 ("Provided are formulations . . . . ***each*** comprising a therapeutically effective amount of epinephrine.") (emphasis added); *see also id.* at 39:37–44 (stating that any disclosed "formulation" refers to "a composition comprising at least one [drug], whereby the formulation is amenable to use for a specified, efficacious outcome in a mammal"). The specification further confirmed that the intranasal epinephrine formulations "described herein" were able to "reach the systemic circulation in a pharmacologically active form," assuring that the epinephrine "will be available to

treat anaphylaxis." *Id.* at 42:56–67. The specification thus confirms that every single one of its disclosed formulations would be "effective." Therefore, since all of the dosages recited in invalid claim 1 are necessarily "effective" under the specification's broad definition of that term, the PTAB's contrary finding was not supported, and thus legally erroneous.

This error is further confirmed by the prosecution history of the '414 Patent. Indeed, during prosecution of the '414 Patent, from which the other Construed Patents claim priority, the examiner stated that the cited prior art anticipated and/or rendered obvious the "structural limitation of [the] claimed method and ***would achieve the same <u>intended results</u>, including "a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis", required by claim 3***. *See* Ex. F, '414 Patent File History, September 9, 2019 Office Action at 8 (emphasis added). Furthermore, despite disputing the substantive teachings of the examiner's cited art regarding the affirmative step of administering the claimed formulation to a patient at length, Aegis, as the patent applicant, never disputed that characterization or argued for the separate patentability of claim 3. *See* Ex. G, '414 Patent File History, December 13, 2019 Response to Office Action at 6-8. In the notice of allowability, the examiner allowed claim 3 solely due to its dependence from claim 1, which was allowed for reasons unrelated to the range of epinephrine amounts recited in that claim. *See* Ex. H, '414 Patent File History, February 5, 2020 Notice of Allowability at 3-7. There was no argument made, either by the examiner or the applicant, that the "wherein" clause was limiting or material to patentability, contrary to the PTAB's decision.

The erroneous decision in the '414 Patent IPR infected the prosecution of the remaining Construed Patents. For example, during prosecution of the '571 Patent, the examiner initially rejected claim 1 as anticipated by the prior art at issue in the IPR, including an express statement that the cited art "meets all structural limitation of claimed method ***and would achieve the same***

***<u>intended results</u>*, *including 'a plasma epinephrine concentration in the human that is efficacious for the elimination (or the prevention of the further progression) of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction'***, required by claims 1, 16, and 22." *See* Ex. I, '571 Patent File History, January 25, 2023 Office Action at 7 (emphasis added). However, following the PTAB's entry of its erroneous Final Written Decision, the examiner stated that they would "reconsider the 102 and 103 of record in this Application based on the PTAB decision," *See* Ex. J, '571 Patent File History, April 28, 2023 Examiner Interview Summary at 1. The examiner then applied the doctrine of collateral estoppel, expressly citing the PTAB's decision as the basis for allowance. *See* Ex. K, '571 Patent File History, May 24, 2023 Notice of Allowability at 9. This same pattern played out in the prosecution of the '895 Patent, with the examiner initially rejecting the claims with statements that the disputed terms were non-limiting, then withdrawing this position expressly due to "the decision of IPR2021-01324 mailed on 02/09/2023 in parent Application No. 16/420,044 [the '414 Patent's application]. *See* Ex. L, '895 Patent File History, June 29, 2023 Notice of Allowability at 9.

By the time the '655 Patent was filed in June of 2023 (*after* the '571 Patent's claims had already been allowed in express reliance on the PTAB's erroneous construction), the examiner did not bother making any prior art rejections at all, and the claims were allowed with little consideration following minor amendments to address various informalities, an indefiniteness rejection under 35 U.S.C. § 112, and terminal disclaimers to overcome double patenting over the other patents in this family. *See* Ex. M, '655 Patent File History, October 26, 2023 Notice of Allowability at 3-4. Even though no prior art rejections had been made, the examiner expressly indicated their reliance on the legally flawed IPR decision:

> The reason for allowance is reiterated here: the references did not teach or suggest the limitation "the pharmaceutical formulation to

> the human provides plasma epinephrine concentrations in the human that are efficacious for the elimination of one, more than one, or all of the symptoms of the type-1 hypersensitivity reaction ... efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type-1 hypersensitivity reaction", required by claims 1, 14, 21, 25, 31, 33, 34, 36, 37, and 41, and ***supported by the decision of IPR2021-01324*** mailed on 02/09/2023 in parent Application No. 16/420,044.

*Id.* at 6 (emphasis added). It is therefore clear that the examiner considered these arguments foreclosed by the PTAB's legally erroneous decision.

## III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is a matter of law to be decided by the Court. *Markman v. Westview Instrs., Inc.*, 517 U.S. 370, 372 (1996). Claim terms "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). Claims "must be read in view of the specification" – "[u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations omitted).

Some claim terms in method claims are not considered limitations at all, but merely statements of intended result. Under this doctrine, claim terms are not limiting if they do not actually alter any of the steps of the method or change the manner in which those steps are performed. When determining whether a statement reciting the intended result of performing a method is limiting, the proper question is whether that language "result[s] in a manipulative difference in the steps of the claim." *Bristol-Meyers Squibb Co. v. Ben Venue Laby's, Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001); *accord In re Copaxone Consol. Cases*, 906 F.3d 1013, 1023 (Fed. Cir. 2018); *In re Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011); *Minton v. NASD, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003) ("A whereby clause in a method claim is not given weight when it

simply expresses the intended result of a process step positively recited."); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1378 (Fed. Cir. 2005) ("We agree with the district court that the term 'in a stabilizing amount' simply describes the intended result of using the weight to volume ratios recited in the claims."); *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993) ("A 'whereby' clause that merely states the result of the limitations in the claim adds nothing to the patentability or substance of the claim." (citing *Israel v. Cresswell*, 166 F.2d 153, 156 (C.C.P.A. 1948) ("In this case, as is presumed to be true in all cases in which the claims have a whereby clause, the clause states the result. ***The result, of course, is not patentable and when stated it adds nothing to the patentability of a claim***." (emphasis added))); *Takeda Pharm. Co. v. Actavis Labs. FL, Inc.*, C.A. No. 15-451-RGA, 2016 U.S. Dist. LEXIS 73121, at *23-29 (D. Del. June 6, 2016); *Endo Pharms. Inc. v. Watson Labs., Inc.*, C.A. No. 13-cv-192-JRG, 2014 U.S. Dist. LEXIS 84804, at *20-24 (E.D. Tex. June 23, 2014) ("[B]oth the preamble and the 'therein' clause here are simply expressions of intended result that follow from practicing the steps of the method, administering the claimed composition." (citing *Bristol-Meyers*, 246 F.3d at 1375)). In other words, if the "steps of the [claimed] method are performed in the same way regardless of whether or not the patient experiences" the recited result, then the claim term does not limit the claim and is not entitled to patentable weight. *Bristol-Meyers*, 246 F.3d at 1375.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

As of December 21, 2018, the earliest priority date that any of the claims at issue may claim,[1] a POSA would have been composed of an individual or a team that would have included:

[1] Certain claims of the Construed Patents, namely claims 10-14 and 16-30 of the '571 Patent; claims 11, 15, and 23 of the '895 Patent; and claims 3, 4, 8, 14-17, 22, 23, and 28 of the '655 Patent, were determined during prosecution not to be supported by the provisional application filed on December 21, 2018, and instead were only afforded the filing date of the first non-provisional application in this patent family on February 6, 2019. However, Lupin does not allege that this

(1) an advanced degree (*e.g.*, M.D., Pharm. D., or Ph.D.) and training in pharmacology, pharmaceutical sciences or a related discipline, or experience treating type-1 hypersensitivity reactions; and (2) at least two years of experience with (i) the development of small molecule pharmaceutical formulations and the development and science of intranasal or mucosal delivery systems or (ii) the treatment of type-1 hypersensitivity reactions. Alternatively, the POSA would have been composed of an individual or a team that would have included (1) a Bachelor's or Master's of Science in the above disciplines and (2) more than seven years of experience with (i) the development of small molecule pharmaceutical formulations and the development and science of intranasal or mucosal delivery systems or (ii) the treatment of type-1 hypersensitivity reactions.

In either case, a higher educational level could substitute for some amount of the requisite experience. A POSA also could have had a lower level of formal education than what is described in the following definitions if such person has a higher degree of experience. *See E.I. DuPont de Nemours & Co. v. Monsanto*, 903 F. Supp. 680, 751 (D. Del. 1995), *aff'd*, 92 F.3d 1208 (Fed. Cir. 1996).

Additionally, a POSA would have had access to and/or consulted with, as needed, one or more members of a team of experienced professionals in the relevant fields in order to solve a particular problem, in particular the development, design, testing, manufacture, formulation, or administration of nasal sprays and associated delivery devices. For example, such a person would likely be a part of a research and development team that may include device engineers, pharmacists, formulators, clinicians, pharmacologists, and related development scientists, as well as persons familiar with regulatory compliance and drug product approval. Such a person would

---

difference in priority date materially affects the level of ordinary skill in the art for purposes of construing the disputed claims.

further have had other resources available to draw upon that are typically employed in the development, testing, approval and marketing of human drug products in the U.S.[2]

## V. DISPUTED CONSTRUCTIONS

| Claim Terms (the "Disputed Terms") | Patents/Claims | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|---|
| "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious"<br><br>"wherein the intranasal administration of the [single dose of the] nasal spray pharmaceutical formulation to the human [with the type-1 hypersensitivity reaction] provides plasma epinephrine concentrations in the human that are efficacious"<br><br>"wherein the intranasal administration of the single administered dose of the pharmaceutical | '414 Patent, claim 3-6, 18-20;<br><br>'571 Patent, claims 1-30;<br><br>'895 Patent, claims 1-26; and<br><br>'655 Patent, claims 1-43. | **For '414 Patent:** Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, *i.e.*, "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]"<br><br>**For '571 Patent:** Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, *i.e.*, "wherein the intranasal administration of the [single dose of the] nasal spray pharmaceutical formulation to the human [with the type-1 hypersensitivity reaction] elicits a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms | These "wherein" clauses are non-limiting. No construction necessary. |

[2] In their responses to Lupin's interrogatories, Plaintiffs identified a slightly different definition of a POSA. However, Lupin contends that any minor differences in the parties' definitions of a POSA would not impact the outcome of the claim construction analysis, should the Court adopt Plaintiffs' definition.

| | | | |
|---|---|---|---|
| formulation to the human provides plasma epinephrine concentrations in the human that are efficacious"<br><br>"wherein the intranasal administration of the [nasal spray] pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious"<br><br>"wherein the intranasal administration of the single dose to the human with [anaphylaxis / the type-1 hypersensitivity reaction] provides plasma epinephrine concentrations in the human that are efficacious" | | of [the disease, disorder, or condition being treated]"<br><br>**For '895 Patent:** Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, *i.e.*, "wherein the intranasal administration of the single administered dose of the pharmaceutical formulation to the human provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]"<br><br>**For '655 Patent, claims 1, 14, 21, and 25 (and all asserted claims dependent thereto):** Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, *i.e.*, "wherein the intranasal administration of the [nasal spray] pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]"<br><br>**For '655 Patent, claims 31, 33, 34, 36, 37, and 41 (and all asserted claims dependent thereto):** Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, *i.e.*, "wherein the intranasal | |

| | | | |
|---|---|---|---|
| | | administration of the single dose to the human with [anaphylaxis / the type-1 hypersensitivity reaction] provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]” | |

### A. Defendants’ Proposed Construction Is Consistent with the Controlling Case Law and the Specification

As stated above, all of the claims at issue in this *Markman* proceeding are method of treatment claims wherein the only affirmative method step is administering an epinephrine nasal spray formulation to a patient suffering from a type-1 hypersensitivity reaction, such as anaphylaxis. *See supra* Part II. The Disputed Terms, whether occurring in an independent claim (*e.g.*, ’895 Patent, claim 1) or in a dependent claim (*e.g.*, ’414 Patent, claim 3), describe only the intended result of the administering step. They do not alter the administering step in any way. Put another way, the claimed formulation will be administered to the patient in the same dosage, and with the same composition, regardless of whether that administration results in “a plasma epinephrine concentration” that is effective for eliminating any symptoms or preventing their progression or appearance. As discussed in more detail below, under binding Federal Circuit precedent, and consistent with the express disclosures of the shared specification of the Construed Patents, this failure to produce any manipulative difference in the claimed method renders the Disputed Terms non-limiting statements of intended result.

#### 1. Binding Precedent Dictates that the Disputed Terms are Non-Limiting Statements of Intended Results, not Limiting Method Steps

The Federal Circuit has considered the proper interpretation of this kind of claim language concerning statements of intended result on a number of occasions, each of which supports Defendants' proposed construction. When considering a similar claim that recited "administering … an antineoplastically effective amount of about 135–175 mg/m2 taxol," the court concluded that "an antineoplastically effective amount" was non-limiting because it was nothing but an "expression of intended result [that] essentially duplicates the dosage amounts recited in the claims that are also described in the specification as 'antineoplastically effective.'" *Bristol-Meyers*, 246 F.3d at 1375; *see also Minton*, 336 F.3d at 1381 ("A whereby clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited." (citing *Tex. Instruments*, 988 F.2d at 1172 ("A 'whereby' clause that merely states the result of the limitations in the claim adds nothing to the patentability or substance of the claim."))). This is directly analogous to the present case. The shared specification of the Construed Patents expressly states that *all* disclosed formulations are "effective" as the patent defined the term. *See* '414 Patent at 41:63–67[3] ("Provided are formulations . . . . *each* comprising a therapeutically effective amount of epinephrine.") (emphasis added); *see also id.* at 39:37–44 (stating that any disclosed "formulation" refers to "a composition comprising at least one [drug], whereby the formulation is amenable to use for a specified, efficacious outcome in a mammal"). Because all of the disclosed formulations are described in the specification as being, by definition, "effective," there can be no doubt that that the Disputed Terms merely state the intended result of the sole claimed method step: administering the claimed formulations to a patient suffering a type-1 hypersensitivity reaction.

[3] The '414, '571, '895, and '655 Patents share a common specification. For ease of discussion, all citations to the patents' shared specification will cite to the '414 Patent.

Similarly, the Federal Circuit has addressed claims directed to a "method of alleviating a symptom of relapsing-remitting multiple sclerosis" that included administering "a therapeutically effective regimen of three subcutaneous injections of a 40 mg dose of glatiramer acetate . . . the regimen being sufficient to alleviate the symptom of the patient." *Copaxone*, 906 F.3d at 1023-24. Relying on *Bristol-Meyers*, the court held that the claim term "sufficient to reduce the frequency of relapses" was non-limiting because it did "not change the express dosing amount or method already disclosed in the claims, or otherwise result in a manipulative difference in the steps of the claims." *Id.* at 1023; *see also Endo Pharms.*, 2014 U.S. Dist. LEXIS 84804, at *21 ("[B]oth the preamble and the 'therein' clause here are simply expressions of intended result that follow from practicing the steps of the method, administering the claimed composition."). Because the claims already provided "express dosage amounts" that were specifically characterized in the patent as "effective," the statement of intended result was "superfluous, [did] not change the claimed method or require any additional required structure or condition for the claims, and is therefore non-limiting." *Id.* The same is true here; all of these key features relied upon by the *Copaxone* court are present here, and the result should be the same.

Finally, the Federal Circuit similarly interpreted claims directed to a "method for treating pain" involving administering a drug, wherein the administration produced a "[maximum blood concentration] at least about 50% higher when the dosage form is administered to the subject under fed versus fasted conditions." *Kao*, 639 F.3d at 1070 (emphasis omitted). The court recognized that claiming different blood concentrations depending on the conditions of administration applied to all disclosed formulations and therefore "adds nothing of patentable consequence" to the claimed method of administration. *Id.* (affirming a finding that any "food effect" on a patient's eventual blood plasma concentration is an inherent property of the drug itself).

It should be noted that the PTAB did cite *Bristol-Meyers* and *Copaxone*, but it did not actually engage with the facts or issues raised in those decisions, instead merely quoting *Bristol-Meyers*'s "no manipulative difference" language, then asserting without further discussion that "Petitioner had not established that all of the claimed doses and formulations would provide the claimed 'plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis' in all claimed mammals," and therefore concluding that claim 3 claimed a narrower "effective" range than the full range of claim 1. *See* FWD at 14-15. While this is legally erroneous in-and-of itself, as it is contrary to the express holdings and facts of *Bristol-Meyers* and *Copaxone*, it also ignores the express definitions for "therapeutically effective amount" and "formulation" provided by the specification.

### 2. The Construed Patents' Shared Specification Supports Defendants' Proposed Construction

The intrinsic record supports Defendants' construction of the Disputed Terms and demonstrates the clear error underlying the PTAB's contrary construction (and Plaintiffs' here). The specification defines "therapeutically effective amount" broadly as any dose that elicits a "biological or medicinal response . . . that is being sought by a researcher, healthcare provider or individual" and "***may, <u>but need not necessarily</u>, eliminate one, more, or all symptoms*** of a disease, disorder, or condition being treated." '414 Patent at 40:61–41:2 (emphasis added); *see also id.* at 39:37–44 (stating that any disclosed "formulation" refers to "a composition comprising at least one [drug], whereby the formulation is ***amenable to use for a specified, efficacious outcome*** in a mammal" (emphasis added)). In so doing, the patentee acted as its own lexicographer, providing definitions for "therapeutically effective amount" and "formulation" that expressly encompass any increase in plasma epinephrine, regardless of whether it actually eliminates any symptoms of the condition being treated. *See, e.g.*, *Sinorgchem Co. v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136

(Fed. Cir. 2007). Any construction that fails to give effect to this lexicography, including the PTAB's construction and the one advanced by Plaintiffs here, is incorrect as a matter of law. *See id.* (reversing ITC decision that was contrary to express definition "set off by quotation marks—often a strong indication that what follows is a definition" because when a patentee acts as his own lexicographer the 'specification acts as a dictionary when it expressly defines terms'" (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))).

Furthermore, contrary to the PTAB's decision, there are, by express definition, no "formulations" disclosed or claimed in the Construed Patents that are not "effective" as the inventors chose to define that term. The specification makes clear that *all* disclosed formulations are "effective" as the Construed Patents defined the term. *See* '414 Patent at 41:63–67 ("Provided are formulations . . . . ***each*** comprising a therapeutically effective amount of epinephrine.") (emphasis added). Additionally, the specification confirms that the intranasal epinephrine formulations "described herein" were able to "reach the systemic circulation in a pharmacologically active form," assuring that the epinephrine "will be available to treat anaphylaxis." *Id.* at 42:56–67. The specification thus confirms that each of its disclosed formulations would be "effective."

In view of these express teachings of the specification that since any disclosed formulation is necessarily "effective" and comprises a "therapeutically effective amount," there is no scope available for the Disputed Terms' recitation of producing a "plasma epinephrine concentration that is efficacious" to modify or narrow the express dosage ranges that they refer to in any way. The method is the same regardless of whether the Disputed Terms are present or not – the same dosage will be administered to the same patient; whether or not any symptoms are thereby alleviated, it is still "effective" within the express definitions provided in the Construed Patents. As discussed

above, this is directly analogous to the express statements of efficacy found to be dispositive in *Bristol-Meyers* and *Copaxone*, which therefore control the result here. As was the case for the claim terms at issue in those cases, the Disputed Terms are nothing more than statements of intended result that do not cause any manipulative difference in the claimed methods, and are therefore not limiting.

### B. Plaintiffs' Proposed Construction Ignores Controlling Precedent, and Is Contrary to the Specification

#### 1. Plaintiffs' Proposed Construction Ignores and Misapplies Controlling Precedent

Plaintiffs' construction ignores the inevitable result of applying *Bristol-Meyers* and *Copaxone* to the facts of this case. To the extent that Defendants understand it, Plaintiffs' position appears to simply adopt the PTAB's erroneous construction which, as discussed above, pays lip service to the language of those Federal Circuit precedents, but ignores or misconstrues their holdings. Plaintiffs also appear primed to argue that a separate panel decision dated less than a year after the *Copaxone* decision, based on facts specific to that case that are not present here, somehow overrules that case's clear holding. This is further error, as until an *en banc* court or the Supreme Court overrules them, *Bristol-Meyers* and *Copaxone* are still binding on this Court.

#### 2. Plaintiffs' Proposed Construction is Contradicted By the Specification

Even if the Court were to find the Disputed Terms to be limiting (which they are not), it still should not adopt Plaintiffs' gloss on the alleged "plain and ordinary meaning" of the Disputed Terms. Although at first glance Plaintiffs' constructions appear to parallel the express definitions from the specification discussed above, they omit a key piece of language that materially alters the specifications' definition. A side-by-side comparison, again using claim 3 of the '414 as exemplary, exposes this linguistic sleight of hand:

| Plaintiffs' Construction | Specification Definition |
|---|---|
| "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) ***is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]***" | "The term "therapeutically effective amount" or "therapeutically effective dose," as used herein, refers to the amount or dose of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, or individual that is being sought by a researcher, healthcare provider or individual. ***A therapeutically effective amount may, but need not necessarily, eliminate one, more, or all symptoms of a disease, disorder, or condition being treated.*** A therapeutically effective amount may also prevent disease progression or the appearance of further symptoms. ('414 Patent at 40:61-41:3.) |

As this demonstrates, Plaintiffs' definition reads the concept that the claimed therapeutically effective amount "may, but need not necessarily" actually "eliminate one, more, or all symptoms of a disease, disorder, or condition being treated" out of the claims. This appears designed to support Plaintiffs' invalidity positions, which broadly track the PTAB's arguments that, in order to anticipate or render obvious the claims, the prior art must not only disclose the claimed formulation and epinephrine concentrations, but must also "establish[ ] that all of the claimed doses and formulations would" necessarily have a clinically meaningful effect on the symptoms of the claimed disease, disorder, or condition. *See* FWD at 14. However, as demonstrated above, this is contrary to both the controlling law and the express definition provided in the specification. Even if the Disputed Terms are found to be limiting to some extent, they surely cannot be permitted to erase part of the express definition that the patentees themselves deliberately chose to include when describing their invention.

For all of these reasons, the Court should reject Plaintiffs' litigation-inspired attempt to rewrite their own patents and adopt Defendants' proposed construction.

## VI. CONCLUSION

For the aforementioned reasons, Defendants respectfully request that the Court adopt their proposed construction that the Disputed Terms are non-limiting statements of intended result.

DATED: October 19, 2026

By: s/Rebekah Conroy
Rebekah Conroy
STONE CONROY LLC
25 A Hanover Road, Suite 301
Florham Park, NJ 07932
Tel: (973) 400-4181
Fax: (973) 498-0070
rconroy@stoneconroy.com

**OF COUNSEL:**

Steven M. Coyle, Esq. (*pro hac vice*)
Nicholas A. Geiger, Esq. (*pro hac vice*)
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, CT 06103
Tel: (860) 286-2929
Fax: (860) 286-0115
scoyle@cantorcolburn.com
ngeiger@cantorcolburn.com

*Attorneys for Defendants Cipla Limited and Cipla USA, Inc.*

By: s/ James S. Richter
James S. Richter
MIDLIGE RICHTER LLC
121 Union Avenue
Middlesex, New Jersey 08846
(908) 626-0622
jrichter@midlige-richter.com

**OF COUNSEL:**

Michael W. Johnson (*pro hac vice*)
Heather M. Schneider (*pro hac vice*)
Eric L. Saunders (*pro hac vice*)
Jason N. Zaccaro (*pro hac vice*)
GEMINI LAW LLP
32 W 39th Street
New York, NY 10018
(917) 915-8832
mjohnson@geminilaw.com
hschneider@geminilaw.com
esaunders@geminilaw.com
jzaccaro@geminilaw.com

*Attorneys for Defendants*
*Lupin Inc., and Lupin Pharmaceuticals, Inc.*