# Exhibit F

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/420,044 | 05/22/2019 | Richard LOWENTHAL | 55358-701.302 | 9239 |

21971 7590 09/09/2019
WILSON, SONSINI, GOODRICH & ROSATI
650 PAGE MILL ROAD
PALO ALTO, CA 94304-1050

| EXAMINER | |
|---|---|
| SHIAO, YIH-HORNG | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1623 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 09/09/2019 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@wsgr.com

**DETAILED ACTION**

The Non-Final Rejection mailed on 06/21/2019 is vacated because of Applicant's request for First Action Interview (Full Pilot Program) filed on 05/22/2019.

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA. Claims 1-20 are pending in this instant application and are currently under examination.

***Priority***

This application is a CON of PCT/US2019/016918 filed on 02/06/2019, which is a CON of 15/890,131 filed on 02/06/2018 and claims benefit of US Provisional Application No. 62/784,057 filed on 12/21/2018.

**Note**: The Application Data Sheet filed on 05/22/2019 and the current Bib Data Sheet incorrectly indicate that the PCT/US2019/016918 is filed on 02/06/2018. The Application Data Sheet filed on 05/22/2019 made incorrectly reference of 62/784,057 to US Application No. 15/890,131 and the current Bib Data Sheet did not include the benefit of 62/784,057.

This application repeats a substantial portion of prior Application No. 15/890,131, filed on 02/06/2018, and adds disclosure not presented in the prior application. Because this application names the inventor or at least one joint inventor named in the prior application, it may constitute a continuation-in-part of the prior application. Should applicant desire to claim the benefit of the filing date of the prior application, attention is directed to 35 U.S.C. 120, 37 CFR 1.78, and MPEP § 211 *et seq.*

Claims 1-20 recite "type-I hypersensitivity reaction", "between about 0.1 mg and about 2.4 mg of epinephrine", "anaphylaxis, eosinophilia, drug allergy, food allergy", "between about 0.4 mg and about 2.4 mg of epinephrine", "between about 0.5 mg and about 1.5 mg of epinephrine", "between about 0.5 mg and about 0.7 mg of epinephrine, or a salt thereof; about 1.0 mg of epinephrine, or a salt

thereof; or between about 1.3 mg and about 1.5 mg of epinephrine, or a salt thereof", "isotonicity agent", "oleic acid, or salt thereof, "about 0.005% (w/v) to about 2.5% (w/v) dodecyl maltoside; about 0.001 (w/v) to about 1 % (w/v) benzalkonium chloride; about 0.001 (w/v) to about 1 % (w/v) oleic acid, or salt thereof", "about 0.005% (w/v) to about 0.08% (w/v) benzalkonium chloride; about 0.01 % (w/v) to about 0.06% (w/v) benzalkonium chloride; or about 0.01 % (w/v) to about 0.04% (w/v) benzalkonium chloride", "sodium chloride", "from about 0.001 % (w/v) to about 1 % (w/v) of disodium EDTA", "pH between about 2.0 and about 6.0", "potassium chloride", and/or "pH between about 3.0 and about 5.0", which are not disclosed or supported by the prior-filed Application No. 15/890,131. Thus, the priority date of claims 1-20 is 12/21/2018.

***Information Disclosure Statement***

The information disclosure statement (IDS) filed on 06/24/2019 has been considered.

***Claim Objections***

Claims 1-3, 5-11, 17, 19, and 20 are objected to because of the following informalities: In claim 1, change the incorrect recitation "comprising the intranasal administration of an aqueous nasal spray pharmaceutical formulation" (lines 1 to 2) to "comprising administering intranasally an aqueous nasal spray pharmaceutical formulation to the mammal in need thereof" to use action term and to identify patient population. In claim 2, change the recitation "type 1 hypersensitivity" (line 2) to "type-1 hypersensitivity" to be consistent with preceding claim; and replace the incorrect recitation "and food allergy" (line 4) with "or food allergy" to comply with the preceding phrase "chosen from". In claims 3, 5, 6, 19, and 20, change the incorrect recitation "a single dose" (line 2 of claims 3, 5, and 6; line 1 of claims 19 and 20), which has been recited in preceding claims, to "the single dose"; also in claim 3, replace the incorrect recitation "to a subject" (line 3) to "to the mammal". In claim 7, delete the excessive word

"optional" before the recitation "pH adjustment agents" (last line" because the claim has recited "optionally" (line 5) in the preceding clause. In claims 8-10, insert the missing phrase "the group consisting of" immediately after the recitation "selected from" (line 1 of claim 8; line 2 of claims 9 and 10) to comply with the Markush group format that ends with "and" before the last species. In claim 11, change the incorrect recitation "is in present in the formulation" (line 7) to "is present in the formulation". In claim 17, change the incorrect recitation "The method of claim 17" (line 1) to "The method of claim 7", because the claim cannot depend from itself. Appropriate correction is required.

***Claim Rejections - 35 USC § 112***

The following is a quotation of 35 U.S.C. 112(b):
(b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 4, 7-17, and 20 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention. Claim 20 depends from claim 4. Claims 8-10 and 12-17 depend from claim 7.

A broad range or limitation together with a narrow range or limitation that falls within the broad range or limitation (in the same claim) is considered indefinite, since the resulting claim does not clearly set forth the metes and bounds of the patent protection desired. See MPEP § 2173.05(c). Note the explanation given by the Board of Patent Appeals and Interferences in *Ex parte Wu*, 10 USPQ2d 2031, 2033 (Bd. Pat. App. & Inter. 1989), as to where broad language is followed by "such as" and then narrow

language. The Board stated that this can render a claim indefinite by raising a question or doubt as to whether the feature introduced by such language is (a) merely exemplary of the remainder of the claim, and therefore not required, or (b) a required feature of the claims. Note also, for example, the decisions of *Ex parte Steigewald*, 131 USPQ 74 (Bd. App. 1961); *Ex parte Hall*, 83 USPQ 38 (Bd. App. 1948); and *Ex parte Hasche*, 86 USPQ 481 (Bd. App. 1949). In the present instance, claims 4, 7 and 11 recite the broad recitation “the single dose of the aqueous nasal spray pharmaceutical formulation is delivered by a nasal spray device” (lines 2 to 3 of claim 4), “one or more absorption enhancement agents” (line 4 of claim 7; lines 7 to 8) or “a preservative” (line 6 of claim 7), and the claim also recites “about 100 µL of the aqueous nasal spray pharmaceutical formulation is delivered to the mammal in one actuation of the nasal spray device” (lines 4 to 5 of claim 4), “and a preservative” (which encompasses benzalkonium chloride, claims 7 and 11) and “and antioxidant” (claim 7), respectively, which is the narrower statement of the range/limitation. Applicant is advised to change the recitations “and about 100 µL of the aqueous nasal spray” (line 4 of claim 4), “one or more of the following:” (line 5 of claim 7), “and pH adjustment agents” (last line of claim 7), and “one or more absorption enhancement” (line 7 of claim 11) to “wherein about 100 µL of the aqueous nasal spray”, “one or more of other agents comprising the following:”, “or pH adjustment agents”, and “one or more other absorption enhancement”, respectively.

***Claim Rejections - 35 USC § 102***

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale or otherwise available to the public before the effective filing date of the claimed invention.

Claims 1-8, 12-14, 16, and 17 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by **Fleming** (US Patent Application Publication No. 2015/0005356, published on January 1, 2015, hereinafter referred to as Fleming ‘356).

With regard to structural limitations “A method comprising administering intranasally an aqueous nasal spray pharmaceutical formulation to a mammal in need of treatment of a type-1 hypersensitivity reaction (or anaphylaxis); wherein the aqueous nasal spray pharmaceutical formulation comprises between about 0.1 mg and about 2.4 mg (or between about 0.4 mg and about 2.4 mg; or between about 0.5 mg and about 1.5 mg; or between about 0.5 mg and about 0.7 mg) of epinephrine, or a salt thereof, in a single dose (or about 100 µL of the aqueous nasal spray pharmaceutical formulation is delivered to the mammal in one actuation of the nasal spray device)” (claims 1-6), “one or more absorption enhancement agents (or a fatty acid, polysorbate 20 (= Tween-20), polysorbate 80 (=Tween-80), and sodium lauryl sulfate), and optionally one or more of other agents comprising the following: an isotonicity agent (or sodium chloride); a stabilizing agent (or from about 0.001 % (w/v) to about 1 % (w/v) of disodium EDTA); an antioxidant; a preservative; and pH adjustment agents (or the pH adjustment agent is an acid; the formulation has a pH between about 2.0 and about 6.0)” (claims 7, 8, 12-14, 16, and 17):

**Fleming** ‘356 disclosed a method for treating anaphylaxis in an individual, comprising applying to the mucosa! surfaces of the nasal cavities of the individual a pharmaceutical composition comprising an antianaphylactic agent, the antianaphylactic agent in the composition is epinephrine, present in amounts ranging from 0.05 mg to 10 mg, preferably from 0.75 mg to 1.5 mg, in a single dose of epinephrine given intranasally. Table 3 shows customizable dosing for adults: Dosage is one spray, unless treatment failure or rebound anaphylaxis requires a second, to a maximum of four additional doses for refractory patient or rebound anaphylaxis (spray volume is targeted at 100 µL each spray):

| | Sprays total* | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| | Adult Body weight (Kg) | | | |
| | ≥30 | ≥60 | ≥90 | ≥120 |
| Epinephrine actual dose: | 0.3 mg | 0.6 | 0.9 | 1.2 |
| Optimal Dose: | 0.3 mg | na | na | na |

. Suitable nasal pump spray devices include for instance, the VP50, VP70 and VP100 models available from Valois S. A. and the 50, 70 and 100 µl nasal pump sprays available from Pfeiffer GmbH. The intranasal epinephrine composition further comprises one or more or combination of additional agents selected from the group of epinephrine potentiator, a mucosal permeation enhancer, an agent that reduces mucosa! transit time, an agent that increases mucosal absorption or adhesion or transport, surfactants, chelators, pharmaceutically acceptable excipients, non-sulfite stabilizers, preservatives, thickening agents, humectants, antihistamines, solubilizing agents, taste and smell masking agents, antioxidant enzymes, viscosity enhancing agents, dispersing agents, colorants, or any combination thereof (page 5/16, [0027]; page 4/16, [0017-0019]; page 12/16, [0090]; page 11/16, [0088]). Aqueous epinephrine formulation targets a highly concentrated solution of epinephrine, so that the effective dose is about 100 uL and includes the use of alternative salts of the active drugs, as well as specific nasal mucosal tight junction permeation agents, including chelators (such as EDTA), surface-active agents (such as Tween-20 or Tween-80). An acid (e.g., sulfuric acid) may be added to adjust the pH of the solution to between 3.0 to about 4.0, preferably at about 3.5. An osmotic adjusting agent may be added to adjust the isotonicity of the solution. Example tonicifying agents for the suspension nanoformulation of epinephrine includes pharmaceutically acceptable sugars and other polyols (such as, trehalose, mannitol, and sorbitol) and salts (such as, sodium chloride) (page 15/16, [0118 to 0120]). An aqueous composition comprised of the following components (per 1 mL volume): 0.5-100 mg epinephrine (preferably, 0.5mg, 1.5 mg, or 1.75 mg), 1 mg polysorbate 80, 2 mg methylcellulose, 0.08 mg entacapone, 0.5 mg phentolamine

hydrochloride, sodium chloride q.s. to provide osmolality in the range of 200 to 350 mOsm/kg, and hydrochloric acid q.s. to adjust pH to 3.5-5.0. The formulations additionally contain 1 mg DDPC, 1 mg EDTA (= 0.1 wt%) and 10 mg methyl-beta-cyclodextrin as nasal permeation enhancers (page 14/16, [0100 and 0103]). The nasal permeation or nasal penetration enhancers include bile salts, alkyl glycoside, lipids (preferred lipids are glycosylated sphingosines, alkylglucosides), surfactants, cyclodextrin, or chelators, or any combination thereof. The permeation enhancers also include ethylene-diamine tetra-acetic acid (EDTA) and fatty acid. The absorption agents including sodium lauryl sulfate, sodium salicylate, oleic acid, lecithin, dehydrated alcohol, Tween, Span, polysorbate 20, polysorbate 80, a chelator such as EDTA, and combinations thereof (page 7/16, [0042, 0043, 0045, and 0047]).

Thus, these teachings of Fleming '356 anticipate Applicant's claims 1-8, 12-14, 16, and 17. The method of Fleming '356 meets all structural limitation of claimed method and would achieve the same intended results, including "a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis", required by claim 3.

***Claim Rejections - 35 USC § 103***

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103 are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of the claims the examiner presumes that the subject matter of the various claims was commonly owned as of the effective filing date of the claimed invention(s) absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1 .56 to point out the inventor and effective filing dates of each claim that was not commonly owned as of the effective filing date of the later invention in order for the examiner to consider the applicability of 35 U.S.C. 102(b)(2)(C) for any potential 35 U.S.C. 102(a)(2) prior art against the later invention.

Claims 1-20 are rejected under 35 U.S.C. 103 as being unpatentable **Fleming** (US Patent Application Publication No. 2015/0005356, published on January 1, 2015, hereinafter referred to as Fleming '356) in view of **Levitt** (US Patent Application Publication No. 2010/0209357, published on August 19, 2010, hereinafter referred to as Levitt '357). Claims 1-8, 12-14, 16, and 17 are rejected here because they have been rejected by the primary reference under 102 above.

**Fleming** '356 disclosed a method for treating anaphylaxis in an individual, comprising applying to the mucosa! surfaces of the nasal cavities of the individual a pharmaceutical composition comprising an antianaphylactic agent, the antianaphylactic agent in the composition is epinephrine, present in amounts ranging from 0.05 mg to 10 mg, preferably from 0.75 mg to 1.5 mg, in a single dose of epinephrine given intranasally. Table 3 shows customizable dosing for adults: Dosage is one spray, unless treatment failure or rebound anaphylaxis requires a second, to a maximum of four additional

doses for refractory patient or rebound anaphylaxis (spray volume is targeted at 100 µL each spray):

| | Sprays total* | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| | Adult Body weight (Kg) | | | |
| | ≥30 | ≥60 | ≥90 | ≥120 |
| Epinephrine actual dose: | 0.3 mg | 0.6 | 0.9 | 1.2 |
| Optimal Dose: | 0.3 mg | na | na | na |

. Suitable nasal pump spray devices include for instance, the VP50, VP70 and VP100 models available from Valois S. A. and the 50, 70 and 100 µl nasal pump sprays available from Pfeiffer GmbH. The intranasal epinephrine composition further comprises one or more or combination of additional agents selected from the group of epinephrine potentiator, a mucosal permeation enhancer, an agent that reduces mucosa! transit time, an agent that increases mucosal absorption or adhesion or transport, surfactants, chelators, pharmaceutically acceptable excipients, non-sulfite stabilizers, preservatives, thickening agents, humectants, solubilizing agents, taste and smell masking agents, antioxidant enzymes, viscosity enhancing agents, dispersing agents, colorants, or any combination thereof (page 5/16, [0027]; page 4/16, [0017-0019]; page 12/16, [0090]; page 11/16, [0088]). Aqueous epinephrine formulation targets a highly concentrated solution of epinephrine, so that the effective dose is about 100 uL and includes the use of alternative salts of the active drugs, as well as specific nasal mucosal tight junction permeation agents, including chelators (such as EDTA), surface-active agents (such as Tween-20 or Tween-80). An acid (e.g., sulfuric acid) may be added to adjust the pH of the solution to between 3.0 to about 4.0, preferably at about 3.5. An osmotic adjusting agent may be added to adjust the isotonicity of the solution. Example tonicifying agents for the suspension nanoformulation of epinephrine includes pharmaceutically acceptable sugars and other polyols (such as, trehalose, mannitol, and sorbitol) and salts (such as, sodium chloride) (page 15/16, [0118 to 0120]). An aqueous composition comprised of the following components (per 1 mL volume): 0.5-100 mg epinephrine (preferably, 0.5mg, 1.5 mg, or 1.75

mg), 1 mg polysorbate 80, 2 mg methylcellulose, 0.08 mg entacapone, 0.5 mg phentolamine hydrochloride, sodium chloride q.s. to provide osmolality in the range of 200 to 350 mOsm/kg, and hydrochloric acid q.s. to adjust pH to 3.5-5.0. The formulations additionally contain 1 mg DDPC, 1 mg EDTA (= 0.1 wt%) and 10 mg methyl-beta-cyclodextrin as nasal permeation enhancers (page 14/16, [0100 and 0103]). The nasal permeation or nasal penetration enhancers include bile salts, alkyl glycoside, lipids (preferred lipids are glycosylated sphingosines, alkylglucosides), surfactants, cyclodextrin, or chelators, or any combination thereof. The permeation enhancers also include ethylene-diamine tetra-acetic acid (EDTA) and fatty acid. The absorption agents including sodium lauryl sulfate, sodium salicylate, oleic acid, lecithin, dehydrated alcohol, Tween, Span, polysorbate 20, polysorbate 80, a chelator such as EDTA, and combinations thereof. Agents for taste masking include glycerin (up to 2.5% in a marketed nasal solution), dextrose (5% in a marketed metered nasal spray), and phenethyl alcohol (up to 0.25% in a marketed metered nasal spray, also could serve as a preservative for multi-use) (page 7/16, [0042, 0043, 0045, and 0047]; page 8/16, [0054]). A process for making a nonsterile nasal solution with preservatives comprises one or more of the following steps: (1) adding at least a therapeutically effective pediatric or, alternatively adult, amount of epinephrine in a vehicle, such as water; (2) adding stabilizers such as benzalkonium chloride (BAC), and either sodium metabisulfite or ascorbic acids, in sufficient concentrations to achieve a 12-24 month shelf life or more (page 11/16, [0085]).

Fleming '356 did not explicitly disclose (a) dodecyl maltoside and/or benzalkonium chloride (or about 0.005% (w/v) to about 0.08% (w/v) benzalkonium chloride), required by claims 9, 11, 15, and 18-20, and (b) about 0.005% (w/v) to about 2.5% (w/v) dodecyl maltoside; about 0.001 (w/v) to about 1 % (w/v) benzalkonium chloride; and/or about 0.001 (w/v) to about 1 % (w/v) oleic acid, or salt thereof, required by claim 10.

**Levitt** '357 disclosed to a pharmaceutical composition suitable for direct administration to the lower airways, comprising a therapeutically effective amount of at least one proinflammatory cytokine inhibitor, at least one-second active ingredient, and at least one pharmaceutically acceptable carrier. Examples of proinflammatory cytokine inhibitors useful in treating, managing, or ameliorating lower airways inflammation, include adrenergic stimulants, e.g., epinephrine. Other compounds may be used in a particular composition such as a surfactant and preservative. A composition comprises active ingredient in the form of a solution that may contain a stabilizing compound(s) and/or a preservative(s). Surfactants are added to improve delivery and/or stability of the composition. Nonionic surfactant agents include: n-Dodecyl α-D-maltoside; n-Dodecyl ß-D-maltoside. Suitable surfactants also include soya lecithin and oleic acid. Surfactant can reduce or prevent surface-induced aggregation of the inhibitor caused by atomization of the solution in forming an aerosol. Amounts will generally range between 0.001 and 4% by weight of the formulation (page 5/35, [0034]; page 26/35, [0217]; page 12/35, [0105 to 0106]; page 18/35, [0141]; page 11/35, [0095]). Nonlimiting examples of preservatives include parabens, such as benzalkonium chloride. Examples of the pharmaceutically acceptable carrier include liquids such as saline, Ringer's solution and dextrose solution. The pH of the solution is preferably from about 5 to about 8. Examples of routes of administration within the lower airways include oral or nasal inhalation (e.g., inhalation of sufficiently small particles to be deposited expressly within the lower airways) in a single unit dosage form for administration to a mammalian subject (page 13/35, [0112 to 0113]; page 12/35, [0100]; page 11/35, [0092]). Pharmaceutically inert vehicles and/or excipients include, e.g., buffering agents such as boric acid or borates, pH adjusting agents to obtain optimal stability or solubility of the active compound, lactose as a carrier, tonicity adjusting agents such as sodium chloride or borates (page 20/35, [0153]).

Thus, it would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was filed to substitute the generic alkylglycoside (or alkylglucoside) and generic

stabilizer/preservative as taught by Fleming '356 with specific Dodecyl α-D-maltoside (or Dodecyl ß-D-maltoside) and benzalkonium chloride, respectively, in view of Levitt '357; and to optimize the amounts (w/v) of dodecyl maltoside, benzalkonium chloride, and oleic acid. One would have been motivated to do so because (a) Fleming '356 teaches that the nasal permeation or nasal penetration enhancers include alkyl glycoside, lipids (preferred lipids are alkylglucosides), surfactants, or any combination thereof. Stabilizers such as benzalkonium chloride (BAC) are added in sufficient concentrations to achieve a 12-24 month shelf life or more. Phenethyl alcohol (up to 0.25% in a marketed metered nasal spray, also could serve as a preservative for multi-use, and (b) Levitt '357 teaches that a nasal composition comprises active ingredient in the form of a solution that may contain a stabilizing compound(s) and/or a preservative(s). Surfactants are added to improve delivery and/or stability of the composition. Nonionic surfactant agents include: n-Dodecyl α-D-maltoside; n-Dodecyl ß-D-maltoside; and oleic acid. Nonlimiting examples of preservatives include benzalkonium chloride. Amounts generally range between 0.001 and 4% by weight of the formulation, described above. Thus, one of skill in the art would have a reasonable expectation that by substituting the generic alkylglycoside (or alkylglucoside) and generic stabilizer/preservative as taught by Fleming '356 with specific Dodecyl α-D-maltoside (or Dodecyl ß-D-maltoside) and benzalkonium chloride, respectively, in view of Levitt '357; and by optimizing the amounts (w/v) of dodecyl maltoside, benzalkonium chloride, and oleic acid, one would achieve Applicant's claims 1-20. "Exemplary rationales that may support a conclusion of obviousness include: (B) Simple substitution of one known element for another to obtain predictable results". See MPEP § 2143 [R-08.2017] [I]. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955). See MPEP § 2144.05 [R-08.2017] [II.A].

## ***Conclusion***

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to YIH-HORNG SHIAO whose telephone number is (571)272-7135. The examiner can normally be reached on Mon-Thur, 08:30 am to 07:00 pm EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Shaojia (Anna) Jiang can be reached on 571-272-0627. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/YIH-HORNG SHIAO/
Primary Examiner, Art Unit 1623