# Exhibit I

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/049,936 | 10/26/2022 | Richard LOWENTHAL | 55358-701.306 | 2657 |

21971 7590 01/25/2023
WILSON SONSINI GOODRICH & ROSATI
650 PAGE MILL ROAD
PALO ALTO, CA 94304-1050

| EXAMINER | |
|---|---|
| SHIAO, YIH-HORNG | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1623 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 01/25/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

patentdocket@wsgr.com

| *Office Action Summary* | Application No.<br>18/049,936 | Applicant(s)<br>LOWENTHAL et al. | |
|---|---|---|---|
| | **Examiner**<br>YIH-HORNG SHIAO | **Art Unit**<br>1623 | **AIA (FITF) Status**<br>Yes |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 10/26/2022.
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL.** 2b) ☑ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) 1-30 is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) 1-30 is/are rejected.

8) ☑ Claim(s) 1,5,16,19,22,25 and 29 is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined allowable, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☑ The drawing(s) filed on 10/26/2022 is/are: a)☑ accepted or b)☐ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
a)☐ All b)☐ Some** c)☐ None of the:
1.☐ Certified copies of the priority documents have been received.
2.☐ Certified copies of the priority documents have been received in Application No. _____.
3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
Paper No(s)/Mail Date 10/27/2022.

3) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date _____.

4) ☐ Other: _____.

**DETAILED ACTION**

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA. Claims 1-30 are pending and are currently under examination.

***Priority***

This application is a CON of 17/396,044 filed on 08/06/2021, which is a CON of 16/869,461 filed on 05/07/2020, now PAT 11191838, which is a CON of 16/420,044 filed on 05/22/2019, now PAT 10682414, which is a CON of PCT/US2019/016918 filed on 02/06/2019, which claims benefit of Provisional 62/784,057 filed on 12/21/2018.

Applicant's claim for the benefit of a prior-filed application under 35 U.S.C. 119(e) or under 35 U.S.C. 120, 121, 365(c), or 386(c) is acknowledged. Applicant has not complied with one or more conditions for receiving the benefit of an earlier filing date under 35 U.S.C. 119(e) as follows:

The later-filed application must be an application for a patent for an invention which is also disclosed in the prior application (the parent or original nonprovisional application or provisional application). The disclosure of the invention in the parent application and in the later-filed application must be sufficient to comply with the requirements of 35 U.S.C. 112(a) or the first paragraph of pre-AIA 35 U.S.C. 112, except for the best mode requirement. See *Transco Products, Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 32 USPQ2d 1077 (Fed. Cir. 1994)

The disclosure of the prior-filed application, Application No. 62/784,057, fails to provide adequate support or enablement in the manner provided by 35 U.S.C. 112(a) or pre-AIA 35 U.S.C. 112, first paragraph for one or more claims of this application. Claims 10-14 and 16-30 recite "fatty acids", "alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate… isoascorbic acid", "sodium bicarbonate… sodium carbonate", which are not disclosed or supported by the prior-filed Application No. 62/784,057. Thus, the priority date of claims 10-14 and 16-30 is 02/06/2019.

### *Information Disclosure Statement*

The information disclosure statement (IDS) filed on 10/27/2022 has been considered.

### *Claim Objections*

Claims 1, 5, 16, 19, 22, 25, and 29 are objected to because of the following informalities: In claims 1, 16, and 22, change the incorrect recitation "with a type-1" (lines 2 to 3 of claims 1, 16, and 22) to "with the type-1" because the preamble has recited "a type-1"; also in claim 1, insert the missing word "about" immediately before the recitation "2.4 mg" (line 5 of claim 1) because the "2.4 mg" is not disclosed in the specification or prior parent applications and cannot encompass the "about 2.4 mg" in dependent claim 6; and also in claim 16, delete the excessive recitation "comprises" immediately before the recitation "about 0.5 mg" (line 5 of claim 16). In claim 5, change the incorrect recitation "nausea and vomiting" (line 5) to "nausea or vomiting". In claims 19 and 25, delete the incorrect recitation "further" (line 1of claims 19 and 25) because EDTA or benzalkonium chloride is encompassed by the generic "surfactants" recited in independent claims 16 and 22. In claim 29, delete the excessive recitation "about" immediately before the recitation "about 50 µl" (line 2). Appropriate correction is required.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112(b):

(b) CONCLUSION.—The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claim 2 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor (or for applications subject to pre-AIA 35 U.S.C. 112, the applicant), regards as the invention.

Claim 2 recites "comprise: generalized hives, pruritis… myocardial infarction, dysrhythmia, cardiac arrest, tachycardia, bradycardia… combinations thereof", which is confusing because there is no symptom combining all listed symptoms. Applicant is advised to insert the phrase "at least one of" immediately before the recitation "generalized hives" (line 2); to insert the conjunction "and" immediately after the recitation "bradycardia," (line 4); and to delete the recitation ", or combinations thereof" (line 5).

***Claim Rejections - 35 USC § 102***

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (a)(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention.

Claims 1-8, 10-27, 29, and 30 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by **Potta et al.** (US 2018/0289617, published on October 11, 2018, hereinafter referred to as Potta '617, also listed in IDS filed on 10/27/2022).

With regard to structural limitations "a method comprising an intranasal administration of a nasal spray pharmaceutical formulation to a human with a type-1 hypersensitivity reaction (or swelling of the tongue or throat, bradycardia, anaphylaxis, allergic rhinitis, drug allergy or food allergy; or generalized itching, nasal congestion, difficulty breathing, or nasal flaring), wherein a single intranasally

administered dose of the nasal spray pharmaceutical formulation comprises a) between 0.1 mg and about 2.4 mg (or about 0.8 mg, about 0.9 mg, about 1.0 mg, or about 2.4 mg; or between about 0.4 mg and about 2.4 mg; the "about" is defined as "encompass the recited value plus or minus 20%" in the specification) of epinephrine as the only pharmaceutically active ingredient; b) one or more other agents as excipients selected from the group consisting of: absorption enhancement agents (or fatty acids, alcohols, polysorbate 80, oleic acid, salt of oleic acid, sodium lauryl sulfate, sodium glycocholate, or sodium taurocholate), isotonicity agents (or dextrose, glycerin, mannitol, or sodium chloride), stabilizing agents (or ethylenediaminetetraacetic acid (EDTA)), antioxidants (or alpha tocopherol, ascorbic acid, butylated hydroxyanisole (BHA), citric acid monohydrate, sodium bisulfite, sodium metabisulfite, or sodium sulfite), preservatives (or benzalkonium chloride), and pH adjustment agents (or hydrochloric acid, citric acid, lactic acid, sodium hydroxide, sodium citrate, sodium bicarbonate, or sodium carbonate); and c) water; has a pH between about 3.0 and about 5.0; and the volume is between 25 µL and 250 µL (or about 100, 125, 175, or 200 µl; the "about" is defined as "encompass the recited value plus or minus 20%" in the specification) (claims 1-8, 10-27, 29, and 30):

**Potta** '617 disclosed a method of treating anaphylaxis comprising administering to a subject in need thereof an epinephrine spray formulation, preferably administration occurs via the intranasal route or sublingual route and wherein, optionally, the subject is suffering from seasonal allergies. Epinephrine decreased swelling of the tongue and throat and increased heart rate preventing or reversing cardiovascular collapse. The term "subject" refers, but is not limited to, a person that is experiencing type I allergies including anaphylaxis. The term "allergen" refers to, but not limited to, chemicals found in drugs, food, or plants. The term "seasonal allergies" refers to an allergic rhinitis. Seasonal allergies symptoms include itchy, watery eyes, sneezing, runny or stuffy nose, swollen nasal turbinates, itchy sinuses, throat or ear canals, ear congestion, postnasal drainage, nasal congestion (swollen nasal turbinates). The method of treating anaphylaxis comprises administering via an

assembled device an epinephrine formulation comprising from about 0.1 % w/w to about 15% w/w epinephrine or a salt thereof. In another preferred embodiment, the assembled device is a unit-dose device that delivers about 200 µL or about 100 µL of the pharmaceutical formulation upon a single actuation. Table 1 exemplified the epinephrine spray formulations:

Epinephrine Formulations

| % w/w | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | #11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Epinephrine base | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 7.5 | 1 | 3.0 | 3.0 | 3.0 | 3.0 |
| HCl (0.5N) | 10.66 | 10.66 | 10.66 | 10.66 | 10.66 | — | 11.35 | — | 32.6 | 32.6 | 32.6 |
| EDTA | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | — | — | — | 0.05 | 0.05 | 0.05 |
| Sodium metabisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | 0.25 | 0.025 | 0.04 | — | — | — |
| sodium bisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | — | 0.025 | | 0.05 | 0.2 | 0.2 |
| Propylene Glycol | — | — | — | — | — | — | — | — | — | — | 5 |
| Menthol | — | — | — | — | — | — | — | — | — | — | 5 |
| Chlorobutanol | — | — | — | — | — | — | — | — | — | 0.5 | — |
| Sucralose | — | — | — | — | — | — | — | — | — | 0.5 | 0.5 |
| 8-Hydroxyquinoline | — | — | — | — | 0.02 | — | — | — | — | — | — |
| Ethanol | — | — | — | — | — | 15 | | — | — | — | 50 |
| Malic Acid | — | — | — | — | — | 2.0 | — | 1.65 | — | — | — |
| Water | 88.27 | 88.26 | 88.25 | 88.24 | 88.22 | 79.75 | 87.6 | 95.31 | 64.3 | 63.15 | 4.15 |
| | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| pH adjusted with NaOH | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 |

.

All numerical values that are defined as "about" each particular value is plus or minus 10% (pages 4/27 to 10/27, [0056, 0003, 0069-0072, 0233, 0237, 0242, and 0065]). In another aspect, the epinephrine spray formulations further comprise a permeation enhancer comprising caprylic acid, menthol, limonene, carvone, methyl chitosan, polysorbates (including polysorbate 80), sodium lauryl sulfate, glyceryl oleate, caproic acid, enanthic acid, pelargonic acid, capric acid, undecylenic acid, lauric acid, myristic acid, palmitic acid, oleic acid, stearic acid, linolenic acid, arachidonic acid, benzethonium chloride, benzethonium bromide, benzalkonium chloride (BKC), cetylpyridium chloride, edetate disodium dihydrate (EDTA), sodium desoxycholate, sodium deoxyglycolate, sodium glycocholate, sodium caprate, sodium taurocholate, sodium hydroxybenzoyal amino caprylate, dodecyl dimethyl aminopropionate, L-lysine, glycerol oleate, glyceryl monostearate, citric acid, peppermint oil and a

combination thereof; an isotonicity agent comprising sodium chloride; a stabilizer selected from the group consisting of butylated hydroxyanisole (BHA), butylatedhydroxytoluene (BHT), ascorbic acid, methionine, sodium ascorbate, sodium thiosulfate, sodium bisulfite, sodium metabisulfite, ascorbyl palmitate, thioglycerol, alpha tocopherol (vitamin E), cysteine hydrochloride, benzalkonium chloride ("BKC"), citric acid, ethylenediaminetetraacetic acid (EDTA), sodium citrate, propyl gallate, 8-hydroxyquinoline, boric acid, histidine or combinations thereof, preferably the stabilizer comprises EDTA; a preservative, preferably, benzalkonium chloride (BKC); and sweeteners including sucralose, sucrose, aspartame, saccharin, dextrose, mannitol, glycerin, xylitol or combinations thereof. In a more preferred embodiment the formulations are at a pH from about 3.0 to about 5.0 (pages 4/27 to 7/27, [0019, 0020, 0022-0024, 0086, 0088, and 0090]).

Thus, these teachings of Potta '617 anticipate Applicant's claims 1-8, 10-27, 29, and 30 because the claimed "about 0.8 mg", "about 0.9 mg", "about 1.0 mg", or "about 2.4 mg", equivalent to 0.8 ± 0.16, 0.9 ± 0.18, 1 ± 0.2, and 2.4 ± 0.48 mg, respectively, according to the definition of "about" in the specification, encompasses 1.0, 1.0 ± 0.1, and 2.7 (= 3.0 - 0.3) of Potta '617. The method of Potta '617 meets all structural limitation of claimed method and would achieve the same intended results, including "a plasma epinephrine concentration in the human that is efficacious for the elimination (or the prevention of the further progression) of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction", required by claims 1, 16, and 22.

***Claim Rejections - 35 USC § 103***

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the

claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966), that are applied for establishing a background for determining obviousness under 35 U.S.C. 103 are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

This application currently names joint inventors. In considering patentability of the claims the examiner presumes that the subject matter of the various claims was commonly owned as of the effective filing date of the claimed invention(s) absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1 .56 to point out the inventor and effective filing dates of each claim that was not commonly owned as of the effective filing date of the later invention in order for the examiner to consider the applicability of 35 U.S.C. 102(b)(2)(C) for any potential 35 U.S.C. 102(a)(2) prior art against the later invention.

Claims 1-30 are rejected under 35 U.S.C. 103 as being unpatentable over **Potta et al.** (US 2018/0289617, published on October 11, 2018, hereinafter referred to as Potta '617, also listed in IDS filed on 10/27/2022). Claims 1-8, 10-27, 29, and 30 are rejected here because they have been rejected by the primary reference under 102 above.

**Potta** '617 disclosed a method of treating anaphylaxis comprising administering to a subject in need thereof an epinephrine spray formulation, preferably administration occurs via the intranasal route or sublingual route and wherein, optionally, the subject is suffering from seasonal allergies.

Epinephrine decreased swelling of the tongue and throat and increased heart rate preventing or reversing cardiovascular collapse. The term "subject" refers, but is not limited to, a person that is experiencing type I allergies including anaphylaxis. The term "allergen" refers to, but not limited to, chemicals found in drugs, food, or plants. The term "seasonal allergies" refers to an allergic rhinitis. Seasonal allergies symptoms include itchy, watery eyes, sneezing, runny or stuffy nose, swollen nasal turbinates, itchy sinuses, throat or ear canals, ear congestion, postnasal drainage, nasal congestion (swollen nasal turbinates). The method of treating anaphylaxis comprises administering via an assembled device an epinephrine formulation comprising from about 0.1 % w/w to about 15% w/w epinephrine or a salt thereof. In another preferred embodiment, the assembled device is a unit-dose device that delivers about 200 µL or about 100 µL of the pharmaceutical formulation upon a single actuation. Table 1 exemplified the epinephrine spray formulations:

Epinephrine Formulations

| % w/w | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | #11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Epinephrine base | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 7.5 | 1 | 3.0 | 3.0 | 3.0 | 3.0 |
| HCl (0.5N) | 10.66 | 10.66 | 10.66 | 10.66 | 10.66 | — | 11.35 | — | 32.6 | 32.6 | 32.6 |
| EDTA | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | — | — | — | 0.05 | 0.05 | 0.05 |
| Sodium metabisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | 0.25 | 0.025 | 0.04 | — | — | — |
| sodium bisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | — | 0.025 | | 0.05 | 0.2 | 0.2 |
| Propylene Glycol | — | — | — | — | — | — | — | — | — | — | 5 |
| Menthol | — | — | — | — | — | — | — | — | — | — | 5 |
| Chlorobutanol | — | — | — | — | — | — | — | — | — | 0.5 | — |
| Sucralose | — | — | — | — | — | — | — | — | — | 0.5 | 0.5 |
| 8-Hydroxyquinoline | — | — | — | — | 0.02 | — | — | — | — | — | — |
| Ethanol | — | — | — | — | — | 15 | | — | — | — | 50 |
| Malic Acid | — | — | — | — | — | 2.0 | — | 1.65 | — | — | — |
| Water | 88.27 | 88.26 | 88.25 | 88.24 | 88.22 | 79.75 | 87.6 | 95.31 | 64.3 | 63.15 | 4.15 |
| | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| pH adjusted with NaOH | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 |

All numerical values that are defined as "about" each particular value is plus or minus 10% (pages 4/27 to 10/27, [0056, 0003, 0069-0072, 0233, 0237, 0242, and 0065]). In another aspect, the epinephrine spray formulations further comprise a permeation enhancer comprising caprylic acid, menthol,

limonene, carvone, methyl chitosan, polysorbates (including polysorbate 80), sodium lauryl sulfate, glyceryl oleate, caproic acid, enanthic acid, pelargonic acid, capric acid, undecylenic acid, lauric acid, myristic acid, palmitic acid, oleic acid, stearic acid, linolenic acid, arachidonic acid, benzethonium chloride, benzethonium bromide, benzalkonium chloride (BKC), cetylpyridium chloride, edetate disodium dihydrate (EDTA), sodium desoxycholate, sodium deoxyglycolate, sodium glycocholate, sodium caprate, sodium taurocholate, sodium hydroxybenzoyal amino caprylate, dodecyl dimethyl aminopropionate, L-lysine, glycerol oleate, glyceryl monostearate, citric acid, peppermint oil and a combination thereof; an isotonicity agent comprising sodium chloride; a stabilizer selected from the group consisting of butylated hydroxyanisole (BHA), butylatedhydroxytoluene (BHT), ascorbic acid, methionine, sodium ascorbate, sodium thiosulfate, sodium bisulfite, sodium metabisulfite, ascorbyl palmitate, thioglycerol, alpha tocopherol (vitamin E), cysteine hydrochloride, benzalkonium chloride ("BKC"), citric acid, ethylenediaminetetraacetic acid (EDTA), sodium citrate, propyl gallate, 8-hydroxyquinoline, boric acid, histidine or combinations thereof, preferably the stabilizer comprises EDTA; a preservative, preferably, benzalkonium chloride (BKC); and sweeteners including sucralose, sucrose, aspartame, saccharin, dextrose, mannitol, glycerin, xylitol or combinations thereof. In a more preferred embodiment the formulations are at a pH from about 3.0 to about 5.0 (pages 4/27 to 7/27, [0019, 0020, 0022-0024, 0086, 0088, and 0090]).

Potta ‘617 did not explicitly disclose the limitation “about 2.0 mg of epinephrine”, required by claims 9 and 28. However, it would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was filed to select 2.0 mg epinephrine as taught by Potta ‘617, who also teaches an epinephrine formulation comprising from about 0.1 % w/w to about 15% w/w epinephrine, including 1.0 mg, 3.0 mg, and 7.5 mg, above. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955). See MPEP § 2144.05 [R-10.2019] [II.A].

***Double Patenting***

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal

Disclaimer that meets all requirements is auto-processed and approved immediately upon submission.

For more information about eTerminal Disclaimers, refer to

www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

(I) Claims 1-30 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-8, 12, 13, 15, 17, 18, and 20 of U.S. Patent No. **10,682,414** (Lowenthal et al., published on June 16, 2020, also listed in IDS filed on 10/27/2022). Although the claims at issue are not identical, they are not patentably distinct from each other because **Patent '414** claims "A method of treatment of a type-1 hypersensitivity reaction (or chosen from allergic asthma, allergic conjunctivitis, allergic rhinitis, anaphylaxis, angioedema, urticaria, eosinophilia, drug allergy or food allergy) in a mammal comprising administering intranasally to the mammal in need thereof an aqueous nasal spray (or about 100 µl) pharmaceutical formulation; wherein the aqueous nasal spray pharmaceutical formulation comprises: an anaphylaxis active ingredient, wherein the anaphylaxis active ingredient consists of between about 0.1 mg and about 2.4 mg (or between about 0.4 mg and about 2.4 mg; between about 0.5 mg and about 1.5 mg; about 1.0 mg; between about 0.4 mg and about 2.0 mg) of epinephrine (or providing a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis), or a salt thereof in a single dose (or pH adjustment agents to adjust the pH of the aqueous nasal spray pharmaceutical formulation to a pH between about 3.0 and about 5.0)" (claims 1-6 and 20); and "the anaphylaxis active ingredient consisting of between about 0.5 mg and about 1.5 mg of epinephrine, or a salt thereof; one or more absorption enhancement agents; and optionally one or more of other agents comprising the following: an isotonicity agent; a stabilizing agent; an antioxidant; a preservative; or pH adjustment agents" (claim 7), reading on claims 1-9, 14-16, 22, and 26-30 of this Application. Claims 8/12, 13/15, 17, and 18 of Patent '414 also read on claims 10/11/17/23, 12/19/25, 13/20/21, and 16/18/22/24 of this Application, respectively. Furthermore, Patent '414 explicitly

disclosed that the nasal spray formulation further comprises synergists with the antioxidants selected from citric acid monohydrate, tartaric acid, thymol, tocopherol (alpha tocopherol), tocopherasol, vitamin E and vitamin E polyethylene glycol succinate and a combination thereof (col. 8, lines 15-19), reading on claims 10, 11, 18, and 24 of this Application. Thus, claims 1-30 of this Application encompass or overlap with claims 1-8, 12, 13, 15, 17, 18, and 20 of Patent '414.

(II) Claims 1-30 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1, 2, 10, and 18 of U.S. Patent No. **11,191,838** (Lowenthal et al., published on December 7, 2021, also listed in IDS filed on 10/27/2022). Although the claims at issue are not identical, they are not patentably distinct from each other because **Patent '838** claims "A method of treatment of a type-1 hypersensitivity reaction (or chosen from allergic asthma, allergic conjunctivitis, allergic rhinitis, anaphylaxis, angioedema, urticaria, eosinophilia, drug allergy or food allergy) in a mammal comprising an intranasal administration of between about 25 μL and about 250 μL of a liquid nasal spray pharmaceutical formulation to the mammal in need thereof; wherein the liquid nasal spray pharmaceutical formulation consists of: between 0.1 mg and about 2.4 mg (or about 0.5 mg, about 0.6 mg, about 0.7 mg, about 0.8 mg, about 0.9 mg, about 1.0 mg, about 1.1 mg, about 1.2 mg, about 1.3 mg, about 1.4 mg, about 1.5 mg, about 1.6 mg, about 1.7 mg, about 1.8 mg, 15 about 1.9 mg, about 2.0 mg, about 2.1 mg, about 2.2 mg, about 2.3 mg, or about 2.4 mg) of epinephrine, or a salt thereof; an alkylglycoside; and optionally one or more of other agents as excipients selected from the group consisting of: isotonicity agents; stabilizing agents; antioxidants; preservatives; and pH adjustment agents" (claims 1, 2, and 10), and "A nasal spray pharmaceutical formulation consisting of: about 0.5 mg, about 1.0 mg, or about 2.0 mg of epinephrine; dodecyl maltoside; water; benzalkonium chloride; ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof and optionally one or more of other agents selected from the group consisting of: (a) dextrose, glycerin, mannitol, potassium chloride,

sodium chloride, or a combination thereof; (b) alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid, isoascorbic acid, butylated hydroxyanisole (BHA), citric acid monohydrate, potassium metabisulfite, sodium bisulfite, sodium metabisulfite, sodium sulfite, or a combination thereof; and (c) hydrochloric acid, sodium hydroxide, or a combination thereof, in a sufficient amount to adjust the pH of the nasal spray pharmaceutical formulation to a pH between about 2.0 and 6.0; wherein the total volume of the nasal spray pharmaceutical formulation is between about 50 µL and about 250 µL" (claim 18), reading on claims 1-30 of this Application, respectively. Thus, claims 1-30 of this Application encompass or overlap with claims 1, 2, 10, and 18 of Patent '838. The method of Patent '838 meets all structural limitation of claimed method and would achieve the same intended results, including "a plasma epinephrine concentration in the human that is efficacious for the elimination (or the prevention of the further progression) of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction", required by claims 1, 16, and 22.

(III) Claims 1-30 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 21, 22, 25-30, 35-37, 39, and 42 of copending Application No. **17/396,044** (Lowenthal et al., claim set of 12/27/2021) in view of **Potta et al.** (US 2018/0289617, published on October 11, 2018, hereinafter referred to as Potta '617, also listed in IDS filed on 10/27/2022). Although the claims at issue are not identical, they are not patentably distinct from each other because **Appl '044** claims "A method of treatment of a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a pharmaceutical formulation to the human with a type-1 hypersensitivity reaction (or chosen from allergic asthma, allergic conjunctivitis, allergic rhinitis, anaphylaxis, angioedema, urticaria, eosinophilia, drug allergy or food allergy; or anaphylaxis selected from hives, generalized itching, nasal congestion, wheezing, difficulty breathing, cough… nasal flaring, or intercostal retractions); wherein the pharmaceutical formulation comprises between about 0.1 mg and

about 2.4 mg (or about 0.3 mg, about 0.5 mg, about 1.0 mg, or about 2.0 mg) of epinephrine, or a salt thereof, in a single administered dose (or about 25 µL, about 50 µL, about 75 µL, about 100 µL, about 125 µL, about 150 µL, about 175 µL, about 200 µL, or about 250 µL); wherein the pharmaceutical formulation does not comprise a degradative enzyme inhibitory agent; and wherein the pharmaceutical formulation does not comprise a vasodilator agent" (claims 21, 22, 25-27, 37, 39, and 42), and "further comprises one or more of other agents as excipients selected from the group consisting of: absorption enhancement agents (or surfactants, fatty acids, bile salts, cyclodextrins, phospholipids, or alcohols; or alkylglycosides, polysorbate 20, polysorbate 80, oleic acid, salt of oleic acid, sodium lauryl sulfate, sodium glycocholate, sodium taurocholate, or sodium taurodihydrofusidate), isotonicity agents (or dextrose, glycerin, mannitol, potassium chloride, or sodium chloride), stabilizing agents, antioxidants (or alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid… sodium metabisulfite, or sodium sulfite), preservatives, and pH adjustment agents" (claims 28-30, 35, and 36), reading on claims 1-11, 14-18, 22-24, and 26-30.

Appl '044 did not explicitly claim "the nasal spray pharmaceutical formulation has a pH between about 3.0 and about 5.0", "ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof", "benzalkonium chloride", "pH adjustment agents are selected from the group consisting of adipic acid, ammonium chloride, citric acid, acetic acid, hydrochloric acid, lactic acid, phosphoric acid, propionic acid, sulfuric acid, tartaric acid, sodium hydroxide, sodium citrate, sodium bicarbonate, and sodium carbonate", required by claims 1, 12, 13, 16, 19-22, and 25.

**Potta** '617 disclosed a method of treating anaphylaxis comprising administering to a subject in need thereof an epinephrine spray formulation, preferably administration occurs via the intranasal route or sublingual route and wherein, optionally, the subject is suffering from seasonal allergies. Epinephrine decreased swelling of the tongue and throat and increased heart rate preventing or reversing cardiovascular collapse. The term "subject" refers, but is not limited to, a person that is

experiencing type I allergies including anaphylaxis. The term "allergen" refers to, but not limited to, chemicals found in drugs, food, or plants. The term "seasonal allergies" refers to an allergic rhinitis. Seasonal allergies symptoms include itchy, watery eyes, sneezing, runny or stuffy nose, swollen nasal turbinates, itchy sinuses, throat or ear canals, ear congestion, postnasal drainage, nasal congestion (swollen nasal turbinates). The method of treating anaphylaxis comprises administering via an assembled device an epinephrine formulation comprising from about 0.1 % w/w to about 15% w/w epinephrine or a salt thereof. In another preferred embodiment, the assembled device is a unit-dose device that delivers about 200 µL or about 100 µL of the pharmaceutical formulation upon a single actuation. Table 1 exemplified the epinephrine spray formulations:

Epinephrine Formulations

| % w/w | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | #11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Epinephrine base | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 7.5 | 1 | 3.0 | 3.0 | 3.0 | 3.0 |
| HCl (0.5N) | 10.66 | 10.66 | 10.66 | 10.66 | 10.66 | — | 11.35 | — | 32.6 | 32.6 | 32.6 |
| EDTA | 0.05 | 0.05 | 0.05 | 0.05 | 0.05 | — | — | — | 0.05 | 0.05 | 0.05 |
| Sodium metabisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | 0.25 | 0.025 | 0.04 | — | — | — |
| sodium bisulfite | 0.01 | 0.015 | 0.02 | 0.025 | 0.025 | — | 0.025 | | 0.05 | 0.2 | 0.2 |
| Propylene Glycol | — | — | — | — | — | — | — | — | — | — | 5 |
| Menthol | — | — | — | — | — | — | — | — | — | — | 5 |
| Chlorobutanol | — | — | — | — | — | — | — | — | — | 0.5 | — |
| Sucralose | — | — | — | — | — | — | — | — | — | 0.5 | 0.5 |
| 8-Hydroxyquinoline | — | — | — | — | 0.02 | — | — | — | — | — | — |
| Ethanol | — | — | — | — | — | 15 | | — | — | — | 50 |
| Malic Acid | — | — | — | — | — | 2.0 | — | 1.65 | — | — | — |
| Water | 88.27 | 88.26 | 88.25 | 88.24 | 88.22 | 79.75 | 87.6 | 95.31 | 64.3 | 63.15 | 4.15 |
| | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| pH adjusted with NaOH | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 | pH 4.5 |

All numerical values that are defined as "about" each particular value is plus or minus 10% (pages 4/27 to 10/27, [0056, 0003, 0069-0072, 0233, 0237, 0242, and 0065]). In another aspect, the epinephrine spray formulations further comprise a permeation enhancer comprising caprylic acid, menthol, limonene, carvone, methyl chitosan, polysorbates (including polysorbate 80), sodium lauryl sulfate, glyceryl oleate, caproic acid, enanthic acid, pelargonic acid, capric acid, undecylenic acid, lauric acid,

myristic acid, palmitic acid, oleic acid, stearic acid, linolenic acid, arachidonic acid, benzethonium chloride, benzethonium bromide, benzalkonium chloride (BKC), cetylpyridium chloride, edetate disodium dihydrate (EDTA), sodium desoxycholate, sodium deoxyglycolate, sodium glycocholate, sodium caprate, sodium taurocholate, sodium hydroxybenzoyal amino caprylate, dodecyl dimethyl aminopropionate, L-lysine, glycerol oleate, glyceryl monostearate, citric acid, peppermint oil and a combination thereof; an isotonicity agent comprising sodium chloride; a stabilizer selected from the group consisting of butylated hydroxyanisole (BHA), butylatedhydroxytoluene (BHT), ascorbic acid, methionine, sodium ascorbate, sodium thiosulfate, sodium bisulfite, sodium metabisulfite, ascorbyl palmitate, thioglycerol, alpha tocopherol (vitamin E), cysteine hydrochloride, benzalkonium chloride ("BKC"), citric acid, ethylenediaminetetraacetic acid (EDTA), sodium citrate, propyl gallate, 8-hydroxyquinoline, boric acid, histidine or combinations thereof, preferably the stabilizer comprises EDTA; a preservative, preferably, benzalkonium chloride (BKC); and sweeteners including sucralose, sucrose, aspartame, saccharin, dextrose, mannitol, glycerin, xylitol or combinations thereof. In a more preferred embodiment the formulations are at a pH from about 3.0 to about 5.0 (pages 4/27 to 7/27, [0019, 0020, 0022-0024, 0086, 0088, and 0090]).

Thus, it would have been *prima facie* obvious to one of ordinary skill in the art at the time the invention was filed to substitute the generic stabling agent, generic preservative, generic pH adjusting agent, and generic pH as claimed by Appl ‘044 with EDTA, benzalkonium chloride, HCl/NaOH, and a pH from about 3.0 to about 5.0, in view of Potta ‘617, respectively, because both Appl ‘044 and Potta ‘617 teach a method of treatment of a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a pharmaceutical formulation, and Potta ‘617 also teaches EDTA as preferred stabilizer; benzalkonium chloride (BKC) as a preferred preservative, HCl/NaOH in the examples, and a preferred pH from about 3.0 to about 5.0, described above. Thus, one of skill in the art would have a reasonable expectation that by substituting the generic stabling agent, generic preservative, generic pH

adjusting agent, and generic pH as claimed by Appl '044 with EDTA, benzalkonium chloride, HCl/NaOH, and a pH from about 3.0 to about 5.0, in view of Potta '617, respectively, one would achieve Applicant's claims 1-30. "Exemplary rationales that may support a conclusion of obviousness include: (B) Simple substitution of one known element for another to obtain predictable results". See MPEP § 2143 [R-10.2019] [I]. This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

## *Conclusion*

No claims are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to YIH-HORNG SHIAO whose telephone number is (571)272-7135. The examiner can normally be reached Mon-Thur, 08:30 am to 07:00 pm EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Shaojia (Anna) Jiang can be reached on 571-272-0627. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional

questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/YIH-HORNG SHIAO/
Primary Examiner, Art Unit 1623