Cynthia S. Betz
Mark M. Makhail
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Paul Steadman (*pro hac vice*)
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-2135

Tracy Block (*pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4733

Thomas H. Wintner (*pro hac vice*)
Adam P. Samansky (*pro hac vice*)
Peter J. Cuomo (*pro hac vice*)
Joseph D. Rutkowski (*pro hac vice*)
Amanda Metell (*pro hac vice*)
Samantha L. Cohen (*pro hac vice*)
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
Phone: (617) 542-6000
Fax: (617) 542-2241

Nana Liu (*pro hac vice*)
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
525 Market Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 432-6000

*Attorneys for Plaintiffs ARS Pharmaceuticals Operations, Inc. and Aegis Therapeutics, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ARS PHARMACEUTICALS OPERATIONS, INC., and AEGIS THERAPEUTICS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN, INC., LUPIN PHARMACEUTICALS, INC., CIPLA USA, INC. and CIPLA LIMITED,<br><br>Defendants. | Civil Action No. 25-cv-15123 (JXN)(MAH) |

**PLAINTIFFS' OPENING *MARKMAN* BRIEF**

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................1

II. THE PATENTS-AT-ISSUE .........................................................................4

III. CLAIM TERMS NOT IN DISPUTE ...............................................................7

IV. CLAIM TERMS IN DISPUTE ......................................................................8

V. LEGAL STANDARDS ..............................................................................11

VI. THE DISPUTED “WHEREIN” CLAUSES ARE LIMITING.....................13

A. The Claim Language Makes Clear That the Disputed “Wherein” Clauses Are Limiting. ..................................................13

1. The disputed “wherein” clauses are part of the body of the claim and as such are presumed to be limiting. ..................13

2. Claim differentiation dictates that the disputed “wherein” clauses are limiting...............................................................17

3. The disputed “wherein” clauses are limiting because they provide an antecedent basis for other parts of the claim that are unchallenged by Defendants. ......................................19

B. The Specification Supports the Conclusion That the Disputed “Wherein” Clauses Are Limiting. ..................................................22

1. The specification explains that the “wherein” clauses result in a manipulative difference in the claims. ......................22

C. The Prosecution History Supports the Conclusion That the Disputed “Wherein” Clauses Are Limiting........................................29

1. During *Inter Partes* Review of the ’414 Patent, the same “wherein” clause at issue here was found to be limiting. .........29

2. During prosecution of the Patents-at-Issue, both the Applicant and the Examiner relied on the disputed “wherein” clauses to distinguish the claims over the prior art.......................................................................................33

D. The Disputed “Wherein” Clauses Should Be Construed to Have Their Plain and Ordinary Meaning. ..................................................38

E. Defendants Have Waived Their Right to Propose Any Alternate Construction of the Disputed “Wherein” Clauses...............................39

VII. CONCLUSION..........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan Sales, LLC v. Sandoz, Inc.*,
935 F.3d 1370 (Fed. Cir. 2019) ................................................................*passim*

*Arendi S.A.R.L. v. Google LLC*,
882 F.3d 1132 (Fed. Cir. 2018) ..................................................................35

*Barrette Outdoor Living, Inc. v. Fortress Iron, LP*,
156 F.4th 1353 (Fed. Cir. 2025) ..............................................12, 30, 34, 35

*Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*,
246 F.3d 1368 (Fed. Cir. 2001) ..................................................................17

*Bristol-Myers Squibb Co. v. Dr. Reddy's Lab'ys, Ltd.*,
No. 19-18686 (MAS) (TJB), 2021 WL 1820486 (D.N.J. May 6, 2021) ..........................................................................................................40

*Centripetal Networks, LLC v. Cisco Sys., Inc.*,
No. 2024-2097, 2026 WL 1162800 (Fed. Cir. Apr. 29, 2026)..........................30

*Chiesi USA, Inc. v. Aurobindo Pharma USA, Inc.*,
No.19-cv-18756-ZNQ-LHG, 2021 WL 4860327 (D.N.J. Oct. 19, 2021) ..........................................................................................................19

*Griffin v. Bertina*,
285 F.3d 1029 (Fed. Cir. 2002) ..................................................................13

*Hill-Rom Servs. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ..................................................................18

*In re Certain Consol. Roflumilast Cases*,
No. 15-3375 (FLW) (DEA), 2016 WL 6089716 (D.N.J. Oct. 18, 2016) ..........................................................................................................21

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ..............................................................11, 21

*Johnson Worldwide Assocs. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) ....................................................................11

*L'Oréal USA, Inc. v. Olaplex, Inc.*,
844 Fed. Appx. 308 (Fed. Cir. 2021)...........................................................18, 19

*L.A. Biomedical Rsch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*,
849 F.3d 1049 (Fed. Cir. 2017) ....................................................................13

*Moskowitz Fam. LLC v. Globus Med., Inc.*,
No. 2024-1696, 2026 WL 2671623 (Fed. Cir. Sept. 11, 2026)..........................20

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ..........................................................12, 19, 20

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*,
133 F. Supp. 3d 721 (D.N.J. 2015)..................................................................39

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................................11, 29, 31, 38

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) ......................................................................35

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
925 F.3d 1373 (Fed. Cir. 2019) ....................................................................12

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) ...............................................................29, 32

*Socket Sols., LLC v. Imp. Glob., LLC*,
185 F.4th 1150 (Fed. Cir. 2026) ...................................................................11

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................................................................11

*Vifor (Int'l) AG v. Mylan Lab'ys Ltd.*,
No. 19-13955 (FLW), 2021 WL 2652123 (D.N.J. June 28, 2021) .....................29

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996) ......................................................................35

**Rules**

L. Pat. R. 4.1 ....................................................................................................39

L. Pat. R. 4.2(a) ...............................................................................................39

# EXHIBIT LIST

| Exhibit No. | Exhibit Title |
|---|---|
| 1 | Certified U.S. Patent No. 10,682,414 |
| 2 | Certified U.S. Patent No. 11,717,571 |
| 3 | Certified U.S. Patent No. 11,744,895 |
| 4 | Certified U.S. Patent No. 11,918,655 |
| 5 | C. Srisawat et al., *A Preliminary Study of Intranasal Epinephrine Administration as a Potential Route for Anaphylaxis Treatment*, 34 ASIAN PAC. J. ALLERGY. IMMUNOL. 38 (2016) ("Srisawat") |
| 6 | '414 Patent Certified File History Excerpt – *Inter Partes* Review Final Written Decision |
| 7 | USPTO.gov – '414 Patent File History Listing |
| 8 | '414 Patent *Inter Partes* Review – Patent Owner's Response |
| 9 | '414 Patent *Inter Partes* Review – Hearing Transcript |
| 10 | '414 Patent Certified File History Excerpt – *Inter Partes* Review Institution Decision |
| 11 | '571 Patent Certified File History Excerpt – April 25, 2023 Applicant Remarks |
| 12 | '895 Patent Certified File History Excerpt – May 5, 2023 Applicant Remarks |
| 13 | '571 Patent Certified File History Excerpt – Notice of Allowance |
| 14 | '895 Patent Certified File History Excerpt – Notice of Allowance |
| 15 | '655 Patent Certified File History Excerpt – Notice of Allowance |

ARS Pharmaceuticals Operations, Inc. ("ARS") and Aegis Therapeutics, LLC ("Aegis") (together, "Plaintiffs") submit this opening claim construction brief concerning the only term in dispute: the meaning of certain "wherein" clauses of United States Patent Nos. 10,682,414 (the "'414 Patent"), 11,717,571 (the "'571 Patent"), 11,744,895 (the "'895 Patent"), and 11,918,655 (the "'655 Patent") (the "Patents-at-Issue").[1]

## I. INTRODUCTION

The Patents-at-Issue claim low-dose formulations of epinephrine for intranasal delivery that are able to achieve a "plasma epinephrine concentration" (i.e., level of epinephrine in the bloodstream) that is effective for the treatment of type-1 hypersensitivity reactions, including anaphylaxis, the most serious of such reactions. The Patents-at-Issue claim what prior researchers had been unable to achieve: epinephrine had proven notoriously difficult to formulate for systemic delivery via any method other than injection (e.g., EpiPen), and essentially impossible to deliver intranasally in anything other than high, potentially dangerous, doses.

[1] Eight patents were asserted in this case. Two of the patents, U.S. Patent Nos. 10,576,156 and 11,173,209, have been withdrawn as part of a stipulation to narrow the case. *See* ECF No. 100. With respect to two other patents that remain asserted, U.S. Patent Nos. 11,191,838 and 12,324,838, the parties do not dispute the meaning of any claim terms. Thus, none of the claims of these four patents are addressed in this claim construction briefing. (*See* ECF No. 81-1 (Joint Claim Construction and Prehearing Statement, or "JCCS")).

Many of the claims of the Patents-at-Issue capture this invention by using a "wherein" clause (a typical limiting clause in a patent claim) to require the particular claimed intranasal formulation (e.g., a particular amount of epinephrine, with a particular amount of additional ingredients), delivered in a particular way (e.g., in a single spray of a particular volume), to have a particular effect (e.g., to provide a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis). This is known as "functional claiming," and is common throughout patent law. Defendants contend, however, that some of these functional limitations claiming efficacy are "non-limiting." In other words, Defendants contend that they should be entitled to no patentable weight and, in effect, be deleted from the claims. Defendants are wrong for at least three reasons, all based on evidence intrinsic to the Patents-at-Issue.

First, the **plain language and structure of the claims** dictate that the disputed "wherein" clauses are limiting and should be given patentable weight. Indeed, because the disputed "wherein" clauses are in the body of the claims and not the preamble, they are strongly presumed to be limiting. Defendants thus face a very high burden from the start. Moreover, treating these functional wherein clauses as non-limiting would collapse multiple claim limitations into one (i.e., render the claim language superfluous), and would render other claim limitations unintelligible (because the disputed clauses provide an antecedent basis for other parts of the

claims). All of this goes against the black-letter law of claim construction.

Second, the **specification** of the Patents-at-Issue dictates that the disputed "wherein" clauses are limiting and should be given patentable weight. The specification explains that not every claimed embodiment produces the required efficacious plasma epinephrine concentrations, and thus shows why these wherein clauses are material to patentability. Notably, the specification identifies a prior art study, Srisawat, which provides that intranasal doses of epinephrine under 5 mg produced ***zero*** plasma epinephrine concentration over the course of two hours after dosing. The claimed inventions, including the claimed "wherein" clauses regarding "plasma epinephrine concentration," are specifically directed to innovative features that distinguish them from prior art like Srisawat. To say that these clauses are non-limiting eviscerates the very invention claimed in the Patents-at-Issue.

Third, the **prosecution history** of the Patents-at-Issue dictates that the disputed "wherein" clauses are limiting and should be given patentable weight. During *Inter Partes* Review ("IPR") of the '414 Patent, the ***same*** clause was challenged and the Patent Trial and Appeal Board ("PTAB" or "Board"), on a fully developed record, determined that it should be given patentable weight. Moreover, during prosecution of the '571, '895, and '655 Patents, the patent examiner allowed the claims based on a finding that the prior art references "did not teach or suggest the limitation 'the nasal spray pharmaceutical formulation to the human with type-1

hypersensitivity reaction provides plasma epinephrine concentrations in the human that is efficacious . . . .'" By specifically calling out the disputed "wherein" clauses in allowing the claims, the patent examiner confirmed that those clauses are material to patentability, and therefore limiting.

In sum, the claim terms at issue are textbook examples of functional claim language that should be given patentable weight. And because Defendants do not offer an alternative construction for this claim language (other than to say that the clauses are "non-limiting," which is incorrect), Plaintiffs' proposed plain-and-ordinary-meaning constructions should be adopted.

## II. THE PATENTS-AT-ISSUE

The Patents-at-Issue all descend from a common application and share the same specification.[2] (*See generally* '414 Patent; '571 Patent; '895 Patent; '655 Patent (attached hereto as Exs. 1-4, respectively)). They are directed to methods of treating type-1 hypersensitivity reactions via the administration of aqueous intranasal formulations of low doses of epinephrine. (*See*, *e.g.*, '414 Patent at 14:50-57, 15:36-51).

The asserted claims of the Patents-at-Issue are directed to certain

[2] Because the specifications of the Patents-at-Issue are the same, citations to the specification in this brief are to the '414 Patent specification only. And because the language is the same, the term "specification" is used in the singular throughout, even where it applies to multiple "specifications" of the Patents-at-Issue.

embodiments of low-dose epinephrine formulations which provide plasma epinephrine concentrations that are efficacious for the treatment of certain type-1 hypersensitivity reactions. ('414 Patent at 1:34-50, 3:7-11, 9:24-33). Anaphylaxis is the most severe form of type-1 hypersensitivity reaction. (*Id*. at 1:38-42 ("Anaphylaxis is a severe, potentially life-threatening type-1 hypersensitivity reaction (systemic allergic reaction) that affects many body systems, with rapid onset typically averaging between about 5 to 30 minutes after intravenous exposure to an antigen and about 2 hours after oral exposure."); *id*. at 1:23-26 ("Anaphylaxis is a medical emergency that may require resuscitation measures such as airway management, supplemental oxygen, large volumes of intravenous fluids, and close monitoring.")). As the Patents-at-Issue explain, not all low-dose epinephrine formulations provide efficacious plasma epinephrine concentrations; some provide none at all. (*Id.* at 3:7-11, 14:60-15:20, Fig. 1).

Epinephrine has long been used to treat type-1 hypersensitivity reactions via intramuscular injection—using the EpiPen and similar needle-based, auto-injector devices. (*Id.* at 1:60-65, 2:20-23). But needle-based injection of epinephrine has significant downsides, including fear of injection. (*Id*. at 2:24-27 ("The need for alternative, needle-free and non-invasive methods for dosing epinephrine are well-documented, as many patients have a fear of injection and, as a result, are reluctant to use an auto-injector of any kind.")). Despite this documented need, prior to the

inventions of the Patents-at-Issue, skilled artisans had not been able to come up with a viable and efficacious needle-free method of administration of epinephrine. And skilled artisans had been even less successful when trying to make intranasal formulations of epinephrine that work as well as intramuscular injections. (*Id.* at 14:62-63 ("Historically, epinephrine has been difficult to formulate as an intranasal solution for systemic delivery.")).

In order for epinephrine to be effective as a method of treatment for type-1 hypersensitivity reactions, it must be absorbed into the systemic blood circulation. (*See id.* at 15:28-36). Achieving systemic absorption of epinephrine via intranasal delivery presents many challenges for a POSA because mammalian mucosal membranes, such as the nose, are barriers to entry for foreign substances. (*See id.* at 18:19-39, 54:46-50). If very little or no epinephrine is systemically absorbed because it is blocked by the mucosal membrane, then the mucosal delivery route will be ineffective. (*Id.* at 14:57-15:20). If too much epinephrine is systemically absorbed, however, the epinephrine itself can cause harmful side effects, including death. (*Id*. at 15:39-44, 15:67-16:15, 17:23-24). This is what is known as a "narrow therapeutic index." (*Id.* at 15:67-16:4).

The Patents-at-Issue balance the desire to effectively treat symptoms of type-1 hypersensitivity, including anaphylaxis, with the desire to minimize or avoid the side effects of epinephrine by using lower, but still effective, intranasal doses. (*E.g.*,

*id.* at 15:47-51, 17:20-23, 72:15-23). Certain embodiments of the invention achieve plasma epinephrine concentrations at doses below 2.4 mg that are comparable to "standard" injection methods, which typically involve a 0.3 mg intramuscular injection. (*Id.* at Figs. 4-9, 66:46-71:58, Tables 6-9c). For example, in a "crossover" study described in Example 2B, subjects received a single dose of 1.0 mg intranasal epinephrine and a single dose of 0.3 mg intramuscular epinephrine. (*Id.* at 67:4-17). In contrast to prior art studies, which found no absorption of epinephrine at intranasal doses below 5 mg, Plaintiffs' study demonstrated that intranasal administration of the claimed embodiments was not only safe and well-tolerated, but also that the pharmacokinetic parameters of the intranasal doses were very similar to intramuscular injection. (*Id.* at 70:43-71:58). The inventors also discovered that the addition of a permeation enhancer to an intranasal epinephrine formulation—and in particular, a permeation enhancer called dodecyl maltoside ("DDM")—increases the bioavailability of epinephrine in a subject, and permits lower doses delivered intranasally to still be efficacious for treating type-1 hypersensitivity reactions. (*Id.* at 3:29-39, 17:4-34, 47:8-11).

## III. CLAIM TERMS NOT IN DISPUTE

The parties have agreed to the construction of the term "***active ingredient***" appearing in claims 1 (not asserted but from which asserted claim 3 depends), 3-6, 18, 19, and 20 of the '414 Patent; claims 1-30 of the '571 Patent; claims 1-26 of the

’895 Patent; and claims 1-8, 10-20, and 31-43 of the ’655 Patent. The parties also agree that the term “***active moiety***” in claims 21-30 of the ’655 Patent should have the same meaning as “***active ingredient***” for purposes of the Patents-at-Issue. Accordingly, the parties agree that these terms should be construed as:

> “The term [‘active moiety’] or ‘active ingredient’ or ‘pharmaceutically active compound’ is defined in the context of a ‘formulation’ and is intended to mean a component of a pharmaceutical formulation that provides the primary pharmacological effect, as opposed to an ‘inactive ingredient’ which would generally be recognized as providing no pharmaceutical benefit.”

(ECF No. 81-1 (JCCS)).[3]

## IV. CLAIM TERMS IN DISPUTE

The parties dispute the meaning of certain “wherein” clauses contained in certain asserted method claims claiming efficacy (e.g., “***wherein*** *the intranasal administration . . . provides plasma epinephrine concentrations . . . that [is/are] efficacious . . .*”). (ECF Nos. 81, 94 (emphasis added)). Plaintiffs contend that these “wherein” clauses are limiting and should be given patentable weight; Defendants contend that they are not limiting and should be given no patentable weight. The disputed “wherein” clauses appear with minor differences in the claims of the Patents-at-Issue, as shown in the chart below:

---

[3] Defendant Cipla did not propose “active ingredient” or “active moiety” as terms requiring construction, but neither did Cipla oppose Plaintiffs’ and Lupin’s agreed constructions for these terms. (*See* ECF No. 94 (Plaintiffs’ and Cipla’s Joint Claim Construction and Prehearing Statement))

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **'414 Patent, claims 3-6, 18-20:** "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious" | Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, i.e., "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" | These "wherein" clauses are non-limiting. No construction necessary.[4] |
| **'571 Patent, claims 1-30:** "wherein the intranasal administration of the [single dose of the] nasal spray pharmaceutical formulation to the human [with the type-1 hypersensitivity reaction] provides plasma epinephrine concentrations in the human that are efficacious" | Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, i.e., "wherein the intranasal administration of the [single dose of the] nasal spray pharmaceutical formulation to the human [with the type-1 hypersensitivity reaction] elicits a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" | These "wherein" clauses are non-limiting. No construction necessary. |
| **'895 Patent, claims 1-** | Plain and ordinary meaning, which is | These "wherein" clauses |

[4] Defendants have not offered an alternative construction for any of the "wherein" clauses at issue, other than that they are non-limiting. Accordingly, Defendants have waived their right to argue an alternative construction should the "wherein" clauses be found by this Court to be limiting. *See* Section VI.E, *infra*.

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **26:** "wherein the intranasal administration of the single administered dose of the pharmaceutical formulation to the human provides plasma epinephrine concentrations in the human that are efficacious" | consistent with the language of the specification and prosecution history, i.e., "wherein the intranasal administration of the single administered dose of the pharmaceutical formulation to the human provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" | are non-limiting. No construction necessary. |
| **'655 Patent, claims 1, 14, 21, and 25 (and all asserted claims dependent thereto):** "wherein the intranasal administration of the [nasal spray] pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious" | Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, i.e., "wherein the intranasal administration of the [nasal spray] pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" | These "wherein" clauses are non-limiting. No construction necessary. |
| **'655 Patent, claims 31, 33, 34, 36, 37, and 41 (and all asserted claims dependent thereto):** "wherein the intranasal | Plain and ordinary meaning, which is consistent with the language of the specification and prosecution history, i.e., "wherein the intranasal administration of the single dose to the human with [anaphylaxis / the type-1 | These "wherein" clauses are non-limiting. No construction necessary. |

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| administration of the single dose to the human with [anaphylaxis / the type-1 hypersensitivity reaction] provides plasma epinephrine concentrations in the human that are efficacious" | hypersensitivity reaction] provides a plasma epinephrine concentration in the human that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" | |

## V. LEGAL STANDARDS

Claim construction "begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). There is a "heavy presumption" that "the terms in the claim mean what they say," and courts must "give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Therefore, "[i]t is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Socket Sols., LLC v. Imp. Glob., LLC*, 185 F.4th 1150, 1155 n.3 (Fed. Cir. 2026) (quoting *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021)).

The claims of a patent "do not stand alone" and "must be read in view of the specification, of which they are a part." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). In addition to consulting the specification, "a court should also consider the patent's prosecution history." *Id.* at 1317. "Like the specification, the

prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent[,]" including "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

"Where multiple patents derive from the same parent application and share many common terms" (as is the case with the Patents-at-Issue), the court "must interpret the claims consistently across all asserted patents." *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1378 (Fed. Cir. 2019); *see also Omega Eng'g, Inc. v. Raytek Corp*., 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[T]he same claim term in the same patent or related patents carries the same construed meaning."). Likewise, "a statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue." *Barrette Outdoor Living, Inc. v. Fortress Iron, LP*, 156 F.4th 1353, 1364 (Fed. Cir. 2025).

Claim terms are deemed to be "limiting" when they are "material to patentability," such as when they "express the inventive aspect of the claimed invention." *Allergan Sales, LLC v. Sandoz, Inc*., 935 F.3d 1370, 1374, 1376 (Fed. Cir. 2019). Claim terms also have a limiting effect when they "relate back to and clarify what is required," and give "meaning and purpose to the manipulative steps"

of the claim. *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002). It is also "significant" if the limitation at issue "is drafted as part of a separate step of the method, not as the preamble or introduction to a process carried out by the administration of the drug." *L.A. Biomedical Rsch. Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 849 F.3d 1049, 1061 (Fed. Cir. 2017).

# VI. THE DISPUTED "WHEREIN" CLAUSES ARE LIMITING

As explained below, both the plain language of the claims and the intrinsic evidence (i.e., the specification and prosecution history) mandate that all of the disputed "wherein" clauses are limiting and should be given patentable weight.

## A. The Claim Language Makes Clear That the Disputed "Wherein" Clauses Are Limiting.

### 1. The disputed "wherein" clauses are part of the body of the claim and as such are presumed to be limiting.

This is not a dispute about the preamble of a claim. There is a significant body of law concerning the words in the preamble of a patent claim, and when those words may be deemed limiting or not. But here, none of the disputed "wherein" clauses are in the preambles of their respective claims. Nor are they merely introductory to the method being carried out (as a preamble might be). Instead, they are part of the body of the claim. It is rare for language in the body of a claim to not be given patentable weight. This is true for "functional" claim language (what a claim element "does" or "accomplishes") just as well as "compositional" claim language (what a claim element "is"). Importantly, the Federal Circuit instructs that when assessing

functional claim language in the body of a claim, a court should start from the presumption that the language is limiting, not that the language merely describes an "intended result." Starting from the opposite presumption, as Defendants would have it, invites mischief by flipping the claim construction exercise on its head. *See Allergan Sales*, 935 F.3d at 1382 (Prost, J., concurring in the judgment that the challenged claim language was limiting) ("We should not begin with the presumption that text in the body of the claim may be meaningless and can only be saved by clear statements in the specification or prosecution history.").

Where claim terms are drafted as "part of a separate step of the method," and not as "the preamble or introduction to a process carried out by the administration of the drug," this weighs "significant[ly]" in favor of their limiting nature. *L.A. Biomedical*, 849 F.3d at 1061. Claim 1 of the '571 Patent shows this distinction very clearly:

> 1. A method of treating a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a nasal spray pharmaceutical formulation to the human with the type-1 hypersensitivity reaction, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises:
>
> > a) between 0.1 mg and about 2.4 mg of epinephrine, wherein epinephrine is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;
> >
> > b) one or more other agents as excipients selected from the group consisting of absorption enhancement agents, isotonicity agents, stabilizing agents, antioxidants, preservatives, and pH adjustment agents; and

c) water;

> ***wherein*** the nasal spray pharmaceutical formulation has a pH between about 3.0 and about 5.0;
>
> ***wherein*** the volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is between 25 μL and 250 μL;
>
> ***wherein*** the intranasal administration of the nasal spray pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human; or
>
> ***wherein*** the intranasal administration of the nasal spray pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human.

The claim starts with a preamble (*"A method of treating . . ."*). It then has three limitations indicating what ingredients are included in the claimed intranasal pharmaceutical formulation to be used in the method of treating (steps a, b, and c). And it then has four "wherein" clauses further limiting the method. The first wherein clause limits the pH of the formulation; the second wherein clause limits the volume of each dose; and the third and fourth wherein clauses provide functional limitations on the efficacy of the administered formulation and dose. Defendants do not challenge the preamble of this claim, nor do they challenge the first two wherein

clauses. They focus exclusively on the last two wherein clauses, and yet all four wherein clauses are clearly within the body of the claim.

Claim 1 of the ’655 Patent also includes multiple different wherein clauses in the body of the claim, as shown below:

> A method of treating a type-1 hypersensitivity reaction in a human comprising intranasally administering to the human with the type-1 hypersensitivity reaction a nasal spray pharmaceutical formulation comprising between about 1 mg/mL and about 40 mg/mL of epinephrine, or a salt thereof, in a volume between about 25 μL and about 250 μL per dose; ***wherein*** epinephrine, or a salt thereof, is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;
>
> ***wherein*** the type-1 hypersensitivity reaction comprises allergic asthma, allergic conjunctivitis, allergic rhinitis, anaphylaxis, angioedema, urticaria, eosinophilia, or combinations thereof;
>
> ***wherein*** the intranasal administration of the nasal spray pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious for the elimination of one, more than one, or all of the symptoms of the type-1 hypersensitivity reaction in the human; or
>
> ***wherein*** the intranasal administration of the nasal spray pharmaceutical formulation to the human with the type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that are efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type-1 hypersensitivity reaction in the human.

Again, Defendants take no issue with the first two wherein clauses in the ’655 Patent, even though they occupy similar locations in the claim and serve the same role as the clauses that Defendants challenge. Nor are any of these four wherein clauses part

of the preamble of the claim. They are clearly not "statements of general purpose," nor are they designed merely to provide an "introduction to a process carried out by the administration of the drug." *L.A. Biomedical*, 849 F.3d at 1061 (distinguishing *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)). As such, all of the disputed "wherein" clauses should be deemed limiting. They occupy the same place in the body of the claims as any other wherein clause, including all of the clauses that are ***not*** challenged by Defendants.

**2. Claim differentiation dictates that the disputed "wherein" clauses are limiting.**

Claim 3 of the '414 Patent has a different claim structure than the '655 Patent or the '571 Patent, but the structure again shows why the disputed "wherein" clause should be given patentable weight. In the '414 Patent, the disputed "wherein" clause is the ***only*** added limitation to the independent claim upon which claim 3 depends (namely, claim 1). This claim structure is shown below:

> 1. A method of treatment of a type-1 hypersensitivity reaction in a mammal comprising administering intranasally to the mammal in need thereof an aqueous nasal spray pharmaceutical formulation; ***wherein*** the aqueous nasal spray pharmaceutical formulation comprises:
>
> > an anaphylaxis active ingredient, ***wherein*** the anaphylaxis active ingredient consists of between about 0.1 mg and about 2.4 mg of epinephrine, or a salt thereof in a single dose.
>
> ***3. The method of claim 1, wherein***:
>
> > intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma

> epinephrine concentration that is efficacious for the treatment of anaphylaxis.

Accordingly, the "wherein" clause of claim 3 of the '414 Patent further limits claim 1 to intranasal epinephrine formulations that yield a "plasma epinephrine concentration" which is "efficacious," and additionally limits claim 1 to treatment of anaphylaxis specifically, as opposed to type-1 hypersensitivity reactions generally. As the Federal Circuit has held: "The presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). "This presumption is especially strong where," as here, "the limitation in dispute is the only meaningful difference between an independent and dependent claim." *Id.*

The "wherein" clause in claim 3 of the '414 Patent is thus a proper functional limitation, similar to the claims in *L'Oréal USA, Inc. v. Olaplex, Inc.*, 844 Fed. App'x. 308, 324-325 (Fed. Cir. 2021) (non-precedential). In *L'Oréal*, the Federal Circuit rejected an attempt to read out the limitations in dependent claims requiring no more than certain percentages of hair "breakage" when a particular formulation of hair product was applied to the scalp. The Court held that "to treat the limitations as of no legal effect would be to interpret each of these dependent claims as entirely a nullity." *Id*. "The fairer understanding of these claims," the Court continued, "is that they limit the options covered by the subject matter defined by the claims on

which they depend to options that produce the concretely specified results—thus making a difference in the manipulative steps." *Id*. So too here.

The result obtained in *L'Oréal* can also be understood in terms of claim differentiation, a doctrine which "imposes a presumption that two claims of a patent are of different scope." *Chiesi USA, Inc. v. Aurobindo Pharma USA, Inc.*, No. 19-cv-18756-ZNQ-LHG, 2021 WL 4860327, at *7 (D.N.J. Oct. 19, 2021). In *Chiesi*, defendants proposed a construction for a functional "wherein" clause (specifically, *"wherein the formulation is resistant to microbial growth"*), and the court rejected this construction because it "effectively read the … feature … out of" the dependent claim. *Id.* Likewise, here, Defendants' proposed non-limiting construction of claim 3 of the '414 Patent's "wherein" clause collapses the scope of claim 3 with claim 1, reads out the limitation of claim 3, and thus "is counter to logic" and the principles of claim differentiation. *Id.* This claim-differentiation principle applies equally to all of the disputed "wherein" clauses, as they must be construed consistently. *Omega Eng'g*, 334 F.3d at 1334.

**3. The disputed "wherein" clauses are limiting because they provide an antecedent basis for other parts of the claim that are unchallenged by Defendants.**

Many of the disputed "wherein" clauses in the Patents-at-Issue provide an antecedent basis to ***other*** limitations with ***additional*** requirements that Defendants have not challenged. Structurally, then, all of the disputed wherein clauses must be

considered limiting, as the same claim term in the related patents must carry the same meaning. *Omega Eng'g*, 334 F.3d at 1334.

For example, several claims of the '655 Patent include the following limitation: "a time to maximum epinephrine plasma concentrations (Tmax) of less than" 35 or 45 minutes. '655 Patent at 73:21-74:27 (claims 34-38), 74:37-60 (claim 41). Defendants do not argue in the Joint Claim Construction and Prehearing Statement ("JCCS") that the term "epinephrine plasma concentrations" in these claims is non-limiting. And yet the disputed "wherein" clauses provide the antecedent basis for these additional requirements (which are quantitative measurements, known as pharmacokinetic parameters, used in evaluating plasma epinephrine concentration). When the preamble of a claim, which generally is presumed to be ***non***-limiting, "provides an antecedent basis for the claim's body," there is "a strong indication that the preamble acts as a necessary component of the claimed invention" and thus, ***is limiting***. *Moskowitz Fam. LLC v. Globus Med., Inc.*, No. 2024-1696, 2026 WL 2671623, at *4 (Fed. Cir. Sept. 11, 2026) (precedential). Here, the case is even stronger. The disputed "wherein" clauses are in the body of the claim and thus are ***presumed to be limiting***. The fact that the plain language of the "wherein" clauses provides an antecedent basis for other claim elements only strengthens this presumption.

The same holds true for many other claims in the '571, '895, and '655 Patents.

Those claims have additional unchallenged limitations requiring "plasma epinephrine concentrations" that are "efficacious" for "the elimination of" or "the prevention of the further progression of" "one, more than one, or all of the symptoms of" the claimed type-1 hypersensitivity disorder. Taking claim 31 of the '655 Patent as an example, if the disputed "wherein" clause was found to be non-limiting (evinced by the crossed-out language in the claim below), then the claim would be nonsensical:

> 31. A method for the treatment of anaphylaxis in a human comprising intranasally administering to the human with anaphylaxis a single dose of an aqueous pharmaceutical formulation comprising about 1.0 mg to about 2.0 mg of epinephrine as the only pharmaceutically active ingredient in the aqueous pharmaceutical formulation in a volume between about 50 μL and about 250 μL;
>
> > ~~wherein the intranasal administration of the single dose to the human with anaphylaxis provides plasma epinephrine concentrations in the human that are efficacious~~ for the elimination of one, more than one, or all of the symptoms of anaphylaxis in the human.

"It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." *Intel Corp.*, 21 F.4th at 810; *In re Certain Consol. Roflumilast Cases*, No. 15-3375 (FLW) (DEA), 2016 WL 6089716, at *5 (D.N.J. Oct. 18, 2016) (There is a "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim."). Here, Defendants' proposed construction of the disputed "wherein" clauses is squarely contrary to this black-letter law. Defendants' proposal would not only read out functional language in the

body of the claims; it would render nonsensical other parts of the claims.

### B. The Specification Supports the Conclusion That the Disputed "Wherein" Clauses Are Limiting.

The specification of the Patents-at-Issue confirms that the "wherein" clauses are material to patentability and do not merely state an "intended result" (as Defendants contend).

#### 1. The specification explains that the "wherein" clauses result in a manipulative difference in the claims.

The specification of the Patents-at-Issue clearly teaches that the ability to achieve efficacious plasma epinephrine concentrations at low doses via intranasal delivery is a key inventive breakthrough, not merely an intended result of the claimed formulations. The specification shows—both through data and express recitations—that only "***some*** embodiments," when administered intranasally, "provide[] plasma epinephrine concentrations that are efficacious for the treatment of an acute hypersensitivity reaction." ('414 Patent at 3:7-11).

The intrinsic evidence confirms that "plasma epinephrine concentration," as understood in the Patents-at-Issue, is the amount of epinephrine in the blood above naturally occurring baseline levels.[5] For example, Figure 3 is a pharmacokinetic

[5] Because epinephrine is made in the body, this naturally occurring amount is measured initially as a baseline and then zeroed out (that is, subtracted) in order to meaningfully assess plasma epinephrine concentration following administration of an epinephrine-containing drug. (*See* Ex. 5 (Srisawat) at 40).

curve reporting results from Example 2A's clinical study[6] and indicates the presence of plasma epinephrine concentration above baseline upon administration of one embodiment of intranasal epinephrine at 0.3 mg.

**Figure 3. Mean Plasma Epinephrine Concentrations with Intransal Epinephrine Described in Example 2A.**




('414 Patent at Fig. 3, 14:10-14). The specification further states that "FIG. 3 shows the mean plasma epinephrine concentrations above baseline (pg/mL) vs. time (min) curves from the first clinical study described in Example 2A comparing 0.3 mg epinephrine IM and IN; the curve with squared [sic] represents IM, and the curve with circles, IN." (*Id.* at 14:10-14). Thus, Figure 3 shows that the administration of

---

[6] Example 2A "assess[ed] the comparative bioavailability of epinephrine after intranasal administration and intramuscular administration as intramuscular epinephrine delivered by auto injector in healthy volunteers under fasted conditions." ('414 Patent at 63:33-37).

a certain embodiment of the claims at an intranasal dose of 0.3 mg epinephrine resulted in plasma epinephrine concentrations above baseline. (*Id.*).

As another example, Figure 4 is a pharmacokinetic curve showing that administration of certain embodiments of the claims at doses of 0.5 mg, 1.0 mg, and 2.0 mg of intranasal epinephrine also provides plasma epinephrine concentrations above baseline.

**Figure 4. Mean Plasma Epinephrine Concentrations with Intranasal Epinephrine Described in Example 2B.**




(*Id.* at Fig. 4, 14:15-20; *see also* Figs. 5-9 (additional pharmacokinetic curves depicting plasma epinephrine concentrations after the administration of certain embodiments)).

In contrast, the prior art demonstrated an ***absence*** of plasma epinephrine concentrations upon intranasal administration of epinephrine at the claimed low

doses, including any dose under 5.0 mg of epinephrine. (*Id.* at Fig. 1, 13:66-14:5). Figure 1 is a graph that, like Figures 3 and 4, reports plasma epinephrine concentrations. It is reproduced in the specification from the Srisawat study, which is prior art to the Patents-at-Issue.

**Figure 1. AUC vs. Time for Intransal Epinephrine as Disclosed in Srisawat *et al.***




Srisawat, in contrast with the results from Examples 2A and 2B depicted in Figures 3 and 4 above, "observed ***no*** blood level of epinephrine at the intranasal dose level of 2.5 mg and below" over the course of two hours after administration. (*Id.* at 15:18-20; *see also id.* at 13:66-14:5). This means that after administration of intranasal epinephrine, Srisawat reported that no epinephrine was absorbed the entire time, even after waiting two hours.

Srisawat further shows that even at the intranasal dose of 5 mg, "absorption during the critical early time points was delayed when rapid absorption is needed to

stop the systemic allergic reaction (anaphylaxis)." (*Id.* at 15:21-28; *see also* Fig. 2 (showing pharmacokinetic curve of 5 mg intranasal epinephrine)). These findings are, as the specification recognizes, "potentially detrimental in serious conditions such as anaphylaxis where immediate treatment, and thus injection-like pharmacokinetics, are desirable." (*Id.* at 15:28-30).

Srisawat's findings correspond to the specification's disclosure that only "some embodiments" of the inventions of the Patents-at-Issue, when administered, "provide[] plasma epinephrine concentrations that are efficacious . . . ." (*Id.* at 3:7-11, 3:29-33, 10:22-26). Likewise, the specification provides that "[i]n some embodiments, increasing the bioavailability of epinephrine permits for lower dose amounts of epinephrine to be delivered intranasally and be efficacious for treating anaphylaxis." (*Id.* at 17:20-23). The specification thus makes clear that "plasma epinephrine concentration" is not always readily achievable using low-dose intranasal epinephrine formulations (i.e., less than 5 mg epinephrine). The claim term "plasma epinephrine concentration" thus cannot simply be an "intended result," because, clearly, not all epinephrine formulations yield the same result.

Further, a POSA would understand that "plasma epinephrine concentrations" are related to measurable pharmacokinetic results. The specification provides extensive quantitative context, defining pharmacokinetic parameters (e.g., bioavailability, AUC, $T_{max}$, and $C_{max}$) for how plasma epinephrine concentrations

may be evaluated. ('414 Patent at 37:25-32 (defining "AUC" as "the area under the drug plasma concentration-time curve"), 37:55-38:9 (defining "bioavailability (F)"), 41:25-27 (defining "$T_{max}$" as "the time, from administration, for a drug or other analyte to reach maximum drug plasma concentration ($C_{max}$)")). The specification further explains that administration of the described nasal spray formulations "yields one or more of the following pharmacokinetic features," such as "a mean $t_{max}$ of less than 45 minutes" or "a $t_{max}$ of less than 35 minutes." (*E.g.*, '414 Patent at 4:60-5:46, 21:55-22:4 (Embodiment 13)). And as discussed above, one of these parameters ($T_{max}$) is present as an additional limitation in some of the asserted claims of the Patents-at-Issue for which the disputed "wherein" clauses provide an antecedent basis. (*E.g.*, '655 Patent at 73:21-39 (claim 34); *see* Section VI.A.3, *supra*).

With respect to the "efficacious" requirement of the disputed "wherein" clauses, the specification does not define that express term. However, the specification provides guidance based on definitions of the related terms "therapeutically effective amount" and "therapeutically effective dose." These terms are defined as "the amount or dose of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system, or individual that is being sought by a researcher, healthcare provider or individual." ('414 Patent at 40:61-66). The specification further provides that "[a] therapeutically effective amount may, but need not necessarily, eliminate one, more, or all symptoms of a

disease, disorder, or condition being treated" and "[a] therapeutically effective amount may also prevent disease progression or the appearance of further symptoms." (*Id.*). The "efficacious" definition from the specification must be read in conjunction with the recited "plasma epinephrine concentrations" language in the disputed "wherein" clauses.

In sum, the totality of the specification indicates that not all claimed formulations provide the required plasma epinephrine concentrations that are efficacious. Intrinsic evidence showing that a clause requiring "efficacy," and which does not simply duplicate a dosage limitation, supports the limiting nature of the efficacy clause. In *L.A. Biomedical*, for example, the challenged limitation of "arresting or regressing" was found to "demand efficacy," whereas the dosage-and-duration limitation did not itself impose an efficacy requirement. 849 F.3d at 1061. The Federal Circuit distinguished this claim from claims "in which efficacy is inherent in carrying out the claim steps," and concluded that the challenged limitation "adds an efficacy requirement that is not otherwise found in the claim language." *Id.* So too here. The figures and examples of the Patents-at-Issue clearly indicate that "efficacious" "plasma epinephrine concentrations" are not inherent in carrying out the administration of all the claimed formulations, and thus these functional limitations carry patentable weight. As the specification makes clear, the disputed "wherein" clauses are not merely the intended result of administering the

claimed dosages.

### C. The Prosecution History Supports the Conclusion That the Disputed "Wherein" Clauses Are Limiting.

#### 1. During *Inter Partes* Review of the '414 Patent, the same "wherein" clause at issue here was found to be limiting.

This is not the first time that a patent challenger has argued to a tribunal that the disputed "wherein" clauses of the Patents-at-Issue should be found non-limiting. Specifically, during an IPR proceeding challenging the validity of the '414 Patent, the petitioner challenging the patent argued that the "efficacious" clause of claim 3 of the '414 Patent was not limiting because it merely described an intended use. This argument was rejected by the USPTO's PTAB after applying the *Phillips* standard, based on a full IPR record that included briefing and oral argument. (*See* Ex. 6 ('414 File History Excerpt – Final Written Decision) at 15).

While the PTAB is not an Article III court, and so its claim construction ruling is not binding on this Court, proceedings before the PTAB during an IPR proceeding are part of the prosecution history of the patent at issue and thus constitute highly relevant, persuasive authority. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) (considering IPR proceedings as part of the court's analysis of the prosecution history); *see also Vifor (Int'l) AG v. Mylan Lab'ys Ltd.*, No. 19-13955 (FLW), 2021 WL 2652123, at *10-11 (D.N.J. June 28, 2021) (agreeing with the PTAB's construction of the same claim term and adopting a construction

"consistent with the findings of the PTAB" where the claim language and specification supported that result). Here, the PTAB's Institution Decision and Final Written Decision are part of the file history of the '414 Patent. (*See* Ex. 7 ('414 File History Listing) at 2 (listing "Request for Trial Granted" and "Trial Termination or Final Written Decision")). Further, the '414 Patent IPR proceedings are compelling intrinsic evidence because they involve the same patent family, the same specification, and the same "wherein" clause at issue here. *See, e.g.*, *Centripetal Networks, LLC v. Cisco Sys., Inc.*, No. 2024-2097, 2026 WL 1162800, at *6 (Fed. Cir. Apr. 29, 2026) (finding patent owner's "statements in the IPR proceeding define the scope of the asserted claims"); *Barrette Outdoor Living*, 156 F.4th at 1364 ("[S]tatement[s] made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

In the IPR proceeding, Plaintiffs took the position, as they do here, that the "wherein" clause of claim 3 of the '414 Patent was limiting. Plaintiffs explained that a POSA would have understood based on claim 3 that not all intranasal methods of treatment are efficacious for the treatment of anaphylaxis because, for example, "they do not elicit any increased plasma epinephrine concentration, or because they do not elicit a rise in plasma epinephrine quickly enough." (Ex. 8 ('414 Patent IPR – Patent Owner's Response), at 18-19). During the oral hearing in front of the three-

judge PTAB panel, Plaintiffs reiterated this position, stating that claim 3 requires "a measurable plasma epinephrine concentration." (Ex. 9 ('414 Patent IPR – Hearing Transcript), at 29:2-4). Further, Plaintiffs distinguished the prior art by arguing that "plasma epinephrine concentrations" are not inherent to intranasal formulations. (Ex. 8 ('414 Patent IPR – Patent Owner's Response), at 20, 29-33). As such, Plaintiffs' statements before the Board emphasized that claim 3 of the '414 Patent (which contains one of the disputed "wherein" clauses and corresponds to all the other disputed "wherein" clauses) is limiting as it requires an actual, measurable elevated plasma epinephrine concentration. (*See id.*).

In applying the *Phillips* standard, the Board agreed with Plaintiffs, holding in its Final Written Decision that the additional "wherein" clause ***is*** limiting because it requires a manipulative difference in the claims by requiring "a plasma epinephrine concentration." As the Board held: "claim 3 plainly recites that the method '*provides a plasma epinephrine concentration* that is efficacious for the treatment of anaphylaxis.'" (Ex. 6 ('414 File History Excerpt – Final Written Decision) at 15 (italics in original)). The Board also explained that "claim 3, by virtue of its dependency from claim 1, recites a range of doses (about 0.1 mg to about 2.4 mg), and Petitioner ha[d] not established that all of the claimed doses would provide a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis in all claimed mammals." (Ex. 10 ('414 File History Excerpt – Institution Decision)

at 14-15). Consistent with the intrinsic evidence, the Board found that claim 3 of the ’414 Patent “embraces a variety of aqueous nasal spray pharmaceutical formulations,” and “[t]he record reflect[ed] that the composition of the intranasal formulation could affect the absorption of epinephrine.” (*Id.* at 15). Thus, the Board held that “claim 3 permits manipulation of the epinephrine dose and formulation to achieve the recited result, and on this record Petitioner ha[d] not established that despite such manipulations, the claimed method would nevertheless result in a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis.” (*Id.*). Further, the Board confirmed the validity of claim 3 because the prior art did not inherently disclose the “plasma epinephrine concentration” requirement. (Ex. 6 (’414 File History Excerpt – Final Written Decision) at 27-36, 65-68). As a result, the Board concluded that the “wherein” clause of claim 3 was not merely a statement of intended result.

In sum, the prior statements made by Plaintiffs, in addition to the conclusions of the PTAB regarding the scope of claim 3 during the ’414 Patent IPR proceeding, should be accorded significant weight here. They are intrinsic evidence that is directly relevant to the disputed “wherein” clauses, and that evidence strongly indicates that these clauses should be deemed limiting. *See Sequoia Tech.*, 66 F.4th at 1327.

### 2. During prosecution of the Patents-at-Issue, both the Applicant and the Examiner relied on the disputed "wherein" clauses to distinguish the claims over the prior art.

During prosecution of the Patents-at-Issue, the applicant relied on the disputed "wherein" clauses to distinguish the prior art, and the examiner allowed the claims on those bases. Further, the applicant adopted the statements and findings from the '414 Patent IPR proceedings during the examinations of other Patents-at-Issue. (*See*, *e.g.*, Ex. 11 ('571 Patent File History, 04/25/2023 Applicant Remarks) at 10; Ex. 12 ('895 Patent File History, 05/05/2023 Applicant Remarks) at 10). Therefore, the disputed "wherein" clauses were central to the examiner's findings of patentability of the Patents-at-Issue.

During examination of the '571 and the '895 Patents, the applicant highlighted the impact of the "wherein" clauses while describing the instant claims. Specifically, the applicant said that "[e]ach independent claim recites the intranasal administration of the nasal spray pharmaceutical formulation to the human <u>provides a plasma epinephrine concentration</u> in the human that is [] efficacious . . . ." (Ex. 12 ('895 Patent File History, 05/05/2023 Applicant Remarks) at 11 (underlining in original); *see also* Ex. 11 ('571 Patent File History, 04/25/2023 Applicant Remarks) at 11-12). The applicant also adopted the Board's finding in the IPR, stating that "[t]he plain language of the independent claims require, at a minimum, that intranasal administration 'provides an efficacious plasma epinephrine concentration.'" (Ex. 12

('895 Patent File History, 05/05/2023 Applicant Remarks) at 11; *see also* Ex. 11 ('571 Patent File History, 04/25/2023 Applicant Remarks) at 11-12). These statements apply to all of the Patents-at-Issue, which are related. *Barrette Outdoor Living*, 156 F.4th at 1364.

Further, during prosecution of the '571 and the '895 Patents, the examiner initially rejected the proposed claims as inherently anticipated and rendered obvious by Potta, a prior art reference. The applicant responded that Potta did not disclose any information addressing whether or not its formulations would necessarily provide the required "plasma epinephrine concentration" of the "wherein" clauses, and stated as follows:

> The Office's obviousness rejections are premised on the assumption that Potta '617 discloses the limitation recited in independent claims 1, 16, and 22, namely a plasma epinephrine concentration that is 1) efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in a human; or 2) efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human. Without this premise, the Office's obviousness rejections fail.

(Ex. 11 ('571 Patent File History, 04/25/2023 Applicant Remarks) at 14; *see also* Ex. 12 ('895 Patent File History, 05/05/2023 Applicant Remarks) at 12). The claims were then allowed. By successfully relying on the "wherein" clauses to distinguish the prior art, the applicant refuted any possibility that these clauses were non-limiting. And as Federal Circuit law makes clear, where a patent owner "clearly

distinguishe[s]" the prior art during prosecution, it "expressly clarifie[s] the scope of its claims." *Barrette Outdoor Living*, 156 F.4th at 1363.

The Notices of Allowance of the '571 Patent, the '895 Patent, and the '655 Patents also indicate that the examiner allowed the claims based on the finding that the prior art references "did not teach or suggest the limitation 'the nasal spray pharmaceutical formulation to the human with type-1 hypersensitivity reaction provides plasma epinephrine concentrations in the human that is efficacious . . . ." (Ex. 13 ('571 Patent File History, 05/24/2023 Notice of Allowance) at 8; *see also* Ex. 14 ('895 Patent File History, 06/29/2023 Notice of Allowance) at 9; Ex. 15 ('655 Patent File History, 01/23/2024 Notice of Allowance) at 3-4). This confirms the examiner's reliance on the limiting nature of the disputed "wherein" clauses in allowing the claims. *See*, *e.g.*, *Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1136 (Fed. Cir. 2018) (finding that the examiner's reasons for allowance "made clear that the examiner and the applicant understood" the scope of the claims); *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (noting that the record "makes clear that the examiner shared [patent owner]'s stated view" of the claims).

* * *

In sum, this claim construction exercise can be resolved using the triumvirate outlined by the Federal Circuit: start with the language and structure of the claims, then turn to the specification, and then turn to the prosecution history. *See Vitronics*

*Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Here, all three point in favor of finding that the disputed "wherein" clauses of the Patents-at-Issue are limiting. As previously discussed, the ***same*** term from one of the ***same*** patents has already been construed on a full IPR record to be limiting, and that construction is highly persuasive here. (*See* Section VI.C.1, *supra*). The Federal Circuit's decision in *Allergan Sales,* which involved similar method-of-treatment claims, is likewise instructive.

In *Allergan Sales*, the patent challenger argued that the "wherein" clauses "merely state[d] the intended results of administering [the drug] twice daily," and "the recited results [we]re not 'material to patentability.'" *Allergan Sales*, 935 F.3d at 1374. In rejecting the patent challenger's arguments, the Federal Circuit found compelling the specification's comparison of the claimed methods with those of the prior art, and the specification's conclusion that the claimed methods were "superior" in both efficacy and safety. Based on this, the Federal Circuit determined the specification "demonstrate[d] that [patent owner] believed the increased efficacy and safety of the claimed methods to be material to patentability." *Id.* at 1375.

Similarly here, the specification of the Patents-at-Issue explains the difficulties of formulating epinephrine as an intranasal solution, and discusses how the prior art (Srisawat) disclosed ***zero*** plasma epinephrine concentrations at the claimed low dosages of intranasal epinephrine. (*See* Section VI.B.1, *supra*). The

specification of the Patents-at-Issue then explains that certain embodiments of the claimed low doses provide efficacious plasma epinephrine concentrations. The specification further emphasizes increased safety of the claimed methods due to the low dosages. Thus, the specification demonstrates that Plaintiffs "believed the increased efficacy . . . to be material to patentability," *Allergan Sales*, 935 F.3d at 1375, supporting the limiting nature of the "wherein" clauses.

Further, just as in *Allergan Sales*, Plaintiffs "relied on the efficacy . . . of the claimed methods during prosecution of the Patents-in-Suit in responding to the examiner's rejections." *Id*. at 1381. Plaintiffs recited the "wherein" clauses as the reason why the prior art did not render the claims anticipated or obvious. Indeed, "the Examiner explicitly relied on the 'wherein' clauses in explaining why the claims of the Patents-in-Suit were 'novel and non-obvious over the prior art.'" *Id*. at 1375-76. So too here. (*See* Section VI.C.2, *supra*). "The prosecution history thus demonstrates the formulation's efficacy . . . —as reflected in the disputed 'wherein' clauses—were expressly relied on to define the claimed methods and distinguish them from the prior art." *Allergan Sales*, 935 F.3d at 1376.

Moreover, while concurring with the majority, Judge Prost explained in *Allergan Sales* that the plain language of the claim also supported the limiting nature of the "wherein" clauses at issue. *Id.* at 1378-79. The claim was "written in open format," meaning that the wherein clauses modified the overall method rather than

any specifically recited ingredients or dosage amounts of the formulation administered in the method. *Id.* at 1378 (noting that the claim allowed "other compositions [to] be present in the formulation, such as solvents, buffers, and preservatives typical for ophthalmic solutions"). The same is true here: in the Patents-at-Issue, the disputed "wherein" clauses modify the method of administration, not any specific ingredient of the intranasal formulation.

Accordingly, the holding of *Allergan Sales* requires finding that "the 'wherein' clauses are material to patentability and thus limiting." *Id.* at 1376.

### D. The Disputed "Wherein" Clauses Should Be Construed to Have Their Plain and Ordinary Meaning.

As discussed above, the disputed "wherein" clauses are limiting. Regarding how these limiting clauses should be construed, it is Plaintiffs' position that no special construction is necessary and they can be afforded their plain and ordinary meanings as understood at the time of the invention by a POSA. *See Phillips*, 415 F.3d at 1312-13; *see also* Section IV (Table of Plaintiffs' Proposed Constructions), *supra*; ECF No. 81-1 (JCCS), at 9-15. Nevertheless, Plaintiffs have offered a clarifying construction to the extent further elaboration of the plain and ordinary meaning of the wherein clauses is required.

Plaintiffs' proposed construction simply applies the specification's definition of "therapeutically ***effective*** amount" and "therapeutically ***effective*** dose" to the "efficacious" requirement in the claims. (*See* '414 Patent at 40:61-41:3 (defining

"therapeutically effective amount" and "therapeutically effective dose")). An exemplary construction consistent with the claim language and the specification for the '414 Patent is shown below in red.

| **'414 Patent (claims 3-6, 18-20)** | **Plain & Ordinary Meaning Construction** |
|---|---|
| "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious" | "wherein: intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of [the disease, disorder, or condition being treated]" |

Further intrinsic support for these constructions is listed in Plaintiffs' portion of the JCCS. (*See* ECF No. 81-1, at 9-15 (third column)).

### E. Defendants Have Waived Their Right to Propose Any Alternate Construction of the Disputed "Wherein" Clauses.

Local Patent Rule 4.2(a) requires that after the exchange of terms for construction pursuant to Local Patent Rule 4.1, "the parties shall simultaneously exchange preliminary proposed constructions of each term identified, . . . including constructions for each term for which 'plain and ordinary' meaning is asserted." The purpose of the Local Patent Rules is to ensure "robust disclosure of all information necessary to litigate complex infringement actions, and requiring parties to fully crystallize their theories of the case early in the litigation." *Otsuka Pharm. Co. v.*

*Torrent Pharm. Ltd.*, 133 F. Supp. 3d 721, 727-28 (D.N.J. 2015). "In other words, the Local Patent Rules ensure litigants put all their cards on the table up front." *Id.*

In the Joint Claim Construction and Prehearing Statement, Defendants state that "[n]o construction [is] necessary" for the disputed "wherein" clauses and offer no alternative construction. (*See* ECF No. 81-1, at 9-15). Thus, to the extent this Court deems the disputed "wherein" clauses to be limiting, Defendants have waived their ability to offer a further construction, and any consideration thereof would "unfairly prejudice" Plaintiffs. *See, e.g., Bristol-Myers Squibb Co. v. Dr. Reddy's Lab'ys, Ltd.*, No. 19-18686 (MAS) (TJB), 2021 WL 1820486, at *2 (D.N.J. May 6, 2021).

## VII. CONCLUSION

Plaintiffs respectfully request that the disputed "wherein" clauses be deemed limiting, and that they be construed to have their plain and ordinary meanings. Plaintiffs also request that the Court adopt the parties' agreed construction for the terms "active ingredient" and "active moiety."

Dated: October 19, 2026

/s/ *Mark M. Makhail*
Cynthia S. Betz
Mark M. Makhail
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444
cbetz@mccarter.com
mmakhail@mccarter.com

*Attorneys for Plaintiffs ARS Pharmaceuticals Operations, Inc. and Aegis Therapeutics, LLC*

Thomas H. Wintner (*pro hac vice*)
Adam P. Samansky (*pro hac vice)*
Peter J. Cuomo (*pro hac vice*)
Joseph D. Rutkowski (*pro hac vice*)
Amanda Metell (*pro hac vice*)
Samantha L. Cohen (*pro hac vice*)
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
One Financial Center
Boston, MA 02111
Phone: (617) 542-6000
Fax: (617) 542-2241

Nana Liu (*pro hac vice*)
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
525 Market Street, Suite 3000
San Francisco, CA 94105
Phone: (415) 432-6000

*Attorneys for Plaintiff ARS Pharmaceuticals Operations, Inc.*

Paul Steadman (*pro hac vice*)
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-2135

Tracy Block (*pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4733

*Attorneys for Plaintiff Aegis Therapeutics, LLC*