# PUBLIC EXHIBIT 8

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMPHASTAR PHARMACEUTICALS, INC.,
Petitioner,

v.

AEGIS THERAPEUTICS, LLC,
Patent Owner.

Case No. IPR2021-01324
U.S. Patent No. 10,682,414

**PATENT OWNER'S RESPONSE**
**PURSUANT TO 37 C.F.R. § 42.120(a)**

## TABLE OF CONTENTS

I. INTRODUCTION ....................1

II. BACKGROUND OF THE INVENTION ....................2

A. Relevant Scientific Background ....................2

B. The ’414 Patent ....................6

C. The Challenged Claims ....................8

III. LEVEL OF ORDINARY SKILL IN THE ART ....................9

IV. CLAIM CONSTRUCTION ....................10

A. “A method of treatment of a type-1 hypersensitivity reaction in a mammal” (Preamble of Independent Claim 1) ....................10

B. “administering intranasally to a mammal” (Independent Claim 1) ....................16

C. “aqueous” (Independent Claim 1) ....................17

D. “provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis” (Dependent Claim 3) ....................18

V. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-18 ARE ANTICIPATED BY POTTA ....................20

A. Potta Does Not Disclose Administering Intranasally a Single Dose of Epinephrine in the Claimed Range of About 0.1 to 2.4 mg. ....................23

1. Potta Table 1 ....................23

2. Potta Claim 21 ....................25

B. Potta Does Not Disclose a Sought After Biological or Medicinal Response For a Single Intranasal Epinephrine Dose Less Than 3 mg For the Treatment of Type-1 Hypersensitivity Reactions. ....................27

C. Potta Does Not Disclose a Plasma Epinephrine Concentration That is Efficacious For the Treatment of Anaphylaxis For a Single Intranasal Epinephrine Dose Less Than 3 mg. ....................34

D. Potta Does Not Anticipate Claims 2, 4-18 ....................37

VI. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-20 WOULD HAVE BEEN OBVIOUS OVER POTTA IN VIEW OF MAGGIO ’145 AND MUNJAL....................37

A. POSAs Would Not Have Been Motivated to Pursue a Method of Treatment Comprising Administering a Dose in the Claimed Range of the ’414 Patent, Nor Had a Reasonable Expectation of Success in Doing So....................39

B. POSAs Would Not Have Been Motivated to Use Dodecylmaltoside to “Optimize” the Intranasal Epinephrine Formulations Disclosed in Potta, Nor Had a Reasonable Expectation of Success in Achieving Such Optimization....................43

C. Claims 2 and 4-20 Would Not Have Been Obvious In Light of Potta, Maggio ’145, and Munjal....................52

VII. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-20 WOULD HAVE BEEN OBVIOUS OVER SRISAWAT IN VIEW OF MAGGIO ’145 AND MUNJAL ....................52

A. Srisawat Provides No Motivation to Lower the Intranasal Dose, Nor a Reasonable Expectation of Success of Doing So....................52

B. Srisawat Provides Minimal Guidance on How to “Optimize” an Intranasal Epinephrine Formulation....................53

C. Srisawat Does Not Disclose Any “Sought-After” Responses at Doses Within the Claimed Range of the ’414 Patent....................54

D. Claims 2 and 4-20 Would Not Have Been Obvious in Light of Srisawat, Maggio ’145, and Munjal....................56

VIII. SECONDARY CONSIDERATIONS SUPPORT NON-OBVIOUSNESS....................56

IX. CONCLUSION....................60

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Amerigen Pharm. Ltd. v. UCB Pharma GmbH*,
913 F.3d 1076 (Fed. Cir. 2019) ....................1

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................13

*Callicrate v. Wadsworth Mfg., Inc.*,
427 F.3d 1361 (Fed. Cir. 2005) ....................20

*Comput. Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ....................15

*Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*,
8 F.4th 1333 (Fed. Cir. 2021) ....................12, 13

*Free Motion Fitness, Inc. v. Cybex Int'l*,
423 F.3d 1343 (Fed. Cir. 2005) ....................20, 21

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
45 F.3d 1550 (Fed. Cir. 1995) ....................16, 21

*HTC Corp. v. Cellular Communs. Equip., LLC*,
877 F.3d 1361 (Fed. Cir. 2017) ....................37, 52, 57

*In re Copaxone Consol. Cases*,
906 F.3d 1013 (Fed. Cir. 2018) ....................18, 19

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................37, 57

*In re Magnum Oil Tools Int'l*,
829 F.3d 1364 (Fed. Cir. 2016) ....................28

*In re Omeprazole Patent Litig.*,
483 F.3d 1364 (Fed. Cir. 2007) ....................26

*InTouch Techs., Inc. v. VGo Communs., Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................41

*Jansen v. Rexall Sundown, Inc.*,
342 F.3d 1329 (Fed. Cir. 2003) ....................13

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................37

*LifeNet Health v. LifeCell Corp.*,
837 F.3d 1316 (Fed. Cir. 2016) ....................16, 21

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................10, 11

*Sanofi-Synthelabo v. Apotex*,
550 F.3d 1075 (Fed. Cir. 2008) ....................16, 20

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ....................42

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................29

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ....................57

**Federal Statutes**

35 U.S.C. § 282(b) ....................10

**Regulations**

37 C.F.R. § 42.6(a)(3)....................39

37 C.F.R. § 42.24(d) ....................62

37 C.F.R. § 42.100(b) ....................10

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 2001 | Declaration of Thomas H. Wintner in Support of PHV Admission |
| 2002 | U.S. Patent No. 10,682,414 Prosecution History Excerpt 06-04-2019 TrackOne Request Granted |
| 2003 | U.S. Patent No. 10,682,414 Prosecution History Excerpt 2019-09-09 List of References Cited by Applicant and Considered by Examiner |
| 2004 | U.S. Patent No. 10,682,414 Prosecution History Excerpt 2019-06-21 Non-Final Rejection |
| 2005 | U.S. Patent No. 10,039,710 (“Potta ’710 patent”) |
| 2006 | US 2017/0079907 (“Potta ’907 application”) |
| 2007 | US 2017/0216199 (“Potta ’199 application”) |
| 2008 | US 2018/0289639 (“Potta ’639 application”) |
| 2009 | US 2018/0318215 (“Potta ’215 application”) |
| 2010 | U.S. Patent Application Ser. No. 15/890,131 Prosecution History Excerpts |
| 2011 | U.S. Patent Application Ser. No. 15/482,283 Prosecution History Excerpts |
| 2012 | Sumatriptan – PubChem |
| 2013 | Declaration of Michael A. Kaliner, M.D. |
| 2014 | Declaration of Joseph W. Wyse, Ph.D. |
| 2015 | WO 2021/225976A1 (“Zhang ’976”) |
| 2016 | Second Declaration of Hugh David Charles Smyth, Ph.D., ARGENTUM PHARMS. v. CIPLA LIMITED, IPR2017-00807, Nov. 20, 2017 |
| 2017 | May 3, 2022 Deposition Transcript of Steven F. Weinstein |
| 2018 | April 14, 2022 Deposition Transcript of Hugh D. C. Smyth |
| 2019 | Bryn Pharma, LLC, Poster L34, *Pharmacokinetic and Pharmacodynamic Effects of Intranasal Epinephrine Versus Intramuscular Epinephrine in Adults*, Presented at the American Academy of Allergy, Asthma & Immunology National Conference (Mar. 16, 2020) |
| 2020 | Bryn Pharma, LLC, Poster L20, *5-Period, 5-Treatment Crossover Study to Compare the Pharmacokinetics of Intranasal and Intramuscular Epinephrine Administration in Healthy Adult Participants*, Presented at the American Academy of Allergy, |

| | |
|---|---|
| | Asthma & Immunology National Conference (Feb. 26 – Mar. 1, 2021) |
| 2021 | Aquestive Therapeutics, Inc.109 Investor Update Deck Final, *Anaphylaxis and Epinephrine AQST-109: Topline Results from Phase 1 PK Studay (Study 210010)* (Oct. 25, 2021) |
| 2022 | J. Chen. et al, Poster 112, *An Open-Label, 5-Treatment, Crossover, Single-Dose Pharmacokinetic Study of Epinephrine Nasal Spray in Comparison to EpiPen® Intramuscular Injection in Healthy Adults With Seasonal Allergies*, Presented at the American Academy of Allergy, Asthma & Immunology Annual Meeting (Feb. 2019) |
| 2023 | U.S. Patent Application Pub. No. US2010/0209357A1 (Levitt) |
| 2024 | P. Martins, et al., *Physicochemical properties of mucus and their impact on transmucosal drug*, INTERNATIONAL JOURNAL OF PHARMACEUTICS 532 (2017) ("Smyth 2017") |
| 2025 | J. Leal, et al., *Strategies to facilitate or block nose-to-brain drug delivery*, INTERNATIONAL JOURNAL OF PHARMACEUTICS 570 (2019) ("Smyth 2019") |
| 2026 | D. Vllasaliu, et al., *Epithelial Toxicity of Alkylglycoside Surfactants*, JOURNAL OF PHARMACEUTICAL SCIENCES, Vol. 102, No. 1 (January 2013) |
| 2027 | B. Bleske, et al., *Effect of Vehicle on the Nasal Absorption of Epinephrine During Cardiopulmonary Resuscitation*, PHARMACOTHERAPY, Vol. 16, No. 6, (1996) |
| 2028 | K. Gradauer, et al., *Dodecylmaltoside Modulates Bicellular Tight Junction Contacts To Promote Enhanced Permeability*, MOLECULAR PHARMACEUTICS (2017) |
| 2029 | WO 2017/223566A1 ("Crystal '566") |
| 2030 | E. Danielsen and G. Hansen, *Probing the Action of Permeation Enhancers Sodium Cholate and N-dodecyl-β-D-maltoside in a Porcine Jejunal Mucosal Explant System*, Pharmaceutics (2018) |
| 2031 | WO 2021/225974A1 ("Zhang '974") |
| 2032 | O. Rachid, et al., *In Vivo Evaluation of Taste-Masked Fast-Disintegrating Sublingual Tablets of Epinephrine Microcrystals*, AAPS PHARMSCITECH, Vol. 19, No. 8 (Nov. 2018) |
| 2033 | WO 2018/093666A1 ("Crystal '666") |
| 2034 | M. Rawas-Qalaji, et al., *Adrenaline (epinephrine) microcrystal sublingual tablet formulation: enhanced absorption in a preclinical model*, Royal Pharmaceutical Society, JOURNAL OF PHARMACY AND PHARMACOLOGY, 67 (2014) |

| | |
|---|---|
| 2035 | M. Rawas-Qalaji, et al., *Sublingual Diffusion of Epinephrine Microcrystals from Rapidly Disintegrating Tablets for the Potential First-Aid Treatment of Anaphylaxis: In Vitro and Ex Vivo Study*, AAPS PHARMSCITECH, Vol. 16, No. 5 (Oct. 2015) |
| 2036 | Food and Drug Administration, U.S. Dept. of Health and Human Services, *Guidance for Industry - Q8 Pharmaceutical Development* (May 2006) |
| 2037 | Food and Drug Administration, U.S. Dept. of Health and Human Services, *Guidance for Industry – M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals*, Revision 1 (Jan. 2010) |
| 2038 | A. Fortuna, et al., *Intranasal delivery of systemic-acting drugs: Small-molecules and biomacromolecules*, EUROPEAN JOURNAL OF PHARMACEUTICS AND BIOPHARMACEUTICS, 88 (Mar. 2014) |
| 2039 | L. Illum, *Nasal drug delivery – Recent developments and future prospects*, JOURNAL OF CONTROLLED RELEASE, 161(Jan. 2012) |
| 2040 | Food and Drug Administration, U.S. Dept. of Health and Human Services, *Guidance for Industry – Drug Product – Chemistry, Manufacturing, and Controls Information* (Jan. 2003) |

## I. INTRODUCTION

Petitioner's case is based on hindsight and speculation, as well as art that was previously before the examiner during prosecution. Petitioner offers a pharmaceutical expert on the purported obviousness of the "formulation-related aspects" of the '414 patented invention, and yet that expert has never worked with epinephrine, nor with one of the key ingredients in the claimed formulation, dodecylmaltoside. Petitioner also offers a clinical expert on the obviousness of the "dose-related aspects" of the invention, and yet that expert does not have any idea what the "optimum" intranasal dose of epinephrine should be. The difficulties of finding the proper dosage amount of epinephrine by any means other than intramuscular injection and of formulating ***any*** drug (let alone epinephrine) for intranasal administration are well known. Given these challenges, these expert declarations are neither credible nor sufficient to establish that the '414 patent claims are unpatentable. Rather than proffer evidence to meet that burden, Petitioner and its experts have improperly worked backwards from the invention itself. *Amerigen Pharm. Ltd. v. UCB Pharma GmbH*, 913 F.3d 1076, 1089 (Fed. Cir. 2019).

Petitioner brings an anticipation argument based on a reference that does not disclose multiple elements of the '414 patent. First, the reference does not disclose intranasal administration of any dose of less than 3 milligrams of epinephrine to any mammal, and yet the patent is limited to doses of "about 2.4 mg" or less. The patent

requires only one step—"administering"—and yet the required administering of the required dose is nowhere present in Petitioner's reference. Second, the reference does not disclose any dose of less than 3 mg epinephrine, regardless of formulation or route of administration, that "provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis," nor even one that elicits a "biological or medicinal response" in a mammal that is related to type-1 hypersensitivity. Because these disclosures do not exist within the four corners of the reference, Petitioner's experts admit to relying on references ***outside*** those four corners, thus turning their anticipation case into one for obviousness. Petitioner's obviousness case, in turn, fails both for the reasons discussed above and because Petitioner has failed to show either a motivation to combine or a reasonable expectation of success for either obviousness ground. Notably, one of Petitioner's primary references expressly teaches away from the claimed low-dose intranasal methods of treatment.

In sum, Petitioner has not met its burden to show that any of the claims of the '414 patent are unpatentable.

## II. BACKGROUND OF THE INVENTION

### A. Relevant Scientific Background

Intramuscular epinephrine has long been used to treat type-1 hypersensitivity reactions and anaphylaxis, but this "IM" method comes with significant drawbacks. Ex. 1001, 2:10-23; Ex. 1013, 1-2; Ex. 1040, 1; Ex. 2013, ¶¶21, 24. Despite the

drawbacks of intramuscular injection, skilled artisans have yet to come up with a viable commercial alternative for the delivery of epinephrine for type-1 hypersensitivity reactions. Ex. 1010, ¶¶3-4; Ex. 1006, 2; Ex. 2013, ¶25.

Various dosage amounts and methods of administration of epinephrine have been explored by POSAs over the years as alternatives to intramuscular injection. Ex. 2013, ¶¶27-30; Ex. 2014, ¶¶52-53. These include inhalative, sublingual, buccal, and intranasal routes of administration. Ex. 2013, ¶¶27-30, 199. These alternative methods, including by some researchers recognized as "pioneers in the field," typically have targeted doses that were much higher than what is claimed in the '414 patent. Ex. 2013, ¶¶27-30. The dosing of epinephrine by methods other than intramuscular has proven difficult for POSAs to optimize, owing to epinephrine's narrow "therapeutic window." Ex. 2013, ¶26. Indeed, repeat doses of intramuscular epinephrine (typically at a 0.3 or 0.5 mg dose for adult humans) are sometimes required in order to ameliorate symptoms of anaphylaxis. *See* Ex. 1014, 10; Ex. 2013, ¶26.

In order for epinephrine to be effective as a method of treatment for type-1 hypersensitivity reactions, it must be absorbed into the systemic blood circulation. Ex. 2013, ¶26. Achieving systemic absorption of a polar compound like epinephrine via transmucosal delivery (such as intranasal) presents a challenge for POSAs. Ex. 2013, ¶¶35-39; Ex. 2014, ¶¶24-27. The mucosal epithelium in mammalian tissues is

not only non-polar (hydrophobic), but it also presents other barriers to entry for foreign substances. Ex. 2013, ¶¶35-39; Ex. 2014, ¶24. The nasal mucosa and other nasal machinery, such as cilia, present more barriers still. Ex. 2013, ¶¶35-39; Ex. 2014, ¶25. A desirable intranasal formulation must be able to get through these natural barriers, but must do so without damaging them chemically, physically, or otherwise. Ex. 2013, ¶38; *see* Ex. 2014, ¶¶21-22, 24-26. The nose is a sensitive organ, and thus a POSA would know not to add more excipients than absolutely necessary to an intranasal formulation. Ex. 2014, ¶¶20, 24-25, 33, 150. As a result, formulating drugs for nasal delivery is an empirical exercise, specific to each drug and each formulation, and cannot be "routinely" "optimized." Ex. 2014, ¶¶27, 30-31; Ex. 2013, ¶¶40-44; Ex. 2015, ¶99; Ex. 2016, ¶42.

POSAs working on intranasal formulations at the time of the invention would have had numerous techniques available for modifying delivery of a small molecule like epinephrine. *See* Ex. 2014, ¶35; Ex. 2013, ¶¶45-46. Some of these methods would have involved physical changes to the active ingredient (such as converting to dry powder); some would have involved nanoparticles/liposomes or other "complexing" agents; some would have involved the use of absorption enhancers or permeation enhancers. Ex. 2014, ¶35; Ex. 2013, ¶46; Ex. 1004, ¶¶20, 86, 262, Table 61; Ex. 2023, ¶100, 141; Ex. 1010, ¶¶42-45, 47; Ex. 1818, 3, 5-7, 9, 12. No single method was necessarily preferred at the time. Ex. 2014, ¶35. And even if a POSA

desired to use a permeation enhancer for an intranasal formulation, there would have been hundreds of options to choose from—including cyclodextrins, chitosans, bile salts/acids, fatty acids, and surfactants, among others. Ex. 2014, ¶¶36-39, 153; Ex. 2013, ¶48. Alkylsaccharides would have been simply one type of surfactant (among many, many choices), and dodecylmaltoside would have been simply one type of alkylsaccharide (again among many, many choices). Ex. 2014, ¶39; Ex. 2013, ¶48.

Neither alkylsaccharides generally, nor dodecylmaltoside specifically, were permeation enhancers of choice for POSAs developing intranasal formulations at the time of the invention. Ex. 2014, ¶41. Although the molecules had been known for potential use in pharmaceutical formulations since at least the early 1990s, they had yet to be used in any FDA-approved drug formulation—intranasal or otherwise—at the time of the ’414 patent, and they were not on the FDA’s “inactive ingredients list,” which is often the starting point for POSAs looking to develop pharmaceutical formulations. Ex. 2014, ¶¶42-43. Many POSAs, including both formulation experts in this case, have never used alkylsaccharides in conjunction with any formulations they have worked on, intranasal or otherwise. Ex. 2014, ¶¶44-45; Ex. 2018, 64:10-65:16, 66:14-20. Some researchers reported significant toxicity of alkylsaccharides to airway epithelial cells, even at levels below what is claimed by the ’414 patent. Ex. 2014, ¶46; Ex. 2026, 1, 8-11 (finding in one assay that the $IC_{50}$ for DDM was 0.0065%, and summarizing other studies on toxicity); *see also* Ex. 1001, Claim 10

(reciting excipient levels). Further, while some studies had shown that alkylsaccharides could be effective at enhancing absorption of a particular molecule (just like many surfactants and permeation enhancers generally), other studies had shown that they sometimes had no effect, or an entirely unpredictable effect, on such molecules. Ex. 2014, ¶47; Ex. 2028; Ex. 2030; *see* Ex. 2029; Ex. 2033.

### B. The '414 Patent

The '414 patent was filed on May 22, 2019, and issued on June 16, 2020, with 20 claims. Ex. 1001. It is a continuation of International Application No. PCT/US2019/016918 filed on February 6, 2019, which claims the benefit of U.S. Patent Application Ser. No. 15/890,131 filed on February 6, 2018, and claims priority to U.S. Provisional Application No. 62/784,057 filed on December 21, 2018. *Id*. at 1:7-11.

In a June 21, 2019 Non-Final Rejection, the examiner rejected claims 1-8, 12-14, 16, and 17 as allegedly anticipated by U.S. Patent Application Publication No. 2015/0005356. Ex. 2003, 6-9. Claims 1-20 were also rejected as obvious over Fleming in view of Pub. No. 2010/0209357. Ex. 1007, 9-14; *see also* Ex. 1007, 13-26. On December 13, 2019, claim 1 was amended to recite that the aqueous nasal spray pharmaceutical formulation comprises <u>an anaphylaxis treating agent, wherein the anaphylaxis treating agent consists of</u> between about 0.1 mg and about 2.4 mg of epinephrine, or a salt thereof in a single dose. Ex. 1007, 30. Following

amendments and further argument, the examiner withdrew the anticipation and obviousness rejections over Fleming and Levitt and allowed the claims. Ex. 1007, 45-46.

The ’414 patent balances the desire to effectively treat symptoms of type-1 hypersensitivity, including anaphylaxis, with the desire to minimize or avoid the side effects of epinephrine by using lower (but still effective) doses of about 0.1 mg to about 2.4 mg. Ex. 1001, 15:45-51, Claim 1. The invention achieves a systemic effect at doses of below 2.4 mg that is comparable to injection methods of treatment (*e.g.*, 0.3 mg intramuscular injection). *Id*. at Figs. 4-7, 69:17-71:78, Tables 5-9c. In certain embodiments, the addition of an alkylsaccharide[1] increases the bioavailability of epinephrine in a subject, and permits lower dose amounts of epinephrine delivered intranasally to still be efficacious for treating type-1 hypersensitivity reactions. *Id*. at 17:4-34, 47:8-11. A preferred alkylsaccharide is dodecyl-beta-D-maltoside, or “dodecylmaltoside.” *Id*. at 17:35-46.

Example 2, “Clinical Protocols,” describes clinical protocols in healthy human volunteers. *Id.* at 63:24-71:59. In Example 2A, subjects received a single dose of 0.3 mg epinephrine in a nasal spray containing dodecylmaltoside and

[1] “Alkylsaccharides” are often interchangeably referred to in the ’414 patent as “alkylglycosides.” *See* Ex. 1001, 36:11-14.

benzalkonium chloride ("BZK") and a single dose of intramuscular 0.3 mg epinephrine. *Id*. at 63:30-66:13. The study showed that intranasal administration resulted in a lower $C_{max}$ and $AUC_{0-t}$ than intramuscular administration, with no adverse events. *Id*. at 66:19-25.

Example 2B describes a dose escalation study and a crossover study. *Id.* at 66:45-71:58. In the dose escalation study, three subjects received three separate doses of intranasal epinephrine (0.5 mg, 1.0 mg, and 2.0 mg), with a 24-hour washout period between each. *Id*. at 66:62-67:3. $T_{max}$ was lower and $C_{max}$ was higher at each of the dosages compared to the prior study. *Id*. at 69:39-48. AUC was higher for all intranasal administered doses compared to intramuscular administration. *Id*.

In the crossover study of Example 2B, subjects received a single dose of 1.0 mg intranasal epinephrine and a single dose of 0.3 mg intramuscular epinephrine. *Id.* at 67:4-17. The study demonstrated that intranasal administration was not only safe and well-tolerated, but also that the pharmacokinetic parameters of the administered intranasal dose were highly similar to or better than intramuscular injection. *Id*. at 70:43-71:58.

### C. The Challenged Claims

The Petition challenges all claims of the '414 patent. The first ground challenges claims 1-18 as anticipated. Pet. 4. The second and third grounds challenge

claim 1-20 for obviousness under two different proposed combinations. *Id*.

Independent claim 1 recites:

> *A method of treatment of a type-1 hypersensitivity reaction in a mammal comprising administering intranasally to the mammal in need thereof an aqueous nasal spray pharmaceutical formulation; wherein the aqueous nasal spray pharmaceutical formulation comprises:*
>
> > *an anaphylaxis active ingredient, wherein the anaphylaxis active ingredient consists of between about 0.1 mg and about 2.4 mg of epinephrine, or a salt thereof in a single dose.*

Ex. 1001, 72:15-23.

Dependent claim 3 recites:

> *The method of claim* ***1****, wherein:*
>
> > *intranasal administration of the single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis.*

Ex. 1001, 72:33-37.

All of the remaining claims are dependent on at least claim 1. Ex. 1001, 72:24-74:45. Claims 19 and 20 specifically require the inclusion of "dodecyl maltoside." *Id*. at 74:27, 74:39.

## III. LEVEL OF ORDINARY SKILL IN THE ART

For purposes of this proceeding, Patent Owner accepts Petitioner's definition of a person of ordinary skill in the art. *See* Pet. 7-8. One of Patent Owner's experts opines that Petitioner's definition makes use of the disjunctive ("or") in two places where it should be conjunctive ("and") given that the definition allows for a "team"

approach anyway. Ex. 2014, ¶¶56-58. But this change does not affect the substance of this expert's opinions, nor of Patent Owner's arguments in this Response. *Id*. at ¶59.

## IV. CLAIM CONSTRUCTION

In an IPR proceeding, claims are to be construed "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

Petitioner raises two terms for construction: "*[a] method of treatment*" (claim 1), and "*provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis*" (claim 3). Pet. 13-20. Petitioner's proposed constructions of both terms, and application of those constructions, improperly reads out the inventive aspect of the '414 patent: namely, the efficacy at lower doses of epinephrine when used to treat type-1 hypersensitivity reactions intranasally.

### A. "A method of treatment of a type-1 hypersensitivity reaction in a mammal" (Preamble of Independent Claim 1)

**<u>Patent Owner's Proposed Construction</u>:** "*administration of a dose of epinephrine to a mammal that elicits a biological or medicinal response that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of type-1 hypersensitivity.*"

The intrinsic support for this proposed construction can be found in the '414 patent at Cols. 4:60-5:46, 37:25-26, 38:21-22, 39:53-57, 40:50-56, 40:61-66, 41:25-27, 63:25-28, and 66:16-25.

Petitioner argues that the beginning of claim 1's preamble, "[a] method of treatment," is non-limiting, because it offers no additional step, limitation or antecedent basis for the claim, and only states the purpose or intended use of the formulations recited. Pet. 13-14. The Board preliminarily agreed with Petitioner, I.D. 12, but noted that exceptions may arise when the preamble "(1) 'recites essential structure or steps'; or (2) provides antecedent basis for terms in the claim body." *Id.* (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).

As an initial matter, Petitioner improperly takes the phrase "[a] method of treatment" out of context. *See Phillips*, 415 F.3d at 1313 ("[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). Specifically, Petitioner ignores the context provided by the remainder of the preamble, which reads: ". . . of a type-1 hypersensitivity reaction in a mammal." *See* Ex. 2013, ¶95. This is important, because "[w]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the

patent." *Eli Lilly & Co. v. Teva Pharm. Int'l GmbH*, 8 F.4th 1333, 1340 (Fed. Cir. 2021) (internal quotations omitted).

Courts distinguish method claims from composition claims when assessing whether a preamble is limiting. When claims "are directed to methods, and more specifically methods of using a composition for a specific purpose," the "claim format is particularly relevant in [the] consideration of the claim as whole." *Eli Lilly*, 8 F.4th at 1340. The Federal Circuit "ha[s] generally construed statements of intended purpose in such method claims as limiting," because "claims to methods of using . . . are not directed to what the method 'is,' but rather they typically rely entirely on what the method 'does.'" *Id.* at 1341 (citing cases finding that "statements of intended purpose in methods of using . . . compositions has tended to result in a conclusion that such preamble language is limiting"). What the claimed method of the '414 patent ***does***—namely, treatment of a type-1 hypersensitivity reaction in a mammal—is recited within the preamble, and is akin to the preamble deemed limiting in *Eli Lilly*. *Id*. at 1335-36 ("A method for treating headache in an individual, comprising: administering to the individual . . . ."); Ex. 2013, ¶96; Ex. 2014, ¶86.

In addition, the body of claim 1 directs the method to be performed on a mammal "***in need thereof***." Ex. 2013, ¶97. When the preamble sets forth the objective of the method, and the body of the claim directs that the method be performed on someone ***in need***, the claim's recitation of that someone in need gives

life and meaning to the preamble's statement of purpose. *See Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003). The patent in *Jansen* claimed "[a] method of treating or preventing macrocytic-megaloblastic anemia in humans . . . which comprises administering . . . to a human in need thereof." *Id.* at 1330. *Jansen* held that "the claims' recitation of a patient or human 'in need' gives life and meaning to the preambles' statement of purpose." *Id.* at 1333. The preamble there, as here, is "not merely a statement of effect that may or may not be desired or appreciated." *Id.*

The preamble also provides an antecedent basis for at least one later claim term in claim 1. The term "administering intranasally ***to the mammal***," within the claim body, clearly refers back to the preamble, which uses the indefinite article "***a mammal***." Ex. 2013, ¶97; Ex. 2014, ¶87. Where the preamble provides an antecedent basis for terms in the body of the claim, a preamble is limiting. *Eli Lilly*, 8 F.4th at 1340, 43; *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371-72 (Fed. Cir. 2020).

Petitioner proposes, if the preamble is deemed limiting, that "treatment" be construed based upon the definition of "therapeutically effective amount" provided by the specification. Pet. 14. Petitioner derives this construction from the specification's definition of other terms: "pharmaceutical formulation," "formulation," and "subject." *Id.* at 14-15. Patent Owner agrees with some of

Petitioner's reasoning. *See* Ex. 2013, ¶98. In particular, the '414 patent specification offers a definition of "in need of treatment," as "refer[ing] to a judgment made by a caregiver (e.g. physician, nurse, nurse practitioner) [sic], that a patient will benefit from treatment." Ex. 1001, 39:53-57; Ex. 2013, ¶98. Further, the specification provides that "subject" is synonymous with "patient," and "refers to any mammal (preferably human) afflicted with a condition likely to benefit from treatment with a therapeutically effective amount [sic] epinephrine, *e.g.*, a subject experiencing a type-1 hypersensitivity reaction (systemic allergic reaction) such as anaphylaxis." Ex. 1001, 40:50-56; Ex. 2013, ¶98. Finally, "therapeutically effective amount" is defined as "the amount or dose of active compound or pharmaceutical agent that elicits the biological or medicinal response in a tissue, system or individual that is being sought by a researcher, healthcare provider or individual." Ex. 1001, 40:61-66; Ex. 2013, ¶98.

Patent Owner disagrees, however, with Petitioner's wholesale use of the definition for "therapeutically effective amount," again without considering it within the context of the claim and the entire specification. Ex. 2013, ¶99; Ex. 2014, ¶88. The definition in the specification is a general definition; it does not mention type-1 hypersensitivity, anaphylaxis, or epinephrine. Using this general definition, Petitioner's proposed construction would allow the claimed method to be shown based on ***any*** biological or medicinal response at all—whether or not such response

is actually beneficial for the treatment of type-1 hypersensitivity, and whether or not such response would actually be sought by a researcher or healthcare provider. Such a reading improperly divorces the specification from the context and purpose of the claimed method. *See Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373-74 (Fed. Cir. 2008).

Further, given the fact that the claims are directed to methods of treatment "in a mammal," a POSA would understand that the "biological or medicinal response" should occur in a mammal, as opposed to a tissue or system. Ex. 2013, ¶100. Likewise, a POSA would understand that in the context of treating a mammal, the biological or medicinal response is not ***any*** response, but one that ***is being <u>sought</u>***. *Id*. The specification supports this construction by providing an example of what biological or medicinal response is being sought after being treated with the claimed methods. Ex. 2013, ¶101. For instance, "[i]n some embodiments, the nasal spray formulation when administered to a subject yields [certain] pharmacokinetic features." Ex. 1001, 4:60-5:46. The specification also defines AUC, $C_{max}$, and $T_{max}$. Ex. 1001, 37:25-26, 38:21-22, 41:25-27. These definitions further confirm to a POSA that a rise in the plasma epinephrine concentration falls within the biological or medicinal responses being sought after treatment with the claimed methods. *See, e.g.*, Ex. 1004, ¶¶258-69 (discussing values of plasma epinephrine concentrations); Ex. 1006, 4-5 (basing conclusions on plasma epinephrine concentrations); *see also*

Ex. 1003, ¶¶53-54, 148-49, 153-54 (agreeing that plasma epinephrine concentration is a "sought-after" biological or medicinal response after treatment with the claimed methods); Ex. 2013, ¶103.

In sum, the preamble of claim 1 should be construed as indicated above.

### B. "administering intranasally to a mammal" (Independent Claim 1)

**Patent Owner's Proposed Construction:** *plain and ordinary meaning*.

The method step of claim 1 requires "administering intranasally to a mammal." Ex. 2013, ¶105. A method claim, by definition, requires that all steps of the method be actively carried out. *See LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1325 (Fed. Cir. 2016); *Sanofi-Synthelabo v. Apotex*, Inc., 550 F.3d 1075, 1082-83 (Fed. Cir. 2008); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). In the '414 patent, where "administering" is the only step recited, it must necessarily be limiting. Ex. 2014, ¶90. As Petitioner's expert, Dr. Smyth, testified: "Administering, it's a very common term in the field, and it is used to describe how the treatment is given." Ex. 2018, 42:6-18. Further, the administration cannot be just any administration, but must be ***intranasal*** administration. This too is an important limitation, because administering the same drug via different routes of administration may have different effects on a subject. When he was asked, "[I]f you administer a drug by a different route of administration, can that hypothetical drug have different effects on the body?," Dr.

Smyth responded, "Absolutely." Ex. 2018, 44:6-12. Therefore, an epinephrine formulation by itself, if not administered, or if not administered intranasally, would not meet this claim limitation.

### C. "aqueous" (Independent Claim 1)

**Patent Owner's Proposed Construction:** *"a predominantly water-based solution (i.e., not a co-solvent system)."*

The intrinsic support for this proposed construction can be found in the '414 patent at Cols. 43:11-14 and 72:15-19.

The term "aqueous" is not explicitly defined in the patent, a POSA would understand it to mean "a predominately water-based solution (i.e., ***not*** a co-solvent system)," because co-solvent systems have distinctly different chemical properties than aqueous systems. Ex. 2014, ¶91-93; Ex. 2013, ¶107. Typical co-solvent systems, such as water-ethanol or water-propylene glycol, are therefore not "aqueous." Ex. 2014, ¶93; Ex. 2013, ¶107. These kinds of co-solvent systems are specifically mentioned in the '414 patent as being distinct from "aqueous." Ex. 1001, 43:11-14 (identifying "water-ethanol" and "water-propylene glycol" solutions as distinct from "aqueous liquid solution"). The patent further notes that "***typically***, the formulation is an aqueous liquid solution," which indicates that not all liquid formulations are aqueous. *Id.* at 43:13-14 (emphasis added). Furthermore, spray-dried power formulations—being "dry"—are also not "aqueous." Ex. 2014, ¶93; Ex. 2013, ¶107.

### D. "provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis" (Dependent Claim 3)

**Patent Owner's Proposed Construction**: *"elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of anaphylaxis."*

The intrinsic support for this proposed construction can be found in the '414 patent at Cols. 4:60-5:46, 15:28-36, 37:25-26, 38:21-22, 39:53-57, 40:50-56, 40:61-66, and 41:25-27.

Petitioner argues this term is not limiting because it is a statement of intended result that does not result in a manipulative difference in the steps of the claim. Pet. 17. The Board disagreed, finding that "claim 3 appears to permit some manipulative differences in the steps of the claim." I.D. 14-15.

Patent Owner agrees with the Board that this term should be limiting because it provides "additional . . . condition[s] for the claims." *In re Copaxone Consol. Cases*, 906 F.3d 1013, 1023 (Fed. Cir. 2018). Specifically, claim 3 requires that (i) the ***plasma epinephrine concentration*** is the sought-after biological or medicinal response, and (ii) the method is efficacious for the treatment of ***anaphylaxis***. Unlike the facts of *Copaxone*, however, where the term "therapeutically effective" duplicated the dosage requirements, a POSA would understand, based on the specification of the '414 patent and the related art, that not all methods of treatment of intranasal epinephrine are efficacious for the treatment of anaphylaxis—for

example, because they do not elicit any increased plasma epinephrine concentration, or because they do not elicit a rise in plasma epinephrine quickly enough. Ex. 2013, ¶¶109-10; Ex. 2014, ¶97. For example, Srisawat observed ***zero*** epinephrine plasma concentration for intranasal doses of 2.5 mg and lower, and concluded that "systemic absorption of epinephrine via the IN route was observed only at 5 mg." Ex. 1006, 4, Fig. 1. Srisawat also acknowledged the necessity of "achiev[ing] better and faster systemic absorption" for the treatment of anaphylaxis. *Id.* at 5; *see also id*., Fig. 2.

Claim 3, unlike claim 1, requires that the sought after "biological or medicinal response" relates specifically to plasma epinephrine concentration. This is supported by the specification. *See, e.g.*, Ex. 1001, 4:60-5:46 ("In some embodiments, the nasal spray formulation when administered to a subject ***yields [certain] pharmacokinetic features***." (emphasis added)). The pharmacokinetic features refer specifically to the epinephrine plasma concentration. Ex. 2013, ¶111; Ex. 2014, ¶98; Ex. 1001, 37:25-26, 38:21-22, 41:25-27. Furthermore, the specification provides that for the treatment of anaphylaxis, "injection-like pharmacokinetics[] are desirable." Ex. 2013, ¶112; Ex. 1001, 15:28-30. The specification further explains that what is desired is a "rapid increase in plasma levels to stop the anaphylaxis reaction much sooner than other routes of administration." *Id.* at 15:30-36; *see also* Ex. 1003, ¶82 (recognizing benefits of fast absorption).

By asking the Board to construe this term to encompass ***any*** biological and medicinal effect, Petitioner renders the terms "plasma epinephrine concentration" and "anaphylaxis" meaningless. *See* Ex. 2013, ¶113. The Federal Circuit has counseled against reading out express language in a claim except in very unusual circumstances, none of which are present here. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005). Indeed, as the Board noted in its Institution Decision, the presumption that each claim in a patent has different scope is supported by these differences between claim 1 and claim 3. I.D. 15-16; *see Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1351 (Fed. Cir. 2005).

The construction of this term should be consistent with the construction of claim 1, while taking into consideration the additional limitations expressly provided by claim 3. Accordingly, the Board should construe this term as indicated above.

## V. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-18 ARE ANTICIPATED BY POTTA

Ground 1 of the Petition is an anticipation ground. Anticipation requires that a single reference, within its four corners, disclose all of the elements of a claim, as arranged in the claim, either expressly or inherently. *Sanofi-Synthelabo*, 550 F.3d at 1082-83. In the case of a method claim, a reference only anticipates if it discloses the actual step(s) recited in the method. *See id.*; *LifeNet*, 837 F.3d at 1325; *Glaverbel*, 45 F.3d at 1554.

All claims of the ’414 patent require that a specific step be carried out, namely: “***administering intranasally*** to the mammal in need thereof an aqueous nasal spray pharmaceutical formulation.” Ex. 1001, 72:16-18 (claim 1) (emphasis added). All claims also require that the amount of active ingredient in a “single dose” of the “aqueous nasal spray pharmaceutical formulation” be ***less than*** “about 2.4 mg of epinephrine or a salt thereof.” *Id*. at 72:20-23. Depending on the claim, the lower end of the epinephrine dose range varies—for example, the lower end of the range is “about 0.1 mg” in claim 1, “about 0.4 mg” in claim 2, and “about 0.5 mg” in claims 5-7. *Id.* In no claim, however, is the upper end of the claimed range greater than “about 2.4 mg.” *Id.*

Accordingly, in order for a reference to anticipate any claim of the ’414 patent, it must, at a minimum, not only disclose a “single dose” of epinephrine that is less than “about 2.4 mg,” but must also disclose the administration of that single dose intranasally to a mammal. Without administration of the claimed dose, the step is not satisfied. *See LifeNet*, 837 F.3d at 1325; *Glaverbel*, 45 F.3d at 1554. Potta does not contain these disclosures within its four corners, and therefore it cannot anticipate any of claims 1-18.[2] Ex. 2013, ¶146; Ex. 2014, ¶128. Moreover, because

---

[2] Petitioner does not allege that claims 19 or 20 are anticipated by Potta. When asked about this at his deposition, Petitioner’s expert testified that those claims require that

Potta does not disclose the intranasal administration of ***any*** single dose of epinephrine that is less than 2.4 mg to ***any*** mammal, it necessarily does not disclose the desired "response" elicited by administration of that dose to a mammal—whether such response is defined generally as a "biological or medicinal response" (based on the construction of the preamble in claim 1) or more specifically as a "plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis" (based on the construction of claim 3). Ex. 2013, ¶154; Ex. 2014, ¶¶133, 135. As the Board correctly noted in its Institution Decision on this issue, "Petitioner's cited expert testimony appears to lack factual corroboration." I.D. 26. And when Petitioner's experts were asked about this lack of factual corroboration at their depositions, the alleged "corroboration" that they were able to provide came from ***other*** references—*i.e.*, outside the four corners of Potta. This is yet another reason why Petitioner's anticipation arguments based on Potta must fail.

---

the intranasally administered formulation contain "dodecyl maltoside," and which Potta does not disclose. Pet. 30; Ex. 2018, 53:11-55:10 (admitting that "dodecyl maltoside is not explicitly stated in Potta, although other permeation enhancers are"); Ex. 2013, ¶ 144.

### A. Potta Does Not Disclose Administering Intranasally a Single Dose of Epinephrine in the Claimed Range of About 0.1 to 2.4 mg.

Petitioner's anticipation argument rests on two formulation-based disclosures in Potta: Table 1 and Claim 21. *See* Pet. 31-32; Ex. 1004, 7, 24. Each of these disclosures is addressed in turn.

#### 1. Potta Table 1

Table 1 of Potta discloses eleven epinephrine formulations ranging from 1.0% to 7.5% w/w epinephrine. Ex. 1004, ¶242, Table 1; Ex. 2013, ¶¶145-46; Ex. 2014, ¶133. In theory, each of these formulations could be converted to a "dose" of epinephrine by multiplying by the volume administered. Ex. 2013, ¶146. However, Potta does not disclose administering any of these Table 1 formulations at all, let alone intranasally. *Id.* Both of Petitioner's experts agreed on this point:

> **Dr. Weinstein:** "Q: [A]re you aware of any evidence anywhere in Potta to suggest that any of the formulations in Table 1 were ever administered to anything? … To a human, to a rabbit, to a pig, to a mouse, to anything? A: "I'm unaware of -- of the one milligram dose being administered to a pig or human or a mouse."
>
> **Dr. Smyth:** "Potta doesn't provide any data of administering those formulations to a mammal intranasally."

Ex. 2017, 123:4-12; Ex. 2018, 120:16-18. At best, Potta discloses testing for the stability and spray plume characteristics of the Table 1 formulations. Ex. 1004, ¶¶243-51; Ex. 2013, ¶146; Ex. 2014, ¶133. This is standard formulation testing; it is not administration of the formulation in a single dose of about 0.1 mg to 2.4 mg to a

mammal in need thereof.[3] Ex. 2014, ¶133. Because the four corners of Potta do not disclose the step of administering any of the Table 1 formulations to any mammal (via any route of administration, for any purpose), those Table 1 formulations cannot anticipate claim 1 or claim 3 of the ’414 patent.

Indeed, Potta’s only disclosure of the administration of ***any*** dose of ***any*** formulation of epinephrine, intranasally or otherwise, is provided in Examples 6 through 8. Ex. 1004, ¶¶258-69; Ex. 2013, ¶147; Ex. 2014, ¶134. In Example 6, 6 mg doses of epinephrine were administered intranasally to mini-pigs. Ex. 1004, ¶¶258-60; Ex. 2013, ¶124. In Example 7, 3 mg, 6 mg, and 12 mg doses of epinephrine were administered sublingually to rabbits. Ex. 1004, ¶¶261-64; Ex. 2013, ¶125. And in Example 8, 3 and 6 mg doses of epinephrine were administered intranasally to

[3] The provisional application from which Potta stems, which is entitled “Sublingual Epinephrine Spray,” makes clear that the formulations in Table 1 were ***intended*** for sublingual use, not intranasal use—even though in that application there still is no evidence the Table 1 formulations were ever “administered” by any route for any purpose. Ex. 2013, ¶148; Ex. 2014, ¶133; *see* Ex. 2006 (“Potta ’907”). Table 1 of Potta was lifted from Table 1 of Potta ’907 verbatim. *Compare* Ex. 1004, ¶242, Table 1 *with* Ex. 2006, ¶71, Table 1; *see also* Ex. 2018, 70:2-87:4 (agreeing that Table 1 of Potta ’907 is the same as Table 1 of Potta).

humans. Ex. 1004, ¶¶265-69; Ex. 2013, ¶126. None of these examples involved administration of any of the formulations in Table 1, nor doses of less than 3 mg. Ex. 2013, ¶147. These dose administrations are too high; they are all outside of the scope of the ’414 patent claims.

#### 2. Potta Claim 21

Potta Claim 21 discloses the alleged intranasal administration of “the formulation” of Claim 1, which is an epinephrine spray comprising “from about 0.1% to about 15% w/w epinephrine or a salt thereof.” Ex. 1004, 23-24. Neither Potta Claim 21 nor the two claims from which it depends (Claim 19 and Claim 1) says anything about the amount or number of doses to be administered. *Id.* Thus, the actual epinephrine dose that is administered intranasally is missing from Potta Claim 21. Ex. 2013, ¶¶149-50; Ex. 2014, ¶135. As discussed above, the only evidence of intranasal ***administration*** of an epinephrine dose in Potta is 3 mg or 6 mg. Ex. 1004, ¶¶258-60, 265-69; Ex. 2013, ¶147. Intranasal administration of lower dose amounts, to any mammal, is not disclosed in Potta.[4] Ex. 2013, ¶¶128, 147. Accordingly, Potta

[4] Thus, Potta Claim 21 is not enabled for dose amounts below 3 mg, and a reference that is not enabled cannot anticipate. *See, e.g.*, *In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1378-79 (Fed. Cir. 2007) (collecting cases).

Claim 21 cannot anticipate the claims of the ’414 patent, which require intranasal administration of “about 2.4 mg” of epinephrine or less.

The difference between the broadly claimed concentration ranges in Potta Claim 21, and the actual dose administered, can be seen in other Potta references relying on the same data from Example 8 in Potta. *See* Ex. 2013, ¶¶169-70; Ex. 2014, ¶136. For example, US 2018/0318215, also to Potta, discloses the same broad concentration range for the “epinephrine spray formulation,” but limits the administered dose to the specific 6 mg dose disclosed in Potta Example 8—*i.e.*, the only dose for which pharmacokinetic data is reported in Potta Figures 1-3. Ex. 2013, ¶¶169-70. Claim 1 of Potta US 2018/0318215 recites:

> An epinephrine spray formulation comprising:
> ***from about <u>0.1% w/w to about 15% w/w epinephrine</u> or a salt thereof***;
> and from about 1% to about 80% w/w water,
> ***<u>wherein administration to a human of 6 milligrams of epinephrine</u> or a salt thereof in the formulation*** provides a pharmacokinetic parameter selected from the group consisting of a $C_{max}$ from about 418 to about 639 picograms per milliliter, a $T_{max}$ from about 0.12 to about 0.41 hours, an $AUC_{last}$ from about 231 to about 596 h*pg/mL, an $AUC_{inf}$ from about 273 to about 727 h*pg/mL and a combination thereof and wherein w/w denotes weight by weight of the formulation.

Ex. 2009, Claim 1 (emphasis added). This claim language makes clear that Potta understood that a ***concentration*** range for a formulation is not the same as, and does not disclose, the actual ***dose*** being administered. Ex. 2013, ¶22; Ex. 2014, ¶51. A POSA reading Potta would have understood this as well. *Id*.

### B. Potta Does Not Disclose a Sought After Biological or Medicinal Response For a Single Intranasal Epinephrine Dose Less Than 3 mg For the Treatment of Type-1 Hypersensitivity Reactions.

As discussed above in the claim construction section, the preamble of claim 1, which recites "[a] method of treatment of a type-1 hypersensitivity reaction in a mammal," is limiting and should be construed as:

> *administration of a dose of epinephrine to a mammal that elicits a biological or medicinal response that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of type-1 hypersensitivity.*

*See supra* Section IV.A.; Ex. 2013, ¶151. If one applies this construction—or even the "alternative" construction proposed by Petitioner—to the disclosures in Potta, it is clear that Potta does not disclose ***any*** "biological or medicinal response" that a researcher or healthcare provider would have been seeking related to type-1 hypersensitivity based on administration of an intranasal dose of epinephrine of less than 3 mg. Ex. 2013, ¶154; Ex. 2014, ¶137. Therefore, Potta does not anticipate claim 1.

There are a variety of biological or medicinal responses that may be sought by researchers or healthcare providers related to the treatment of type-1 hypersensitivity reactions. Ex. 2013, ¶¶152-53; Ex. 2014, ¶138. Some responses may be measured by blood plasma concentration of epinephrine (as in the '414 patent, or Potta, or Srisawat); others may be measured in other ways (such as via

reduction or elimination of a particular symptom). Ex. 2013, ¶¶152-53; Ex. 2014, ¶138. Potta, however, discloses no biological or medicinal response ***at all*** for doses within the claimed range of the '414 patent, because those doses were never administered to any mammal (intranasally or otherwise). *See supra* Section V.A.

To the extent Petitioner argues that a POSA would understand that the intranasal administration of the Potta Table 1 formulations or Claim 21 concentrations would "inherently" produce a sought after biological or medicinal response, that is pure speculation. Ex. 2013, ¶¶155-56; Ex. 2014, ¶¶139, 141. Neither Petitioner nor its experts can point to any biological or medicinal data within the four corners of Potta to support their "inherency" assertion for ***any*** mammal. *In re Magnum Oil Tools Int'l*, 829 F.3d 1364, 1380-81 (Fed. Cir. 2016) (a petitioner cannot satisfy its burden of proof on invalidity with "mere conclusory statements," and "must instead articulate specific reasoning, based on evidence of record"). Potta does indeed include biological response data—in the form of increased plasma epinephrine concentrations—for the 6 mg doses administered intranasally in Examples 6 and 8. Ex. 2013, ¶¶124-27, 154; Ex. 2014, ¶139. But Potta includes no such data, or any other evidence of a sought-after biological response, at doses lower than 6 mg of epinephrine administered intranasally.

When pressed to provide support for his speculative inherency position, Petitioner's expert admitted that he was not actually relying on Potta alone to justify

his opinions regarding biological response, but additionally was relying on the teachings of Srisawat:

> **Q:** Isn't it possible, Dr. Smyth, that one or more of the 1% formulations in Potta table 1 would have failed to elicit the desired biological or medicinal response that was being sought by Potta -- when delivered intranasally?
> **A.** Let me make sure I'm clear on your question. So the biological response, using the formulations of Potta, table 1, is it possible that those may have failed to elicit a biological response?
> **Q.** That's right, when delivered intranasally.
> **A.** Based on the teachings of Srisawat, I don't think so.

Ex. 2018, 147:2-19; *see also id*. at 120:21-122:15, 147:2-149:13. It is black-letter law that where an expert combines two references to show anticipation, express or inherent, the expert has converted an anticipation challenge into one for obviousness. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002). That is exactly what happened here.

Furthermore, even if the Board wishes to consider the data in Srisawat in conjunction with the disclosures in Potta for anticipation purposes, those data do not support Petitioner's argument that the Potta Table 1 or Claim 21 formulations would inherently have yielded a sought-after "biological or medicinal response" when administered intranasally to a mammal at doses of about 2.4 mg or less. Ex. 2013, ¶¶42, 156. The plasma epinephrine concentration data reported in Srisawat are clear:




**Figure 1.** The area under the plasma concentration versus time curve at time 0 – 120 minutes ($AUC_{0\text{-}120\ min}$) of epinephrine absorption at different dosages and routes of administration. The plots are shown as mean ± SEM. An asterisk indicates a significant difference compared with the IN saline ($p < 0.05$, Mann-Whitney test).

Ex. 1006, Fig. 1. A POSA reviewing these data would understand that to any degree of statistical relevance, essentially ***zero*** plasma epinephrine concentration was achieved with intranasal epinephrine doses of 0.3, 0.6, 1.25, and 2.5 mg. Ex. 2013, ¶156. This is especially true after accounting for detection limits for very low amounts of epinephrine, as well as the existence of baseline levels of endogenous epinephrine. Ex. 2013, ¶¶117, 156, 162-63; *see also* Ex. 1006, 3 (recognizing that the study could cause stress to patients and thus "affect plasma levels of epinephrine due to an increased release from the endogenous source"); Ex. 2017, 137:14-23 (admitting that a POSA would expect, and have to account for, "endogenous baseline epinephrine" in studies like Srisawat).

The data presented in Srisawat Figure 1 is the area under the curve (AUC) from time 0 to 120 minutes after administration. Ex. 1006, Fig. 1; Ex. 2013, ¶¶116-17. The AUC represents the total exposure of a drug over a specified time, in this case, two hours. Ex. 1006, Fig. 1; Ex. 2013, ¶117; Ex. 2014, ¶103. This means that the 0.3, 0.6, 1.25, and 2.5 mg intranasal doses of epinephrine had ***no*** systemic response in any of the study participants at any point after administration for ***two hours***. Ex. 1006, Fig. 1; Ex. 2013, ¶117. This, of course, is precisely what Srisawat reported in words: "In this study, significant systemic absorption of epinephrine via the IN route was observed ***only*** at the dose of 5 mg." Ex. 1006, 4 (emphasis added).

Given how unambiguous Figure 1 in Srisawat is, Petitioner's experts crafted a new argument at their depositions—entirely divorced from their declarations—by saying there would be ***other*** "biological or medicinal responses" that would necessarily flow from the hypothetical intranasal administration of the Table 1 formulations in Potta. For example, Dr. Smyth asserted that the "transient tremor," "palpitation," and "increases in heart rate, and diastolic and systolic blood pressure at $T_{max}$" reported in Srisawat indicated that there are biological and medicinal responses for the intranasal administration of doses 2.5 mg and less. Ex. 2018, 151:2-12 ("Srisawat is showing . . . biological and medicinal effects" such as "increases in heart rate and increases in diastolic and systolic blood pressure."). For several reasons, this argument is not credible.

First, Srisawat does not indicate which subjects had these responses, and it is clear they were not observed in all subjects. Ex. 1006, 4 ("one" subject experiencing transient tremor; "two" subjects experiencing palpitation; "most" but not "all" subjects experiencing heart rate and blood pressure increases); Ex. 2013, ¶157. There is no data in Srisawat to support these alleged biological "responses"; there is merely two sentences of text indicating that while some subjects experienced these responses, others did not. *See* Ex. 2013, ¶157. Second, Srisawat notes that there was "no correlation" found between the symptoms and the plasma concentration of epinephrine. Ex. 1006, 4; Ex. 2013, ¶157. Third, even assuming these symptoms were a biological response to the administration of intranasal epinephrine at low doses in Srisawat, they were not ***sought-after*** responses. Srisawat was seeking to measure plasma epinephrine concentrations, as was Potta. Ex. 1006, 4-5; Ex. 1004, ¶¶258-60, 265-69; Ex. 2013, ¶158. Dr. Weinstein testified that most of these "responses" were not "sought after" responses, but instead "adverse" and "side" effects. Ex. 2017, 54:2-55:21 (noting that "the main side effects would be increased heartrate, increased blood pressure, and [] peripheral tremor"); Ex. 2013, ¶220. He also testified that many of the effects would not be expected in all cases. Ex. 2017, 52:9-21 (noting that epinephrine's "effects on blood pressure are variable"); *see also* Ex. 2013, ¶29. In sum, Potta cannot be read to teach an inherent sought-after

biological or medicinal response based on intranasal administration of epinephrine at a dose of less than about 2.4 mg. Ex. 2013, ¶¶42, 158.

Dr. Weinstein also posited at his deposition that the intranasal administration of Potta's formulations would inherently cause a local biological or medicinal response such as vasoconstriction. Ex. 2017, 123:13-126:22 (relying on non-Potta reference to show that epinephrine exhibits vasodilation effects when applied to the nose topically). Again, this is rank speculation. *See* Ex. 2013, ¶42, 159. Dr. Weinstein presented no objective evidence, either in his declaration or at his deposition, that a nasal spray containing the formulations in Table 1 of Potta would necessarily lead to vasoconstriction. As Patent Owner's expert Dr. Kaliner explains, even to elicit a local response, an intranasal spray needs to permeate both the mucus layer and at least one epithelial layer. *See* Ex. 2013, ¶¶37, 38, 159. Without such permeation before the small amount of spray runs down the back of the nose and into the digestive tract, where it is metabolized, there can be zero local or systemic biological response. *See id.* Furthermore, vasoconstriction in the nose is not a "sought after" response for a researcher like Potta or Srisawat. Ex. 2013, ¶160. To the contrary, Srisawat suggests adding drugs with vaso***dilation*** effects, specifically, alpha-adrenergic receptor antagonists such as phentolamine, "to counter the vasoconstriction effect of epinephrine, which prevents its own systemic absorption." *Id*.; Ex. 1006, 5.

### C. Potta Does Not Disclose a Plasma Epinephrine Concentration That is Efficacious For the Treatment of Anaphylaxis For a Single Intranasal Epinephrine Dose Less Than 3 mg.

As discussed in the claim construction section above, the claim term "plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis," in claim 3, should be construed as:

> *elicits a plasma epinephrine concentration that (i) is being sought by a researcher or healthcare provider; and (ii) is related to preventing the progression or appearance of, or eliminating, one or more symptoms of anaphylaxis.*

*See supra* Section IV.D.; Ex. 2013, ¶¶108-13, 161. In contrast, Petitioner's proposed construction and analysis of this term, which provides no meaningful difference between claim 1 and claim 3, reads out the phrase "plasma epinephrine concentration," as well as the requirement that said concentration be "efficacious" for the treatment of anaphylaxis.

Examples 6 through 8 make clear that Potta knew how to measure plasma epinephrine concentrations resulting from doses of epinephrine, and plasma epinephrine concentrations are reported following doses of 6 mg and 12 mg to different mammals via different modes of administration. Ex. 1004, ¶¶258-69; *see also* Ex. 2013, ¶¶127, 165; Ex. 2014, ¶141. However, as discussed above, Potta does not disclose administration of ***any*** epinephrine dose lower than 3 mg, to any subject (intranasally or otherwise), and does not disclose the plasma epinephrine concentrations for intranasal doses other than 6 mg, despite purportedly

administering a 3 mg intranasal dose. Ex. 2013, ¶¶164-69; Ex. 2014, ¶141. Therefore, Petitioner and its experts are left to speculate what the "plasma epinephrine concentrations" resulting from these purported administrations in Potta would be. As Dr. Weinstein testified with respect to Potta Table 1:

> **Q:** Do you know what the plasma epinephrine concentration is that was -- that would result from administration of any of the formulations in Table 1 to any mammal?
> **A:** I don't know what the -- what the plasma concentrations would be with administering these -- these formulations.
> **Q:** And Potta certainly doesn't tell us what those would be, correct?
> **A:** Potta does not have information regarding plasma concentrations of these doses.

Ex. 2017, 127:14-128:2. Similarly, with respect to the various concentrations recited in Potta Claim 21, Dr. Weinstein stated that "the short answer is that I don't know what the plasma concentration would be," and that "Potta does not have that information or present that information." *Id*. at 128:10-130:24.

Dr. Smyth testified in similar fashion, adding that a POSA would need to turn to Srisawat in order to speculate about the plasma epinephrine concentration resulting from certain of the formulations in Potta:

> **Q.** . . . [I]f you look at formulation No. 1 in table 1 of Potta, what is the plasma epinephrine concentration that results from administration of that formulation intranasally to a mammal?
> **A.** Potta doesn't report that plasma concentration for formulation 1 in table 1 after intranasal administration either systematically -- you know, systemic plasma or even local plasma concentration. But I think looking -- as I said before, ***looking at Srisawat***, a person of ordinary skill would understand that plasma concentrations would be very low.

> **Q.** And Potta doesn't report a systemic or a local plasma concentration of epinephrine from intranasal delivery of formulations 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 in table 1 of Potta either, correct?
> **A.** No, not for the formulations in table 1.
> **Q.** So if I understood you correctly, you said that looking at formulation No. 1 in table 1 of Potta and ***looking at Srisawat***, a person of ordinary skill in the art would understand that the resulting epinephrine plasma concentration would be low, correct?
> **A.** Yes.

Ex. 2018, 136:19-138:6 (emphasis added); *see also id*. at 131:21-132:8 ("Well, if you look at the Srisawat pharmacokinetic data, it sort of provides a range of what [the undisclosed plasma epinephrine concentrations in Potta] could be."); *see also id*. at 153:4-154:1 (similar testimony for Potta Claim 21).

Just as with claim 1, *see supra* Section V.B., Petitioner's own experts have converted their anticipation case for claim 3 into an obviousness case by introducing evidence beyond the four corners of Potta. *See* Ex. 2013, ¶168. Furthermore, even if permitted for purposes of anticipation, which it should not be, the interpretation of the plasma epinephrine concentrations disclosed in Figure 1 of Srisawat by Petitioner's experts is simply not credible. For such doses, Figure 1 teaches the opposite of what they wish to use it for: namely, ***zero*** plasma epinephrine concentration. *See* Ex. 2013, ¶¶110, 117, 166. A plasma epinephrine concentration of zero is not "efficacious" for the treatment of anaphylaxis under any construction. *Id*.

### D. Potta Does Not Anticipate Claims 2, 4-18

Because claims 1 and 3 are not anticipated by Potta, and claims 2 and 4-18 are dependent on claims 1 and/or 3, claims 2 and 4-18 are also not anticipated by Potta. *See HTC Corp. v. Cellular Communs. Equip., LLC*, 877 F.3d 1361, 1366, 1369 (Fed. Cir. 2017).

## VI. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-20 WOULD HAVE BEEN OBVIOUS OVER POTTA IN VIEW OF MAGGIO '145 AND MUNJAL

Obviousness is a question of law premised on underlying issues of fact: (i) the scope and content of the prior art; (ii) the level of ordinary skill in the pertinent art; (iii) the differences between the claimed invention and the prior art; and (iv) secondary considerations such as commercial success, long-felt need, and the failure of others. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). To render a claim obvious, a POSA must have had not only a "reason to combine the teaching of the prior art references to achieve the claimed invention," but also "a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012).

Although POSAs at the time of the '414 patent invention were well aware of the disadvantages associated with injection of epinephrine, it remains the treatment of choice for anaphylaxis—indeed, the only treatment. Ex. 2017, 44:11-14 ("The injectable epinephrine [] is the only treatment that patients have, whether it's

children or whether it's adults, whatever, that can take care of their condition."); Ex. 2013, ¶25. POSAs have therefore focused on alternative methods of treating type-1 hypersensitivity reactions—including sublingual, buccal, inhalative, and intranasal—all largely without success until the '414 patent. Ex. 2013, ¶¶27-29, 199.

The '414 patent invention's ability to achieve sought-after biological responses at the claimed 2.4 mg and lower doses of epinephrine was entirely unexpected and solved a long-felt but unmet need in the art. The solution discovered by the '414 patent inventors was not a "minor difference," Pet. 44-45, but instead a major advancement. Ex. 2013, ¶¶223-35. This is especially true given that POSAs knew, based on the teachings of Srisawat, that intranasal doses under 5 mg elicited ***no*** sought-after biological response, and thus POSAs were routinely investigating doses for transmucosal routes that were approximately two or five or even ten times higher than the highest claimed dose in the '414 patent. Ex. 2013, ¶¶27-29; Ex. 1006, Fig. 1.

As both sides' experts testify, formulating drugs for intranasal delivery is an empirical exercise that is specific to each drug and each formulation. Ex. 2013, ¶¶40-44; Ex. 2014, ¶143. Figuring out the dosage of epinephrine that will deliver sought-after responses related to the treatment of type-1 hypersensitivity reactions via intranasal delivery is harder still, especially given the narrow therapeutic window of epinephrine, and that the required pharmacokinetics of epinephrine for treatment of

anaphylaxis are not well characterized. *See* Ex. 1003, ¶101; Ex. 1041, Fig. 4; Ex. 2013, ¶¶26, 202.

### A. POSAs Would Not Have Been Motivated to Pursue a Method of Treatment Comprising Administering a Dose in the Claimed Range of the '414 Patent, Nor Had a Reasonable Expectation of Success in Doing So.

Contrary to Petitioner's assertions,[5] POSAs would not have been motivated to pursue the claimed aqueous intranasal dose of 2.4 mg or less of epinephrine for the treatment of type-1 hypersensitivity reactions for two reasons. Ex. 2013, ¶178; Ex. 2014, ¶144. First, prior to the '414 patent, it was not known in the art that the claimed doses could elicit a sought after biological response related to treatment of these conditions. Second, POSAs routinely investigated doses of epinephrine for

[5] Petitioner's obviousness arguments repeatedly cite to more than ***fifty*** paragraphs of expert testimony at a time, in disregard of 37 C.F.R. § 42.6(a)(3)'s prohibition against incorporation by reference of arguments from one document into another. *See*, *e.g.*, Pet. 49 (citing to Ex. 1002 ¶¶358-409 and Ex. 1003 ¶¶307-57 for the proposition that "POSAS would have pursued the low dose formulations in Potta and understood them to work with absorption enhancement agents"); Pet. 45 (citing to Ex. 1002 ¶¶362-409 and Ex. 1003 ¶¶311-57); Pet. 51 (citing to Ex. 1002¶¶ 357-409 and Ex. 1003 ¶¶306-57).

transmucosal delivery that were several times higher than the claimed dose, indicating a motivation to use higher rather than lower epinephrine doses for intranasal delivery to achieve effect.

Petitioner's expert on the "dose-related" aspects of epinephrine, Dr. Weinstein, opined in his declaration that "a POSA would have been motivated to combine the teachings of Potta, Maggio '145, and Munjal (in light of the state of the art) and optimize the dose of epinephrine to be 'between about 0.1 mg and about 2.4 mg of epinephrine,' to treat a type-1 hypersensitivity reaction." Ex. 1003, ¶311. When asked at his deposition about intranasal dosing of epinephrine at the time of the invention, however, Dr. Weinstein stated that "I don't know what the maximum dose is." Ex. 2017, 118:2-6. And when asked what the "optimum dose" for epinephrine given intranasally would be, he stated: "[O]ptimum could be the highest dose, optimum could be the best dose, optimum could be the safest dose, optimum could be showing that there's no effect . . . there's a variety of things it could be." Ex. 2017, 118:8-119:1. This reveals Dr. Weinstein's opinions in his declaration regarding dose optimization for what they are: speculative and hindsight-based. *See InTouch Techs., Inc. v. VGo Communs., Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

For example, the epinephrine doses that Potta reported as showing increased plasma epinephrine concentrations when delivered intranasally were 6 mg. Ex. 1004, Example 8; Ex. 2013, ¶179; Ex. 2014, ¶145. This dose is consistent with the findings

of Srisawat, which reported that for all intranasal doses tested ***under*** 5 mg (including 0.3, 0.6, 1.25, and 2.5 mg), there was no plasma epinephrine concentration and therefore no sought-after biological or medicinal response. Ex. 1006, 4, Fig. 1; Ex. 2013, ¶179; Ex. 2014, ¶145. Petitioner fails to point to any art indicating that a single intranasal dose of epinephrine below 3 mg could elicit a sought-after biological or medicinal response in any mammal. *See* Ex. 2013, ¶180; Ex. 2014, ¶145. When asked what the plasma epinephrine concentration would be for Potta Table 1 and Claim 21 formulations, Petitioner's experts did not know. Ex. 2018, 131:21-132:8, 136:19-138:6, 153:4-154:1; Ex. 2017, 127:14-131:1. Thus, Petitioner's argument that the combination of Potta's formulations with Maggio '145 and Munjal would result in a formulation that inherently elicits a biological response is unsupported. *See Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012); Ex. 2013, ¶180.[6]

---

[6] Unlike *Santarus*, where the blood serum levels after administering an active ingredient were well-documented in the prior art, 694 F.3d at 1354, here, Srisawat discloses the opposite: that there is ***no*** epinephrine plasma concentration resulting from administration of epinephrine in the claimed dose ranges of the '414 patent. *See* Ex. 1006, 4. This is the opposite of inherency.

Indeed, in light of Srisawat's express instruction that "***the study should be repeated*** in a larger sample size and ***at the IN doses of <u>5 mg or higher</u>*** to confirm the reproducibility of these findings and ***to obtain the optimal IN doses***," Ex. 1006 at 5 (emphasis added), Dr. Weinstein's opinion that POSAs would have been motivated to "optimize" at 3 mg or ***lower*** doses is simply not credible. Srisawat's data showing no response at all from epinephrine doses less than 5 mg administered intranasally also undercuts any reasonable expectation of success that such lower doses would actually work. *See* Ex. 2013, ¶179; Ex. 2014, ¶146. In order for a motivation to use such doses to exist, and for there to be a reasonable expectation of success, there must be an indication that such doses would at least elicit ***some*** rise in plasma epinephrine concentration. Ex. 2013, ¶190; Ex. 2014, ¶146. The notion that POSAs would be motivated to use non-effective doses is contrary to tenets of drug discovery and formulation. Ex. 2013, ¶190; Ex. 2014, ¶146.

It was also known from Potta and Srisawat that epinephrine doses of 5 or 6 mg, when delivered intranasally, were well tolerated in patients. *See* Ex. 2013, ¶¶32, 181-86; Ex. 2014, ¶147. Post-priority date evidence indicates that this trend continues even today. Ex. 2013, ¶187; *see, e.g.*, Ex. 2019, Ex. 2020 (clinical studies with intranasal epinephrine doses of 4.4, 6.6, 8.8 and 13.2 mg); Ex. 2022 (6 mg intranasal doses). These dosage amounts would not have been surprising to a POSA, as they were similar to dosage amounts being used in approved studies for other

methods of transmucosal delivery of epinephrine. *See* Ex. 2013, ¶186; Ex. 2014, ¶147 (citing Ex. 1051, 2, 4 (up to 40 mg for sublingual administration); Ex. 1050 (up to 8 mg for inhalative administration); Ex. 1066 (up to 10 mg for nasal administration via epinephrine-soaked cotton swabs)). Again, these studies continue to this day, with no serious adverse effects being reported. *See*, *e.g.*, Ex. 2019; Ex. 2020; Ex. 2021. Given that neither of Petitioner's experts were able to articulate what the maximum tolerable dose of epinephrine was or what the optimum dose was when delivered intranasally (or even transmucosally), it is not credible for them to claim that POSAs would have been motivated to formulate in the dosage range claimed by the '414 patent, or that they would have had a reasonable expectation of success in achieving an effective method of treatment in doing so. *See* Ex. 2017, 101:13-22 (Dr. Weinstein admitting: "I, frankly, don't know whether [POSAs] could use 10 or 20 or 50 or 100 milligrams."); *see also* Ex. 2018, 35:8-35:16.

### B. POSAs Would Not Have Been Motivated to Use Dodecylmaltoside to "Optimize" the Intranasal Epinephrine Formulations Disclosed in Potta, Nor Had a Reasonable Expectation of Success in Achieving Such Optimization.

As discussed above, Petitioner's "dosing"-related obviousness arguments are based on impermissible hindsight. So too are Petitioner's "formulation"-related obviousness arguments. On this issue, Petitioner's 290-page expert declaration can be distilled down to the argument in paragraph 384: "In my opinion, based on the

disclosures in the art about the advantages of dodecyl maltoside, in particular Maggio '145, ***skilled artisans would have been motivated to optimize intranasal spray formulations disclosed in Potta and would have added dodecyl maltoside from Maggio '145 to provide rapid onset of action and bioavailability of epinephrine*** for treatment of type-1 hypersensitivity reaction, such as anaphylaxis." Ex. 1002, ¶384 (emphasis added).

As explained by Patent Owner's expert, Dr. Wyse, this argument suffers from multiple problems. First, the argument presumes that a POSA would have been motivated to "optimize" the intranasal formulations disclosed in Potta. Ex. 2014, ¶149; Ex. 2013, ¶193. Potta reports data for 6 mg doses from a Phase 1 clinical study in humans dosed with 3 mg or 6 mg epinephrine intranasally. Ex. 1004, Example 8. The conclusion that Potta reaches is: "[T]he bioavailability of intranasal formulations of the present invention ***is as good or better*** than that of the intramuscular injection both in subject that are and are not experiencing seasonal allergies." Ex. 1004, ¶269 (emphasis added). Potta makes no suggestion that these positive results with 6 mg necessarily needed to be "optimized." Ex. 2013, ¶193.

Second, "optimizing" an intranasal drug formulation, even if the desire is to increase bioavailability of the drug, does not necessarily mean using "permeation enhancers," let alone a particular permeation enhancer (here, dodecylmaltoside). As Dr. Wyse explains, the fewer inactive ingredients that can be added to an intranasal

formulation, the better. Ex. 2014, ¶150. Each new excipient presents potential stability issues for the overall formulation, and the cost of excipients can vary widely. *Id*. at ¶¶31, 40; *see also id*. at ¶¶23, 34, 152 (describing experience with intranasal naloxone formulations). As Dr. Smyth admitted in another proceeding involving intranasal spray formulations: "nasal spray formulations require a fine balance of several parameters, including chemical stability, physical stability, microbial stability, dose uniformity, osmolality, pH and spray quality," and "each of these parameters is interrelated, so modifying any one of them will also modify any of the other parameters in unknown ways." Ex. 2016, ¶42.

Moreover, many approaches to "optimizing" an intranasal composition for bioavailability do not include the use of permeation enhancers at all. Ex. 2014, ¶151; *see also* Ex. 2013, ¶194. One of these methods includes physical changes to the formulation, such as converting to a dry powder. Ex. 2014, ¶151; Ex. 2013, ¶194. Potta discloses exactly this approach: use of a spray-dried powder version of another formulation which led to dramatic differences in the absorption of epinephrine in rabbits, enabling an almost 7-fold difference in absorption within the first 5 minutes. Ex. 1004, ¶¶261-64; Ex. 2013, ¶194. As Dr. Wyse explains, other methods of increasing bioavailability include the use of nanoparticles or liposomes, or the use of complexing agents. Ex. 2014, ¶151.

Dr. Smyth testified that at least three of the inactive ingredients in Potta's clinical formulations would ***already*** have been understood to be able to function as permeation enhancers: edetate disodium dehydrate (akin to EDTA), benzalkonium chloride, and ethanol. *See* Ex. 1004, Table 62; Ex. 2018, 95:8-96:19; *see also* Ex. 2013, ¶195. Dr. Smyth provides no explanation for why a POSA would necessarily have tried new and different permeation enhancers to "optimize" the clinical formulations in Potta, when other options disclosed in Potta not involving permeation enhancers would also have been reasonable and viable approaches, especially given that the addition of each new excipient could adversely affect the formulation in unknown ways. Ex. 2014, ¶152; Ex. 2016, ¶42.

Third, even assuming a POSA would have been motivated to optimize the clinical formulations in Potta using a "permeation enhancer" different from the ones that Potta already employed, it is pure hindsight to say that they would have immediately alighted on dodecylmaltoside and had a reasonable expectation of success that it would work to allow the intranasal epinephrine formulation to be more "efficacious" in the treatment of type-1 hypersensitivity, including anaphylaxis. *See* Ex. 2013, ¶¶196-202. As Dr. Wyse explains, there are hundreds of potential permeation enhancers that a formulator would have considered for an intranasal formulation of epinephrine, and dodecylmaltoside is only one of them. Ex. 2014, ¶¶36-37, 153; *see also* Ex. 2013, ¶196; Ex. 2023, ¶141; Ex. 1010, ¶¶42-45, 47; Ex.

1018, 8-10; Ex. 2018, 168:19-169:14, 183:19-185:16. There are even multiple "branded" permeation enhancers. Ex. 2014, ¶39. Potta itself lists numerous permeation enhancers suitable for his formulations, and dodecylmaltoside is not among them. Ex. 1004, ¶¶20, 86. The "preferred" permeation enhancers in Potta, in fact, are "caprylic acid" and "menthol." *Id*. at ¶86; Ex. 2013, ¶129. Further, a more recent reference surveying the field of different permeation enhancers for use with polar small molecules identified chitosan as an "ideal" permeation enhancer ***over*** surfactants, such as alkylsaccharides and dodecylmaltoside. *See* Ex. 1018, 5-8, 11-12, 17; Ex. 2024, 12-13; Ex. 2025, 2-3 (both recognizing chitosan); Ex. 2013, ¶48, 196; Ex. 2014, ¶153.

In review articles around the time of the '414 patent, Dr. Smyth lists various approaches to permeation enhancement, and again dodecylmaltoside is not among them. *E.g.*, Ex. 2024, 12-13; Ex. 2025, 2-6; Ex. 2013, ¶48; Ex. 2014, ¶¶44. So far as the experts are aware, dodecylmaltoside had never been used in any approved FDA medication at the time of the invention, nor was it listed on the FDA's "inactive ingredients list." Ex. 2014, ¶154; Ex. 2018, 112:6-15. Some articles even questioned the viability of dodecylmaltoside as an inactive ingredient due to toxicity concerns, even at concentrations below or at the lower end of the amount claimed in the '414 patent. Ex. 2026, 1, 8-11; Ex. 2013, ¶166; Ex. 2014, ¶154. Not surprisingly, then, neither Dr. Smyth nor Dr. Wyse, who combined have over fifty years of

pharmaceutical formulation experience, have ever worked with or considered a formulation, intranasal or otherwise, with ***any*** alkylsaccharides, let alone dodecylmaltoside specifically. Ex. 2018, 64:10-65:16; Ex. 2014, ¶45.

Of the art that discusses the use of alkylsaccharides as a permeation enhancer, none are targeted specifically for intranasal epinephrine formulations for the treatment of type-1 hypersensitivity reactions at or near the claimed range in the ’414 patent. *See* Ex. 2013, ¶¶197-201; Ex. 2014, ¶155. For example, Kee found that the ***topical*** addition of dodecylmaltoside, along with another compound (HPMC), enabled epinephrine to permeate better through the ***cornea*** (not the nose) by measuring percent change in rabbit pupil diameter. Ex. 1021, 9:15-38; Ex. 2013, ¶198; Ex. 2014, ¶155. The differences between Kee and the ’414 patent are legion: the use of an additional viscosity agent, the structure of the cornea versus that of the nasal mucosa (including mucus, cilia, etc.), the topical/local response sought (as opposed to systemic), and the clinical indication (glaucoma versus type-1 hypersensitivity). Ex. 2013, ¶198; Ex. 2014, ¶155. Accordingly, a POSA would not view the results presented in Kee as relevant to, or predictive of, the problem of intranasal delivery of epinephrine for the treatment of type-1 hypersensitivity reactions. Ex. 2013, ¶198. Further, Hill’s extremely broad disclosures do little more than prophesize the use of eleven different categories of permeation enhancers. *See* Ex. 1022, ¶¶53, 102, 130, claims 23-24; Ex. 2013, ¶198; Ex. 2014, ¶155. Hill

provides no actual data or examples that would allow a POSA to conclude that dodecylmaltoside, when used with epinephrine, would enable a sought-after response at the claimed range when delivered intranasally. Ex. 2013, ¶198; Ex. 2014, ¶155.

Meanwhile, the prior art indicated that ***other*** permeation enhancers were preferred with epinephrine. Ex. 2014, ¶156. As discussed earlier, the studies referenced by Srisawat for the use of "bile salts and surfactants" disclosed taurodeoxycholic acid as the bile salt and polyoxyethylene-9-lauryl ether as the surfactant, not dodecylmaltoside. Ex. 1006, 5 (citing Ex. 2027, 3); Ex. 2014, ¶156; Ex. 2013, ¶217. Both excipients increased plasma epinephrine concentrations, and the study concluded that the examined surfactant was not more effective at enhancing absorption over the bile salt. *See* Ex. 2027, 6; Ex. 2014, ¶156; Ex. 2013, ¶217. Further, as previously mentioned, chitosan was seen as an "ideal" permeation enhancer over alkylglycosides for use with polar small molecules. *See* Ex. 1018, 5-8, 11-12, 17; Ex. 2014, ¶156; Ex. 2013, ¶48; Ex. 2014, ¶153. Finally, Potta identifies certain preferred permeation enhancers for use with epinephrine spray formulations, none of which are alkylsaccharides or dodecylmaltoside. Ex. 1004, ¶¶20, 86; Ex. 2014, ¶156; Ex. 2013, ¶129.

Fourth, a POSA would not have considered Maggio '145 or Munjal to change the analysis regarding motivation or reasonable expectation of success. Maggio '145

is primarily focused on, and cited by Petitioner for, the use of alkylsaccharides with opioids. Ex. 1005, Claims 1-32; Ex. 2014, ¶157; Ex. 2013, ¶¶200-01. Munjal is focused on yet another distinct molecule: sumatriptan. Ex. 1020, 1. A POSA would not have concluded from either disclosure that there was a reasonable expectation of success of using dodecylmaltoside to improve the effectiveness of an ***epinephrine*** intranasal spray. Ex. 2013, ¶201. As Dr. Weinstein stated, "[s]umatriptan is not in the same chemical class as epinephrine," "it hits different receptors in the body," and "interacts with other chemicals and other molecules in the body whether they're proteins or receptors." Ex. 2017, 149:10-18 (testifying that as between epinephrine and sumatriptan: "they're different targets, . . . different indications, different disease states, . . . different molecules"). Further, the record reflects that "[e]ach drug is one particular case and, thus, the relationship between the drug characteristics, the strategies considered and the permeation rate is essential." Ex. 1064, 17.

Fifth, as Dr. Wyse explains, there are papers showing that the effects of dodecylmaltoside are (a) largely unpredictable, and (b) can have no absorption enhancing effects on certain molecules, even structurally similar molecules. Ex. 2028, 1, 5; Ex. 2014, ¶158; *see* Ex. 2013, ¶202; *see* Ex. 2029; Ex. 2033. As Amphastar has itself admitted in a recent patent application: "The choice of [permeation] enhancers is important because each candidate enhancer can have its

own unique physiochemical interactions with the active pharmaceutical ingredient (e.g., epinephrine) as well as the mucosa." Ex. 2031, ¶8.

Finally, in addition to Potta's failure to mention alkylsaccharides as one of many useful or preferred permeation enhancers, Potta clearly discloses the benefits of "hydro-alcoholic" (co-solvent) formulations of epinephrine. *See* Ex. 2013, ¶128. Thus, if attempting to optimize Potta, POSAs would have been motivated to use those "hydro-alcoholic" formulations over the "aqueous" formulations claimed in the '414 patent. Ex. 1004, ¶¶267-68 ("Among subjects receiving either the aqueous or the hydroalcoholic formulations the subjects receiving the hydroalcoholic formulations had higher $C_{max}$ across the entire sampling time than those receiving the aqueous formulation both in the absence and presence of an allergen."). Ex. 2014, ¶159. Alternatively, a POSA reading Potta would have been motivated to use spray-dried formulations after seeing the dramatic increase in absorption shown in Example 7. Ex. 1004, ¶¶261-64, Table 61; Ex. 2014, ¶159. Given that spray-dried formulations are "dry," it would have understood by POSAs that they are not "aqueous." Ex. 2014, ¶159.

In sum, Petitioner has failed to meet its burden to show that either claim 1 or claim 3 of the '414 patent would have been obvious in light of Potta, Maggio '145, and Munjal.

### C. Claims 2 and 4-20 Would Not Have Been Obvious In Light of Potta, Maggio ’145, and Munjal.

Because claims 1 and 3 would not have been obvious in view of Potta, Maggio ’145, and Munjal, and claims 2 and 4-20 are dependent on claims 1 and/or 3, these dependent claims would also not have been obvious. *HTC*, 877 F.3d at 1366, 1369.

## VII. PETITIONER HAS FAILED TO SHOW THAT CLAIMS 1-20 WOULD HAVE BEEN OBVIOUS OVER SRISAWAT IN VIEW OF MAGGIO ’145 AND MUNJAL

Srisawat teaches the opposite of what Petitioner claims would have been obvious, by instructing POSAs to repeat its clinical study, with more participants, using intranasal epinephrine at doses of “***5 mg <u>or higher</u>***.” Ex. 1006, 5; Other than providing some general suggestions of what “might” be added to these 5 mg or higher intranasal epinephrine doses, Srisawat provides no information that would have motivated a POSA to use dodecylmaltoside, and certainly not with doses in the claimed range of the ’414 patent, to achieve a sought-after biological or medicinal response, or a reasonable expectation of success of doing so. *Id.* at 4-5; Ex. 2014, ¶161.

### A. Srisawat Provides No Motivation to Lower the Intranasal Dose, Nor a Reasonable Expectation of Success of Doing So.

As discussed above, Srisawat observes significant systemic absorption at only a 5 mg dose of epinephrine, and expressly teaches that lower doses did not achieve any systemic absorption. *See supra* Section V.B; Ex. 2014, ¶161. Srisawat expressly

teaches that the 0.3, 0.6, 1.25, and 2.5 mg doses achieved no plasma epinephrine concentration at all over the two-hour span in which measurements were taken. Ex. 1006, Fig. 1; Ex. 2013, ¶¶210-14; Ex. 2014, ¶162. Srisawat also expressly directs POSAs to repeat the study at intranasal doses of "5 mg ***or higher*** to confirm the reproducibility of these findings and ***to obtain the optimal IN doses***." Ex. 1006, 5 (emphasis added); Ex. 2013, ¶¶213, 214, 217; Ex. 2014, ¶163.

Even putting aside Srisawat's express teachings, POSAs would still not have had a motivation to pursue the '414 patent's claimed doses, because POSAs at the time would have seen other researchers administering intranasal and other transmucosal at or above the 5 or 6 mg range, not below. Ex. 2014, ¶164; Ex. 2014, ¶27-31; *see supra* Section VI.A.

### B. Srisawat Provides Minimal Guidance on How to "Optimize" an Intranasal Epinephrine Formulation.

Although Srisawat suggests that "bile salts and surfactants . . . might also promote the nasal absorption of epinephrine," Srisawat provides no direct mention of using dodecylmaltoside. Ex. 1006, 5; Ex. 2013, ¶215; Ex. 2014, ¶165. The class of bile salts and surfactants encompasses at least hundreds of different compounds. *See, e.g.*, Ex. 1018, 5-6; Ex. 2023, ¶141; Ex. 2018, 184:10-185:16; *see also supra* Section VI.B. Furthermore, the specific studies referenced by Srisawat use taurodeoxycholic acid as the bile salt and polyoxyethylene-9-lauryl ether as the

surfactant. Ex. 1006, 5 (citing Ex. 2027, 3); Ex. 2013, ¶217. Neither of these are alkylsaccharides. Ex. 2014, ¶165. The authors concluded both excipients increased plasma epinephrine concentrations, and that the specific surfactant did not enhance nasal absorption of epinephrine to a greater degree than the specific bile salt. Ex. 2027, 6; Ex. 2014, ¶165. Thus, given the minimal direction provided by Srisawat, POSAs would not have been motivated to combine intranasal epinephrine formulations with dodecylmaltoside, nor had a reasonable expectation of success in doing so. Ex. 2013, ¶218; Ex. 2014, ¶165.

Petitioner's argument that POSAs would have been motivated to use dodecylmaltoside to optimize Srisawat's doses based on Maggio '145 and Munjal suffers from the same pitfalls as Ground 2. *See supra* Section VI.B.

### C. Srisawat Does Not Disclose Any "Sought-After" Responses at Doses Within the Claimed Range of the '414 Patent.

Srisawat reported that "transient tremor" was observed in one subject and "palpitation" in two subjects. Ex. 1006, 4. But Srisawat did not report the epinephrine doses at which these effects were seen. *Id.* Srisawat also reported increases in heartrate and blood pressure at $T_{max}$ in most (but not all) patients, and found no correlation between those symptoms and plasma epinephrine concentrations. *Id.* Again, Srisawat did not report the epinephrine doses at which these effects were seen. *Id.*

Even Petitioner's experts disagree on whether these effects constitute sought-after biological or medicinal responses. Ex. 2013, ¶¶219-20. On the one hand, Dr. Smyth testified that Srisawat's report of "biological or medicinal responses" at doses within the claimed range supported the conclusion that the administration of the Table 1 formulations in Potta would necessarily result in a biological or medicinal response. *See supra* Section V.B.; Ex. 2018, 120:21-122:15, 147:2-149:13, 151:2-12. On the other hand, Dr. Weinstein characterized peripheral tremor, increased heartrate, and increased blood pressure as "***adverse***" effects (or "side effects"), not desired effects of the clinical study. *Id*.; Ex. 2017, 54:2-55:21. In the end, however, even assuming these effects were sought-after, Srisawat does not provide enough data to conclude that they were caused by administration of epinephrine at the low doses claimed in the '414 patent. *Id*.; Ex. 2013, ¶220.

Finally, instead of the adverse effects described in some of the subjects in Srisawat, Dr. Weinstein posits that a sought-after response would have been "vasoconstriction," opining that such effect is inherent to epinephrine at the claimed doses. *See* Ex. 2017, 124:2-126:22; Ex. 2013, ¶¶42, 221. However, as explained above, vasoconstriction is not "sought-after" by POSAs for the treatment of type-1 hypersensitivity reactions or anaphylaxis. *See supra* Section V.B.; Ex. 2013, ¶221. To the contrary, Srisawat suggests adding drugs with vaso***dilation*** effects, specifically, alpha-adrenergic receptor antagonists such as phentolamine, "to

counter the vasoconstriction effect of epinephrine, which prevents its own systemic absorption." Ex. 1006, 5 (emphasis added); Ex. 2013, ¶¶216, 221.

In conclusion, Petitioner has not met its burden to show that claims 1 and 3 of the '414 patent would have been obvious in light of Srisawat, Maggio '145, and Munjal.

### D. Claims 2 and 4-20 Would Not Have Been Obvious in Light of Srisawat, Maggio '145, and Munjal.

Because claims 1 and 3 would not have been obvious in view of Srisawat, Maggio '145, and Munjal, and claims 2 and 4-20 are dependent on claims 1 and/or 3, claims 2 and 4-20 also would not have been obvious. *See*, *e.g.*, *HTC*, 877 F.3d at 1366, 1369.

## VIII. SECONDARY CONSIDERATIONS SUPPORT NON-OBVIOUSNESS

When present, secondary considerations of nonobviousness must be considered. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). They "guard as a check against hindsight bias." *Cyclobenzaprine*, 676 F.3d at 1079. Here, secondary considerations include at least (i) long-felt but unresolved need, and (ii) unexpected results.

**Long-felt, Unresolved Need:** Epinephrine administered via intramuscular injection has been long known in the art for treating type-1 hypersensitivity reactions. Ex. 1001, 1:60-2:23; Pet. 20; Ex. 2013, ¶224; Ex. 2014, ¶169. However, intramuscular injection has a number of disadvantages outside of a hospital setting,

which generally result from self-administration via needle. Ex. 1001, 2:10-31; Ex. 1010, ¶5; Ex. 1006, 2; Ex. 2013, ¶224. These disadvantages include: variable pharmacokinetics depending on the site of injection, product quality, complicated protocols for administration, incorrect self-administration, fear of injection, needle-stick injury, and reluctance to self-inject in public. Ex. 1001, 2:10-31; Ex. 1010, ¶5. Patients find auto-injectors awkward to carry, and yet they are recommended to keep two devices in cases of rebound anaphylaxis. Ex. 1010, ¶5. As a result, up to 50% of patients do not use their auto-injector when they should. Ex. 2017, 45:20-25; Ex. 2013, ¶24.

Despite the above disadvantages, epinephrine for use in a non-clinical setting is still only available on the market as an intramuscular injection (e.g., EpiPen™ and Adrenaclick™ Autoinjector). *See* Ex. 1010 ¶4; Ex. 2017, 62:1-9; Ex. 2013, ¶25; Ex. 2014, ¶170. And although POSAs have explored other avenues of administering epinephrine for the treatment of anaphylaxis—such as sublingual, lingual, buccal, inhalative, and intranasal delivery—since as early as 1986, none of these efforts have resulted in a commercial product. Ex. 2013, ¶¶27-31; Ex. 1052, 6. Epinephrine has further proven difficult to formulate at the ’414 patent’s claimed dosages for systemic delivery to treat anaphylaxis via the intranasal route. Ex. 1001, 14:61-66 (citing Ex. 1006); Ex. 1064, 17 (noting that the “intranasal route presents several

limitations which must be overcome to develop a successful nasal medicine."); Ex. 2013, ¶229.

Further complicating the development of alternatives to intramuscular injection, epinephrine has a relatively narrow therapeutic window. Ex. 1040, 5; Ex. 2013, ¶26, 230. For intranasal delivery in particular, certain disadvantages include: (i) poor transport across the nasal membrane, (i) possible degradation in the nasal cavity or tissue, and (i) rapid clearance from the absorption site. *See* Ex. 1018, 2-3; Ex. 1003, ¶93; Ex. 2013, ¶¶35-39. On the other hand, more rapid administration of epinephrine, which can occur in higher doses, may increase the risk of serious adverse effects such as ventricular arrhythmias, myocardial infarction, pulmonary edema, intracranial hemorrhage, and death. *See* Ex. 1014, 11; Ex. 1052, 3-4; Ex. 1056, 2; Ex. 1059, 4; Ex. 1003, 104; Ex. 2013, ¶¶23, 231. Amphastar itself acknowledges, in a recent patent application, that despite efforts in formulating intranasal epinephrine and the purported advantages of intranasal delivery, "pulmonary and nasal administration formulations ***remain elusive***." Ex. 2015, ¶99 (emphasis added).

The '414 patent provides an alternative to the intramuscular method of treating patients suffering from type-1 hypersensitivity reactions, that for the first time, uses doses below 3 mg with an intranasal route. Ex. 2013, ¶232. The inventive

method provides an efficacious treatment with these lower doses that allows for greater patient convenience, safety, and compliance. *Id*.

**Unexpected Results:** Around the time of the ’414 patent, POSAs were investigating several different methods of transmucosal delivery of epinephrine, and using much higher doses than intramuscular injection to achieve a systemic response. *See* Ex. 1004, ¶¶265-69 (6 mg); Ex. 1006, 4, Fig. 1 (5 mg); Ex. 1051, 2, 4 (up to 40 mg); Ex. 2032 (20 mg); Ex. 2014, ¶172; Ex. 1050, 1-2 (4 and 8 mg); Ex. 1066 (10 mg); Ex. 2013, ¶¶27-29, 233. Prior studies had shown ***no*** systemic absorption of epinephrine when administered intranasally at doses of 2.5 mg and lower. Ex. 1001, 14:61-15:20; Ex. 1006, 3, Fig. 1; Ex. 2013, ¶234. Further, POSAs had found that the higher doses were (and still are) well-tolerated. Ex. 2013, ¶¶30-31; Ex. 2014, ¶¶52-53, 172; Ex. 2019 (6.6, 13.2 mg intranasal doses); Ex. 2020 (4.4, 6.6, 8.8, 13.2 mg intranasal doses); Ex. 2021 (12 mg sublingual doses); *see* Ex. 2017, 95:7-96:1; Ex. 2013, ¶¶30-31, 234. Accordingly, Patent Owner’s discoveries with respect to lower doses of epinephrine were entirely unexpected.

Moreover, although alkylsaccharides had been investigated in pharmaceutical formulations since at least the early 1990s, they had not been adopted for use before the priority date. Ex. 1028, [22]; Ex. 2013, ¶¶50-53, 235. Some researchers reported significant toxicity of alkylsaccharides to airway epithelial cells, even at lower levels. Ex. 2026, 1, 8-11; Ex. 2013, ¶235. Petitioner has failed to show that as of the

priority date, alkylsaccharides had been employed in any FDA-approved drug formulation. Ex. 2018, 112:6-15. Petitioner's assertion that U.S. Patent No. 5,661,130 would have discouraged or blocked others from developing such formulations does not withstand scrutiny, given that Petitioner's primary references are dated after expiration of that patent. Ex. 2013, ¶52. Thus, it was unexpected that the inventors of the '414 patent were able to combine dodecylmaltoside with epinephrine administered intranasally and arrive at the doses claimed in the '414 patent. Ex. 2013, ¶235.

## IX. CONCLUSION

For any of the foregoing reasons, the Board should determine that Petitioner has failed to prove that the challenged claims of the '414 patent are unpatentable under any of the Instituted Grounds.

Dated: May 18, 2022

/*Kenneth E. Jenkins*/

Kenneth E. Jenkins (Reg. No. 51,846)
Leslie B. Overman (Reg. No. 48,541)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Rd, Suite 300
San Diego, CA 92130
Phone: (858) 314-1500
Fax: (858) 314-1501
KJenkins@mintz.com
LBOverman@mintz.com

Thomas H. Wintner (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,

GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone: 617-348-1625
Facsimile: 617-542-2241
E-mail: twintner@mintz.com

## CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. §42.24(d), Patent Owner hereby certifies, in reliance on the word count of the word-processing system (Microsoft Office Word 2010) used to prepare this response, that the number of words in this paper is 13,977. This word count excludes the tables of contents, tables of authorities, certificate of word count, certificate of service, and table of exhibits.

Dated: May 18, 2022

/*Kenneth E. Jenkins*/
Kenneth E. Jenkins (Reg. No. 51,846)

## CERTIFICATE OF SERVICE

I certify that copies of Patent Owner's Response and accompanying Aegis Exhibits 2013 through 2040 are being served by electronic mail on the following counsel of record:

**Lead Counsel**
Emily J. Greb
(Reg. No. 68,244)
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, WI 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499
Greb-ptab@perkinscoie.com
egreb@perkinscoie.com

**Backup Counsel**
Courtney M. Prochnow
(Reg. No. 67,639)
PERKINS COIE LLP
633 West 5th Street, Suite 5850
Los Angeles, CA 90071-3537
Telephone: (310) 788-3284
Facsimile: (310) 788-3399
Prochnow-ptab@perkinscoie.com
cprochnow@perkinscoie.com

**Backup Counsel**
Nathan K. Kelley
(Reg. No. 45,295)
PERKINS COIE LLP
700 13th St., NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-3343
Facsimile: (202) 654-9574
Kelley_nathan-ptab@perkinscoie.com
nkelley@perkinscoie.com

**Backup Counsel**
Brandon M. White
(Reg. No. 52,354)
PERKINS COIE LLP
700 13th St., NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6206
Facsimile: (202) 654-9681
bmwhite@perkinscoie.com

Dated: May 18, 2022

/*Kenneth E. Jenkins*/
Kenneth E. Jenkins (Reg. No. 51,846)