# PUBLIC EXHIBIT 9

Trials@uspto.gov
571-272-7822

Paper No. 42
Entered: January 17, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMPHASTAR PHARMACEUTICALS, INC.,
Petitioner,

v.

AEGIS THERAPEUTICS, LLC,
Patent Owner.

IPR2021-01324
Patent 10,682,414 B2

Record of Oral Hearing
Held: November 16, 2022

Before ROBERT A. POLLOCK, TIMOTHY G. MAJORS, and CYNTHIA M. HARDMAN, *Administrative Patent Judges.*

APPEARANCES:

ON BEHALF OF THE PETITIONER:

EMILY GREB, ESQUIRE
COURTNEY PROCHNOW, ESQUIRE
NATHAN KELLEY, ESQUIRE
BRANDON M. WHITE, ESQUIRE
Perkins Coie LLP
greb-ptab@perkinscoie.com
prochnow-ptab@perkinscoie.com
kelley-ptab@perkinscoie.com
bmwhite@perkinscoie.com

ON BEHALF OF THE PATENT OWNER:

KENNETH JENKINS, ESQUIRE
LESLIE OVERMAN, ESQUIRE
THOMAS WINTNER, ESQUIRE
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
kjenkins@mintz.com
lboverman@mintz.com
twintner@mintz.com

The above-entitled matter came on for hearing on Wednesday, November, 16, 2022, at the U.S. Patent and Trademark Office, 600 Dulany Street, Alexandria, Virginia before Julie Souza, Notary Public.

P R O C E E D I N G S

- - - - -

JUDGE HARDMAN: Good morning, Counsel, and welcome. I am Judge Hardman, this is Judge Pollock with me here on the bench, and Judge Majors is appearing remotely by video.

This is the final oral hearing in IPR2021-01324, Amphastar Pharmaceuticals, Inc. v. Aegis Therapeutics, LLC. This hearing is open to the public. We have a court reporter present. The Board will issue a transcript and we'll make that part of the record in due course.

Let's start with the introductions. Counsel for the Petitioner, would you please introduce yourselves?

MS. GREB: Good morning, I'm Emily Greb, counsel for Petitioner. With me this morning is Ms. Prochnow, Mr. White, and Ms. Stephanie (indiscernible).

JUDGE HARDMAN: And, Ms. Greb, will you be doing the speaking today?

MS. GREB: Yes, Your Honor.

JUDGE HARDMAN: Thank you.

Counsel for Patent Owner, would you please introduce yourselves?

MR. WINTNER: Good morning, Judge Hardman. Tom Wintner from Mintz, Levin on behalf of the Patent Owner, Aegis Therapeutics, LLC. With me today is lead counsel, Ken Jenkins, also for the Patent Owner, and I'll be arguing on behalf of the Patent Owner.

JUDGE HARDMAN: Thank you, Counsel. Good morning.

As set forth in our hearing order, each side has 60 minutes to present

your arguments today. My colleagues and I will do our best to keep track of time, but you also may want to watch your time as well. We will have the clock running here above us.

Petitioner will present your arguments first, and you may reserve up to 20 minutes for rebuttal, if you wish. Thereafter, Patent Owner will respond to Petitioner's presentation. Also you have 60 minutes and you may reserve up to 20 minutes for surrebuttal.

So, Ms. Greb, how much time, if any, would you like to reserve?

MS. GREB: Your Honor, I'd like to reserve 20 minutes for rebuttal, please.

JUDGE HARDMAN: Thank you.

And Mr. Wintner?

MR. WINTNER: I think I'd like to reserve ten minutes for surrebuttal.

JUDGE HARDMAN: Thank you.

Now, the panel has access to the entire record, including the parties' demonstratives. When referring to papers or exhibits or demonstratives during your argument, please identify what you're referring to to give us time to call up a copy, if needed, and for Judge Majors to find what you're talking about.

We understand Petitioner has filed a motion to exclude and the parties have fully briefed that motion. We do not expect to rule on that motion today and you're welcome to argue it, if you'd like; you're not required to, but you may, if you wish.

The parties are free to use your time as you wish. I will note at the

outset that the panel is particularly interested in talking about claim construction for Claim 3, as well as the anticipation and unpatentability arguments surrounding Claim 3.

Our expectation is that, unless absolutely necessary, each side will not interrupt the other during the other party's presentation.

And, with that, Ms. Greb, we will start the clock at 40 minutes, and you may begin when you're ready.

MS. GREB: Thank you, Your Honors, and may it please the Court.

We're here today to discuss the '414 patent, a patent that claims the administration of an epinephrine nasal spray to mammals having allergic reactions, but this patent claims nothing new. For many, many years before the 2018 priority date, doctors have used epinephrine to treat allergic reactions.

JUDGE POLLOCK: Pardon me, Ms. Greb. I have some machine noise behind me. Can you get a little closer to the microphone?

MS. GREB: Certainly. Is that better?

JUDGE POLLOCK: As much as you can, please.

MS. GREB: Most people are aware, when it comes to treating anaphylaxis, a life-threatening allergic reaction, the treatment is injection with an EpiPen; that's what's known as an intramuscular injection, and it's currently marketed and approved for the treatment of anaphylaxis.

An important hallmark of that injection is the rapid onset of action when epinephrine is delivered intramuscularly. However, patients generally don't like needle injections even for something as serious as anaphylaxis if it can be avoided. For that reason, before the priority date of the '414 patent,

skilled artisans began looking at other forms of delivery of epinephrine, including nasal sprays for epinephrine.

And so, in the years leading up to the filing of the '414 patent, the art holds that many, many skilled artisans were working on and publishing prior art related to the nasal delivery of epinephrine.

I have Slide 2 up right now. Slide 2 provides a timeline of highlighted prior art references that provided a roadmap to skilled artisans leading to the claimed invention.

In the Fleming reference, and Potta and Srisawat, for example, skilled artisans were taught about low doses of nasal epinephrine, and in Kee and Hill, skilled artisans were taught how to increase absorption in mucosal delivery systems with dodecyl maltoside, or DDM, and epinephrine.

And, well before the priority date, skilled artisans understood that DDM provided rapid absorption with small molecules.

The claims of this patent that we'll talk about today are composed of elements that are well known by skilled artisans at the time of the invention and skilled artisans were very much aware of that art as of the filing of the patent.

By way of reminder, there are three grounds that Petitioner has set forth. Ground 1, Claims 1 through 18, anticipated by Potta; Ground 2, Claims 1 through 20, obviousness in view of Potta, Maggio '145, and Munjal; and Ground 3, obviousness in view of Srisawat, Maggio '145, and Munjal.

Before we go into the details of this ground, I'd like to just talk briefly about Claim 1. Claim 1 of the '414 patent -- and we're now on slide 4 -- that

has the language of Claim 1 requires administration of a nasal formulation spray with about 0.1 milligrams to 2.4 milligrams of epinephrine to a mammal with a Type 1 hypersensitivity reaction. That's it. It's a broad claim, it purports to cover many, many possible formulations administered to any mammal.

You'll hear from Patent Owner Aegis today a lot about how they're trying to get around the prior art. One of their arguments about this, though, is that the patent claims require that the formulations have a level of therapeutic efficacy that is simply not claimed, and it will be important to remember that as we walk through anticipation and obviousness. Aegis was very much its own lexicographer when it used terms like treatment and efficacy, and how those words are used in this patent simply are not the same as they're used in other contexts. In other contexts, to treat anaphylaxis, doctors will look to plasma epinephrine concentrations that would be similar to the 0.30 milligram currently-marketed intramuscular dose, but a huge number of formulations claimed in this patent come nowhere close and the claims cannot require it.

By way of reminder, Petitioner has argued and the institution decision agreed that the phrase in the preamble "a method of treatment" is not a limitation. We think that's the right result. All that's required is the administration of the claimed doses to a mammal. There's textbook law for finding a preamble not a limitation, and there's no reason to change course now.

I'd like to jump ahead a little bit to Claim 3 and talk about the claim construction as it relates to Claim 3.

Slide 11 provides the language of Claim 3. Claim 3 is the method of Claim 1 where an intranasal administration of a single dose of the aqueous nasal spray pharmaceutical formulation to the mammal provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis.

Now, it's that last phrase, provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis, that the parties have provided a construction for and the Board provided a construction for in its institution decision.

So looking at Slide 9, Slide 9 provides the language for the institution decision construction, Petitioner's construction, and Patent Owner's construction.

Now, these constructions have a couple important differences. The most important difference that I'd like to focus on here is that the Patent Owner has eliminated some phrases that appear in the institution decision and that's highlighted on the screen, which says "which may, but need not necessarily eliminate one, more, or all symptoms of anaphylaxis."

That "which may, but need not necessarily" language is language that's in the institution decision construction and Petitioner's construction, but Patent Owner has eliminated it from their construction.

We think that that's important language that should remain in the construction. The reason for that -- and we're now on Slide 10 -- is that that phrase comes right out of the language of the patent.

Now, the patent doesn't define the specific word efficacious, it doesn't specifically define the phrase that we're talking about in Claim 3, but it does

define the term "therapeutically-effective amount," which is guidance given in the specification about what we're talking about when we talk about efficacy in this patent, and that language appears right in the definition of therapeutically-effective amount. And it's important because it says "a therapeutically-effective amount may, but need not necessarily eliminate one, more, or all symptoms," which provides a permissible bar. The therapeutically-effective amount does not have to eliminate one, more or symptom of anaphylaxis.

JUDGE HARDMAN: Counsel, on Slide 9 you have set up the three different constructions at issue here for Claim 3. I think the -- each of the proposals on the table here are getting at what efficacious means, but I wonder whether we even need to go there.

Would you agree with me that Claim 3 requires that the method, the intranasal administration of the single dose of the claimed nasal spray must provide a plasma epinephrine concentration that is efficacious -- the claim goes on to say that that plasma epinephrine concentration must be efficacious, but just stepping back, it seems to me that the plain language of the claim requires that the administration results in some plasma epinephrine being able to be measured.

And I think in your reply papers that Petitioner has said that you don't necessarily need to measure a plasma epinephrine concentration above baseline, but that seems inconsistent with the language of the claim itself.

MS. GREB: Well, Your Honor, you know, our primary position is, yes, the plasma epinephrine concentration that you're measuring for Claim 3 can be the same as baseline. There's other things that can happen, for

example, vasoconstriction or other downstream effects, but at the end of the day what -- the most that this patent requires and the most that this claim can require is some increase over baseline. You know, it does not require something the same as intramuscular, it doesn't require -- maybe if we look at -- we can go to slide -- we're on Slide 13 to talk about this.

So Slide 13 shows Figure 7 of the '414 patent. So Figure 7 is the data resulting from an experiment done that disclosed in Example 2B where patients were given increasing amounts of epinephrine -- now, this was dosed with dodecyl maltoside -- so they were given increasing amounts of an intranasal spray with epinephrine and the absorption enhancer dodecyl maltoside, and the results are indicating in Figure 7, and we've highlighted by color to make it a little easier to see.

So the yellow is 0.5 milligrams of epinephrine, plus dodecyl maltoside; the green is one milligram of epinephrine plus dodecyl maltoside; and the blue is two milligrams of epinephrine plus dodecyl maltoside; and then they also mapped out data from the EpiPen.

And what you can see in Figure 7 is that the 0.5 milligram plus dodecyl maltoside does not provide a dose comparable to intramuscular. Even with the 0.5 milligrams plus dodecyl maltoside, all we're seeing is a little bit of increase over baseline on the plasma epinephrine concentration.

And if we look back at Slide 11 with Claims 3 and Claim 5, this is incredibly important because Claim 5 depends from Claim 3, and Claim 5 reads, "The method of Claim 3 wherein the single dose of an aqueous nasal spray pharmaceutical formulation comprises the anaphylaxis-active ingredient consisting of between about 0.5 and about 1.5 milligrams of

epinephrine."

And so because of this dependency Claim 3 has to include doses all the way down to about 0.5 milligrams.

Now, Claim 5, the word "about" is defined in the patent as plus or minus 20 percent. And so that actually goes down to 0.4 milligrams, which is also important because it doesn't include dodecyl maltoside. So we're talking about Claim 5 is a nasal spray all the way down to 0.4 milligrams with no absorption enhancer.

And if we look back at Slide 13 with Figure 7, they show data of the 0.5 milligram dose with an absorption enhancer that does not -- that is not equivalent to intramuscular and the line is just above baseline.

JUDGE HARDMAN: I don't read, though, Patent Owner's proposed construction as requiring something equivalent to the 0.3 intramuscular administration.

MS. GREB: That may be true, Your Honor, but the way that we read their papers is that they are requiring something more than just a minor increase above baseline.

Now, if their construction is read to be no more than a minor increase above baseline, that may be okay. I think the critical component of the claim construction issue here is that the requirement of Claim 3 can't require any plasma epinephrine concentration that's more than some sort of very minor increase above baseline because anything other than that simply couldn't be squared with Claim 5 and the data in the patent.

JUDGE HARDMAN: Is it Petitioner's position that Claim 3 does require some increase over baseline no matter how minor? Because I

thought in Dr. Dyar -- I hope I'm saying that right -- in Dr. Dyar's declaration, I thought he was taking the position that the claim does not require anything above baseline.

MS. GREB: Your Honor, I think that that is our primary position. I think, though, that, you know, the patent -- I think the issue when it comes, for example, to anticipation and obviousness, Petitioner has met its burden of proof for anticipation and obviousness even if the Board would find this minor increase above baseline.

And I think, even accepting Patent Owner's definition or Petitioner's definition, whatever definition is accepted, I think a critical component of the claim construction issue is that claim can't be read to be more than some sort of extremely minor increase above baseline.

JUDGE HARDMAN: I guess, just to be really clear, though, is it your position then that Claim 3 does require something over baseline or is -- if we administer a formulation, say the Potta formulation or any of these formulations, and check the blood levels, if we don't see any measurable epinephrine increase over the baseline before administration of the formulation, would that still satisfy Claim 3, in Petitioner's position?

MS. GREB: I think the data in the patent, given that the 0.5 milligram with DDM is already quite minimal over baseline in Figure 7. If what you did, if you take that and say 0.4 milligrams without DDM is covered by the claims, which it has to be under Claim 5, I don't think you would see an increase over baseline, and I think that's covered by the claims.

But at the end of the day, I think, again, the important part is it can't be anything more than an extremely minor, at best, increase over baseline;

otherwise, the claims just don't make sense in light of this investigation.

JUDGE HARDMAN: Maybe then we can talk about the inherent anticipation arguments based on Potta. As I understand -- well, I think we can agree that Potta didn't administer -- so, as I understand, Petitioner is relying on the formulations in Potta Table 1 and Potta Claim 21, and I think we can agree that Potta didn't administer those and check the blood level, right?

MS. GREB: You're right, Your Honor.

JUDGE HARDMAN: So I understand Petitioner's position to be that Claim 3 is inherently anticipated and you point to the Junior article and the Srisawat paper as evidence of an inherent anticipation, right?

MS. GREB: That's correct, Your Honor.

JUDGE HARDMAN: So maybe we could talk about, if you could turn to Junior, I had some questions about Junior's procedure.

MS. GREB: Yes. And we're on Slide 19 --

JUDGE HARDMAN: Thank you.

MS. GREB: -- which has the graph from Junior.

JUDGE HARDMAN: Let me just go there myself. Thank you.

So the challenged claims -- bear with me, I want to just get the language itself -- the challenged claims recite aqueous nasal spray where you have a single dose of a spray. I understand Junior they're soaking cotton strips and placing those in the nostril. Is that -- that seems to me to be different than what the claim is requiring of a single spray.

MS. GREB: Yes, Your Honor. The claims require a spray and Your Honor is correct that Junior required -- Junior used a cotton swab. However,

what Petitioner has used Junior for is to show that even at extremely small doses, five times less than what is administered in Potta, you see a rise in PK. And so, while it's a different formulation, Dr. Dyar and Dr. Smyth both felt like, given the difference in dosages where the Junior was given at such a tiny dose, that a skilled artisan reading this would understand that even at these minor doses, which a tiny, tiny amount is given, you're seeing a rise in plasma concentrations, that that was enough information to understand that the Potta formulations would do at least this minimal rise over baseline that we're talking about with Claim 3.

And so we do, we have Junior up on the slide, which is, again, Slide 19, and a couple of important things to point out here is that you have the lowest dose that was given over the course of 40 minutes was the 0.4 milligrams, and that was the total dose given and that was administered over 40 minutes. They also measured plasma epinephrine concentrations at half the time when only half the dose was given. And so on Slide 19, the 2a -- well, it's not the 2a dose, but it's right in the middle there -- that middle marker is half the time and they're showing a rise in plasma epinephrine concentration when there was 0.2 milligrams given, which is tiny compared to the 1 milligram formulation in the Potta nasal spray.

And so while, yes, it was soaked in the swab and administered that way, because it was such a tiny amount, that's sufficient to show that you would know that, given the Potta formulation, you would also see this, you know, what only has to be a very, very small rise in plasma epinephrine concentrations.

JUDGE HARDMAN: Where in Junior -- I was having trouble

correlating this 1a dose, 2a dose, 3a dose to -- I understand that they took blood levels at -- you know, administered some cotton strips -- I understand that you're saying that the 2a dose is sort of like mid-experiment, that they had the swabs in there for 40 minutes total and the 2a dose is, let's say, 20 minutes, but I couldn't figure out in Junior where they specify what 1a dose, 2a dose, 3a dose means.

MS. GREB: Sure. So if you look somewhere on Exhibit 1066, page 3 -- and I'll give folks a minute to get there --

JUDGE HARDMAN: Yes, thank you.

MS. GREB: So in the left column they show -- so we're in the left column, the first paragraph, the last sentence, it says, the total quantity of adrenaline that was given was 400 micrograms in the 1-to-50,000 solution, which shows the 1-to-50,000 at the bottom of the table on the slide. And then it says that the 2,000 micrograms is 2 milligrams, and that's in the 1-to-10,000 solution; the 10,000 micrograms, 10 milligrams in the 1-to-2,000 solution.

And in this same section, if you look up, it says that those were in kept in contact during 40 minutes in each case, and then that's the total quantity over the 40 minutes. And then so, when you look at the graph, the 40 minutes is all the way at the end and the 20 minutes is the halfway marker.

JUDGE HARDMAN: Does he ever really specify what 1a and 2a and 3a mean?

(Pause)

MS. GREB: I apologize, Your Honor, that one I'm not sure off the

top of my head --

JUDGE HARDMAN: Okay.

MS. GREB: -- but I can look and I'm happy to provide it.

JUDGE HARDMAN: That's okay. I understand that you're saying that this is sort of midpoint in the experiment, or at least at some point before the 40 minutes, which is at the right-hand side of the graph.

These cotton swabs, though, also had lidocaine, correct? So how do we deal with the potential confounding effect of the contribution of lidocaine?

MS. GREB: Yes, Your Honor, and I know that that's something that was raised at Dr. Dyar's deposition. And so what Dr. Dyar explained at his deposition, when Patent Owner asked him about this, was that the lidocaine was constant with all of the doses and, in his view, he could see that there was a correlation between rise in plasma concentration and dose regardless of any effect of lidocaine. And so he was comfortable that because the lidocaine was constant in all the doses and you were still seeing this rise in plasma epinephrine concentration that the rising concentration was due to the rising effects of the doses. And so the lidocaine, in his mind, was not an important consideration with respect to the anticipation positions.

JUDGE HARDMAN: What can you say about the differences between -- so we have cotton strips in close contact in the nostril for up to 40 minutes -- or even up to 20 minutes, if you're going to go halfway, you know, check the blood levels halfway through this experiment -- but that seems to be quite different from a single actuated spray into the nostril as required by the claim.

So, you know, what comfort can you give us that the spray in the nostril, even though I understand that the amounts are vastly different, but the amount of contact is also quite different as required by the claim versus what Junior was doing. So how can we necessarily assume that what happens in Junior is going to happen once you spray the Potta formulations?

MS. GREB: Well, Your Honor, I would have two comments there. The first is that, I mean, as I mentioned before, the amount is so vastly different that even though the contact is more when you put the cotton swab on the nose that that sort of washes away when you talk about magnitudes of difference in amounts.

And I would also look to Srisawat, which Dr. Smyth mentioned in his reports and deposition, as well as Dr. Dyar. Srisawat was a spray. You know, Srisawat concluded that you needed 5 milligrams of just a saline solution to be equivalent to intramuscular, but Srisawat also noted that there were increases in heart rate and blood pressure at Tmax in most subjects, and Srisawat dosed all the way down to 0.3 milligrams.

And a couple other important things here that -- you know, Srisawat, again, was just in saline, so had no -- nothing else that's in a pharmaceutical formulation and nothing else that's in the Potta formulation. You know, Potta includes the Potta anticipatory formulations; it has an absorption enhancer in it. And so having this increase in heart rate and diastolic and systolic blood pressure at Tmax in most subjects when they're dosing just in saline all the way down to 0.3 milligrams is an important piece of information because that was a spray. And, you know, Srisawat didn't provide information about plasma epinephrine concentrations at those low

doses.

And, you know, Dr. Smyth also had pointed out in his deposition that the particular graph in Srisawat, Figure 1, is a nanogram scale and most of the scales that we're looking at in a lot of these articles are picogram scales, and so it's admittedly a bit hard to tell if there's a measurable rise in epinephrine concentration. But the fact that Srisawat pointed out this increase in heart rate and diastolic blood pressure in Tmax in most subjects all the way down, when they're going all the way down to 0.3 milligrams in the saline is also relevant information for the anticipation needs here.

JUDGE HARDMAN: I think Srisawat, though, could actually cut against Petitioner's argument that Junior is relevant because Srisawat is closer to the claims in that we're doing an intranasal spray, as required by the claims, and when they do the 0.3 milligram they say that there's no significant difference in epinephrine absorption compared to saline. So that seems -- you know, we have Junior on the one hand, Srisawat is a closer mode of administration and we're not seeing what the claim requires of an increased plasma concentration.

So why should we find Junior more relevant than Srisawat?

MS. GREB: Well, Your Honor, a couple of things there. I mean, Junior did measure plasma epinephrine concentrations and, again, you know, the scale in Srisawat, you know, with the nanograms versus picograms, it's a little bit hard to ascertain if there's a difference between the 0.3 milligrams and the saline.

And, you know, from a claim construction perspective, you know, obviously, the patent is what we look to, but at the end of the day, again, that

Claim 3 has to go down all the way to 0.4 milligrams. And so, if we're going all the way down to 0.4 milligrams with no DDM, you know, maybe there's no -- maybe there can't be a PK requirement, but even if there is it has to be so minor that you're going to see a rise in plasma epinephrine concentration from the -- based on what Junior says.

And, you know, the Srisawat data in -- you know, that 0.6 milligrams, in theory, would be covered by the claims as well.

JUDGE HARDMAN: I understand Petitioner is pointing to on Srisawat, under Figure 1 where it talks about the adverse events, the tremor, the palpitation, increase in heart rate, increase in blood pressure in most subjects. I think, though, in Srisawat, if I'm not mistaken, each subject received each formulation or each different dosage, and it doesn't tell us -- although it tells us that most subjects saw these increases in heart rate and blood pressure, et cetera, but it doesn't tell us that they had that at every dosage.

So how do we know that even the 0.3 milligram dosage resulted in increase in heart rate, increase in blood pressure in most subjects?

MS. GREB: Your Honor, I think, is correct. I don't think we know for sure. You know, Srisawat tells us what it tells us and is certainly imperfect, but I would point Your Honor back to Junior, which does provide the plasma epinephrine concentrations at very low levels. And Srisawat provides, you know, additional teachings that the experts in this case found to be supportive of the anticipation argument.

JUDGE POLLOCK: Counsel, could we jump back to your Slide 9 where you're looking at the concentration that provides the epinephrine

concentration that's efficacious for the treatment of anaphylaxis. Now, here your construction focuses on the word "efficacious" and looks to the express definition in the specification, whereas Patent Owner's construction, proposed construction appears to be more in line with the common and ordinary meaning of that term.

In such circumstances, has a reviewing court invariably applied the express definition in a patent? And, if not, why should we do so here?

MS. GREB: I'm sorry, I missed part of your question. Has a what part?

JUDGE POLLOCK: Has the Federal Circuit invariably applied the express definition in a patent as opposed to something more akin to the common, ordinary meaning? And, if not, why should we do that here?

MS. GREB: Well, Your Honor, I think certainly the Federal Circuit has -- and I apologize, I don't have a specific case cite for you today on the plain and ordinary meaning question, but certainly the Federal Circuit looks to the patent specification when the plain and ordinary meaning doesn't sort of suffice to define a term as it would be defined by skilled artisans.

And, here, you know, efficacious, if you're outside the patent, to a skilled artisan, would probably mean actually treating anaphylaxis, and the patent tells us that that's not true.

And so, here, we need to look at the patent because the Patent Owner here has absolutely been its own lexicographer in providing an understanding of what provides a plasma epinephrine construction efficacious for the treatment of anaphylaxis means because, as we've sort of walked through today, it can't possibly mean treating anaphylaxis because

the standard for that in the medical community is what does an intramuscular dose do. And, given the claim dependencies here and the data and what this claim requires in terms of not requiring dodecyl maltoside and allowing for extremely low doses in the spray, it can't be that sort of the plain and ordinary meaning, you know, to the medical community of efficacious would apply.

And so, in this case, we need to look to the patent and what the Patent Owner has done to define the terms in this patent.

JUDGE POLLOCK: Thank you.

MS. GREB: So I'd like to spend a couple minutes talking about our obviousness case as well and jumping ahead to Slide 22.

So by way of reminder, you know, we've talked a lot about -- already about claim construction and anticipation, but by way of reminder there are two obviousness grounds as well, Potta in view of Maggio '145 and Munjal, and Srisawat in view of Maggio '145 and Munjal. And Slide 22 provides an overview of the reasons that the claimed invention is unpatentable as obviousness.

And we've talked about Claim 3 and just sort of by way of reminder, Claim 3 is really the only claim that can even have this efficacy requirement. And we've talked a lot about anticipation, but I'd like to just focus for a few minutes on the obviousness of Claim 3.

JUDGE HARDMAN: Before you delve into Claim 3, can I just ask you, Claim 1, as we've construed it in the institution decision, didn't have an efficacy requirement, so then what would be the proper measure of a reasonable expectation of success for that claim? Is it just if -- the

motivation is that a skilled artisan wants a treatment for anaphylaxis that's going to act rapidly and, you know, is going to be useful, would the reasonable expectation of success then require some measure of efficacy to match the motivation even though that's not written into the claim?

MS. GREB: No, Your Honor, I don't think so. A skilled artisan can certainly be motivated to make a product that ultimately treats anaphylaxis or treats other allergic reactions, but when there's not that requirement in the claim, the obviousness analysis does not require anything extra for reasonable expectation of success. The reasonable expectation of success only has to be what's actually in the claimed invention.

And so, here, while certainly there were lots of motivations out in the world for skilled artisans to want to make a product that would ultimately treat anaphylaxis, when you look at Claim 1 and think about what a reasonable expectation of success is with respect to Claim 1, it's really just making that -- making that dosage form and administering it to a mammal.

And I understand there's a little bit of a cognitive disconnect there, but that's how Patent Owner wrote its patent and so that's what we're left with.

So, with respect to Claim 3 and the reasonable expectation of success, just because time is short, I will dive into the reasonable expectation of success for Claim 3 because, as mentioned, that is the only one that has any sort of efficacy requirement.

So we have a couple papers that are relevant to reasonable expectation of success I'd just like to touch on briefly. You may recall the Munjal paper. Munjal took sumatriptan and added DDM to it and, importantly, found that at half the dose they had a very large increase in the absorption profile. And

that rapid absorption, as I sort of mentioned at the beginning, is critical for the treatment of anaphylaxis. So, from a motivation perspective, that rapid absorption is really important and, from a reasonable expectation of success perspective, when you have something like dodecyl maltoside, which is expected to provide this really rapid absorption, even at the low doses you're going to see that.

So any concerns, you know, that the Board may have about Srisawat or Junior in the anticipation world really go away in obviousness when you look at Munjal and others.

So another important reference to keep in mind is Cunningham. I'm sure you'll hear from Patent Owner that sumatriptan isn't the same as epinephrine. We don't dispute that, they are different molecules, but at the end of the day they're both small molecules and Cunningham provides the important teaching that for small molecule drugs, "nasal bioavailability in the presence of alkylsaccharide absorption enhancers is predominantly a function of molecular weight and is expected to be high." And epinephrine fits right in there, epinephrine is a small molecule.

JUDGE POLLOCK: What's the molecular weight of epinephrine?

MS. GREB: The molecular weight of epinephrine? Let me go -- I don't recall it off the top of my head, but it is on a slide. I will get there.

(Pause)

MS. GREB: I believe it's 183. So the molecular weight of epinephrine is 183.2. So it's a little bit smaller than sumatriptan, which is 295 and sumatriptan is what was used by Munjal. And then the Cunningham paper that I referenced used hydromorphone and they saw the

same sort of rapid absorption profile, and that one comes in at 285.

So I'd like to talk about Ground 2 in particular when we're talking about reasonable expectation of success. So Potta, as we talked about with anticipation, so Ground 2 is Potta in light of Munjal and Maggio '145, and I'd like to talk briefly about Example 8.

You know, we talked about the 1 milligram formulation in Potta, but Example 8 in Figure 2 is an important part of the obviousness case because really what a skilled artisan would be looking at here is that, you know, the hydro-alcoholic at 6 milligrams in Figure 2 was administered -- and we do have a PK curve -- you know, it doesn't look too bad, but as Dr. Smyth mentioned, hydro-alcoholic can be very irritating to the nose. So a skilled artisan would not want to give that six milligram and would be looking for something that would provide, you know, a similar profile, but without the irritation. And that intranasal 1 milligram epinephrine plus DDM would provide exactly what a skilled artisan is looking for.

And talking briefly about reasonable expectation of success here, again, you know, Maggio '145 provided a number of teachings about the use of DDM with small molecules, and it also taught about the use of DDM with phenylephrine with data, and then suggested its use with epinephrine.

I'd also point the Board to Kee and Hill, which disclose the use of DDM with epinephrine, and then again to Maggio and Munjal where we're seeing a rapid absorption with intranasal DDM with smaller doses.

And so, again, the relevance of the anticipation argument here is -- Your Honors have expressed some concern and there are lots of questions about whether there's enough information in the art to show that from an

anticipation perspective the Potta doses would anticipate. But here, when we're in the obviousness world, all of that falls away because we have dodecyl maltoside, a motivation to add it and, once you add that to the formulation, there's a significant amount of art that would show you would expect increased absorption and 1 milligram would surely be ample epinephrine to provide all that we need, which, again, is a very low bar of efficacy. Just adding, you know, that little bit over baseline is the most that claim can require.

So I think, with my last 30 seconds, I will just close by saying that, you know, I think the important things to remember are the most this patent can require, regardless of the construction chosen, is this minor increase over baseline. Junior provides all that the Board needs, particularly in light of the Srisawat and the expert testimony and defined anticipation, but certainly the obviousness case fills any gap, to the extent the Board finds one.

Thank you. I'll keep my last 20 minutes for rebuttal.

JUDGE HARDMAN: Thank you, Counsel.

Mr. Wintner?

MR. WINTNER: Thank you, Your Honor. It's going to take us one second --

JUDGE HARDMAN: Of course.

MR. WINTNER: -- just to switch computers.

(Pause)

MR. WINTNER: All right. Good morning, Your Honors, Tom Wintner, again, on behalf of the Patent Owner.

I have some slides here, but we'll probably have some Q&A. I'm

going to start just with a few responses to some of the issues that came up in Petitioner's presentation and then I'll jump into some of our slides, mostly specific to Claim 3, for the panel discussion early on.

Just in terms of framing, I wanted to go back to the very first slide that was presented by the Petitioner, this prior art timeline. I think it's important to remember a couple of things. First of all, this slide contains, I think, 12 pieces of art; the grounds, even in the obviousness case, only include three. And I don't think there's really any dispute what the closest pieces of prior art here are in this case, there really are only three and they all involve intranasal delivery of epinephrine.

So there is Srisawat, which was expressly part of the '414 application, and in fact figures in Srisawat appear in the application. There's the Fleming reference, which wasn't talked a lot about by Petitioner, but was specifically distinguished during examination and raised by the examiner, and in fact an amendment moving from "comprising" to "consists of" language was added to address that. And then the third one is Potta, and it's my understanding that that's the primary basis for the institution decision by the Board because the Board determined that that hadn't been properly considered or was misapprehended by the examiner, or at least wasn't taken into account, notwithstanding the fact that it disclosed at least some intranasal administration of epinephrine.

So the other references are, whether you're talking about the Junior reference from Brazil in 2009 or some of these other references like Cunningham and Hill and Kee, are in many instances far afield and in some instances very far afield from the closest prior art. So I think we should be

focusing on those references primarily and that's important when it comes to the issue of inherent anticipation when it comes to both the Junior and the Srisawat reference.

The second point I'll make, sort of addressing some of the colloquy that occurred earlier this morning, has to do with claim construction. Patent Owner isn't arguing that the claims should be construed in a way that's sort of inconsistent with what is in the specification, nor are we saying that the claims require some sort of equivalency to EpiPen or to the 0.3 milligram dose. That language doesn't appear in the claims, that language doesn't appear in the specification, it doesn't appear in our proposed construction.

There is a -- and this question came up from Judge Pollock -- there is, to be sure, some difference between the proposed construction from the Patent Owner, the proposed construction from the Petitioner, and the preliminary construction from the Board. Part of the problem there is that the word efficacious, which appears expressly in Claim 3, doesn't have a matching definition in the specification. There is a discussion of therapeutically effective amount that both parties draw from language within the specification where it expressly talks about what that means. We don't take words that aren't present in that discussion of therapeutically effective amount, we create what we believe is a little more readable construction, but we're not -- in terms of sort of are we taking an express construction versus a plain meaning, in some way, shape, or form you have to give some meaning to that term "efficacious," in addition to the term plasma epinephrine concentration.

JUDGE POLLOCK: Mr. Wintner, your claims are directed to

administering to a mammal; correct?

MR. WINTNER: That is correct, Your Honor.

JUDGE POLLOCK: And is this mammal a human or is it unlimited? Does it range from mice to elephants, for example?

MR. WINTNER: Well, the -- certainly, in terms of the way the claims are written, I don't believe there's any restriction on the kind of mammal that is used.

JUDGE POLLOCK: So how do we look at efficacious in terms of this numerous orders of magnitude in mass between the smallest and the largest mammals that are encompassed by the claim?

MR. WINTNER: Well, the -- and there is some testimony with respect to this from the experts -- is one of the reasons why the definition of efficacious, as specified by the Board -- and we're comfortable with the Board's construction and even our definition is a relatively broad one. For example, for Claim 1 -- and I recognize that the Board doesn't import any sort of efficacy into that -- the only efficacy requirement would be a biological response.

In Claim 3 -- and we can turn, just so that we're all looking at the same thing, if we take a look at Claim 3, that provides a plasma epinephrine concentration definition, and this is the Board's construction or preliminary construction from the institution decision. So, at a minimum, the term "provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis" means provides a plasma epinephrine concentration that elicits the biological or medicinal response in a tissue system or individual that is being sought by a researcher, health care

provider, or individual, and is anaphylaxis-related.

So you have to have some plasma epinephrine concentration and I think there's really no dispute that that has to be a measurable plasma concentration of a baseline.

And the -- you're correct, Your Honor, that there could be differing measures of efficacy. You would simply look to the individual piece of art and what was being sought by a researcher. There could be different biological or medicinal responses that were being sought. In many instances, those are the same. The biological response that's being sought might be a rise in plasma epinephrine concentration, the biological response that's being sought might be an increase in heart rate or in blood pressure; the biological response might be vasoconstriction. I suppose there could be a variety of different biological responses, but there needs to be something and there is -- I believe it was Dr. Smyth, when I asked him this question, said, you know, those things can be measured in mammals, they can be measured in mice, they can be measured in dogs.

So it's not unique to a human the way in which epinephrine can interact with the circulatory system once it is systemically absorbed. There may be differences, you're correct, in terms of weight, and so on and so forth, but at a minimum -- and I think this is conceded by the Petitioner in their reply brief, this is at pages 5 to 6 of their reply brief, they say, "thus, the plasma epinephrine concentration required to meet Claim 3 is one that elicits a biological response."

Now, I would add to that it elicits a biological response that's anaphylaxis-related. If you simply say that, you know -- I don't know, I'm

making it up -- it leads to throbbing in the feet or something like that, it's not clear to me that that would be a biological response that's anaphylaxis-related. But, at a minimum, you would have to have a plasma epinephrine concentration to meet Claim 3 and it should elicit a biological response.

And that is, as we will see, the fundamental problem and I'm happy to -- I'll jump into that, I guess, before I talk a little bit more about Potta, but if -- and I do want to get to Potta Table 1 very briefly, but that's the fundamental problem with Srisawat and Junior, which, as I understand it, are the two references that Petitioner tries to shoehorn into their anticipation argument.

Sort of as an initial matter, it's Patent Owner's position that the way in which their experts actually refer to both Junior and Srisawat, it defeats anticipation from the get-go. Here's a statement from Dr. Smyth where I'm asking about the possibility that --

JUDGE POLLOCK: Slide, please?

MR. WINTNER: Excuse me?

JUDGE POLLOCK: Slide, please?

MR. WINTNER: Oh, I apologize, Your Honor. This is Slide 21 in Patent Owner's demonstratives and this is from Dr. Smyth's deposition at -- which is Exhibit 2018, at page 147, lines 2 through 19. There's also some additional colloquy about this, but I was asking him about how you would know that the Table 1 formulations in Potta would necessarily elicit a biological response, and he said, based on the teachings of Srisawat, I don't think there's any way that they would fail to elicit a biological response.

So he's clearly combining what he's learning from Srisawat with Potta,

and I think the same is true both with Dr. Smyth and Dr. Weinstein when they're talking about the Junior reference.

The other thing is --

JUDGE HARDMAN: Well, Counsel, it is --

MR. WINTNER: Yes?

JUDGE HARDMAN: -- the law, is it not, that to show inherent anticipation you can rely on references outside of the alleged anticipating reference, right? Isn't that what they're doing with Srisawat and Junior?

MR. WINTNER: Yes, it is true that if you're -- for inherent anticipation, you would necessarily try to say it's not there expressly, so I have to come up with some reason why it would be inherent. And if you're going to say it's inherent in the art or inherent in the chemistry or inherent in whatever, you have to base that on something.

So I take your point, Judge Hardman, with respect to that, but to me this argument seems a little bit more like a combining Srisawat with Potta or a combining Junior with Potta.

And even if we set that aside and we take -- we sort of take the expert's discussion of these two documents at face value, Srisawat is anticipation-defeating because what it -- and, again, whether we look at -- there are two arguments that I think I understand Petitioner to be making in their papers, one is, well, you would necessarily -- when you deliver these Potta formulations, you would necessarily elicit a plasma epinephrine concentration, that's argument number one. I'm sorry, I keep hitting the microphone. And Srisawat says, well, that's not actually true because at the lower doses, the doses that are actually claimed in the '414 patent, there's no

epinephrine concentration that's measurable at all.

In Petitioner's slides, they cut off the key of Figure 1 and you'll note that there's actually an asterisk that's explained in Figure 1, the asterisk appears for the 5 milligram intranasal dose and the 0.3 milligram IM dose, which is the EpiPen control, it says an asterisk indicates a significant difference compared with the IM saline, which is the control. So they have already taken into account what is significant and what is not. We don't know -- we don't have a ton more information in Srisawat because it's a limited reference, but those asterisks are not unimportant. And whether we're talking about nanograms or picograms, we can only go with the information that Srisawat gives us, which is to say that there's no measurable plasma epinephrine concentration within the arrow marks that are shown for the 0.3, 0.6, 1.25, and 2.5 milligram doses in Srisawat.

The second inherency argument, as I understand it, has less to do with the -- an actual elicitation of a plasma epinephrine concentration, but a biological or medicinal response. And, here, their experts focus on that increase in heart rate and diastolic and systolic blood pressure at Tmax in most subjects.

And one of the problems, I think, came out in the questioning, we simply don't know -- and now I'm shifting to Slide 23, this is testimony from Dr. Dyar, who was the expert that Petitioner introduced with their reply brief who was a new expert, and I asked him for which subjects in Srisawat, which specific subjects were increases in heart rate and diastolic and systolic blood pressure at Tmax observed?

And he said, "So we cannot answer the question because we don't

have the actual individual patient responses, so I cannot answer which subjects specifically -- subject X, Y, or Z, or any other indication -- which ones would not have had an increase in heart rate but that most of them would have."

So not only do we not know which patients, whether it was 0.3, zero point -- which of the five patients in response to which of the doses got these biological responses. What we do know is that it didn't occur all of the time, it only occurred most of the time, and that is also anticipation-defeating.

Let me shift to the Junior reference, which is now Slide 25 in demonstrative exhibits from the Patent Owner. And I think the panel hit on most of the things that I want to discuss here. To me, this is really a bridge too far. Srisawat is, of course, an intranasal epinephrine dosing paper, Junior is not. It's from 2009, it's much earlier, it has to do with stuffing soaked cotton swabs into the noses of patients in an attempt to staunch the bleeding for nasal surgery, based on the possibility that epinephrine might lead to some vasoconstriction and, therefore, reduce bleeding during those operations.

So you have a completely different mode of delivery of epinephrine, you have different amounts of epinephrine being used over different periods of time, you have those being delivered to a different patient population, and you have this confounding factor of lidocaine. There is definitely 1 percent lidocaine in all of the solutions. What the paper does not tell us and when I asked the expert he was -- Dr. Dyar, he was unable to tell me, was whether that lidocaine is present in the control. And I assume a control in this situation would be a solution without any epinephrine. So, if we don't know

if there's lidocaine in the control, it doesn't matter whether the tiniest dose of epinephrine with 1 percent lidocaine elicits some sort of vasoconstriction or some sort of plasma epinephrine concentration because, for whatever reason, that could be due to the lidocaine or lidocaine's effect on the epinephrine, we don't -- we can't separate out a control.

So, for a whole host of reasons, this is simply an incomplete experiment that, at least for anticipation purposes or inherent anticipation purposes, should not be used to buttress the disclosures that are missing in the Potta reference.

Let me just go back now, if I can, to Potta itself, and then I'll move on to obviousness in a second. I just want to talk -- and I think this is clear from our papers, so I won't spend a lot of time on it, but I want to focus on what's actually in Table 1 of Potta and what's actually in Claim 21 of Potta. I am now on Slide 11 and I'll be moving forward from there.

Petitioner also looks at Table 1, this is sort of the primary place where they get their so-called 1 percent epinephrine formulations, and you'll see Table 1 has 11 different formulations, six or seven of which use 1 percent weight-by-weight epinephrine base.

And the argument, as I understand it, Petitioner's -- and as the Board picked up in their institution decision is that the -- if you take 1 percent weight by weight and use a 100 microliter dose -- or, excuse me, a 100 milliliter dose, which is typical for intranasal administration -- it doesn't say how many doses, but if you use one, you can get one (indiscernible) of delivery.

What I want to make clear is that immediately below Table 1 there's a

discussion of what Table 1 was used for in Potta. That's at paragraph 243 of the Potta reference, we're now at Slide 12, and it says the formulations listed in Table 1 were subjected to stability. So this is purely a stability exercise to see how epinephrine reacts to these various other ingredients: acid, ethanol, menthol, and so on and so forth. There is no delivery of any of these Table 1 formulations to any mammal and certainly not to a human.

The same is true with respect to Claim 21. Claim 21, again, I don't think there's any dispute here, Petitioner has a similar slide. Claim 21 of Potta depends on Claim 19, which then depends on Claim 1. Claim 1 is a formulation -- Claim 21 is a method-of-treatment claim, Claim 1 in a Potta is a formulation claim with a very broad amount of epinephrine, not doses, but concentrations. So 0.1 weight-weight percent to about 15 percent weight-weight.

So, if you multiply that out by a volume, which could be a hundred mills, it could be 200 mills, and you could have one dose, you could have two doses, you could have more than that, you have a very, very large variety of potential dose amounts, many of which would fall well outside of the range of the claims of the '414 patent.

So, you know, which -- you know, that requires a POSA to look at what Potta actually administers intranasally, and Potta does that in two examples, Example 6, which is delivering to minipigs, and in Example 8, which is delivering to humans.

So now I'm on Slide 15. The minipig dosing on slides -- on --

JUDGE HARDMAN: Counsel, can I just --

MR. WINTNER: Yes, Your Honor.

JUDGE HARDMAN: -- interrupt you there?

MR. WINTNER: Sure.

JUDGE HARDMAN: I think there's probably no dispute that there's no express disclosure in Potta of administering the dosages that fall within the challenged claims, but, as we said in the institution decision, Potta does disclose these unit dose devices that can deliver in a single instance the 100 microliters or the 200 microliters. Those were known to be the standard intranasal unit dose devices in the art and anticipation allows us to combine portions of a different reference, we don't need a disclosure of the actual, you know, matching the exact language of the claim.

Isn't it fair that a POSA would know Potta discloses intranasal administration, they know that these 100 microliter unit dose devices are the standard, Potta teaches using them, why wouldn't a POSA have seen that that -- those two things can immediately be combined, which then gets them into the claimed subject matter?

MR. WINTNER: Okay. So, in response, I would say -- I mean, to me this gets into -- and maybe I have it wrong, but to me this gets into the doctrine that the Federal Circuit has described as the sort of at once (indiscernible) doctrine, which is when you have, you know, a reference that's used for anticipation, and maybe it has all of the elements somewhere in the specification, but they're not necessarily in exactly the order of the claim and in fact they can be combined in a variety of ways to create a pretty large genus. This is described quite well in a recent Federal Circuit decision, which we cite in our surreply at page 6, Mylan v. Merck, it's from September of this year, and it talks about a similar kind of a broad

specification for an anticipatory reference. In that case, it was sort of ratios of ingredients.

My point is that this sort of fits into a similar bucket because, depending on which of the concentrations you're using, depending on which volume you're using -- and Potta is clear that there are multiple volumes you can use, not just 100 -- and depending on how many doses you have, you actually have a lot of different combinations, well over, you know, a hundred different potential combinations, and why you would necessarily home in on the range that's claimed in the patent.

So that's my primary response to that, Judge Hardman, would be to look, to call the Court's attention to that Mylan v. Merck case, which does suggest that if you essentially have a genus-type disclosure when you make all these combinations, it almost morphs into a little bit of the obvious-to-try analysis. It's a question of sort of how many different combinations are there and, out of those combinations, how close, you know, are you sort of targeted towards the particular range that's claimed in the contested patent.

JUDGE HARDMAN: Potta Claim 21 does claim a range of concentrations, but Table 1, I think, just has the 1 percent concentration, and I think if you put that in the 100 microliter device or the 200 microliter device, I think both of those or at least the 100 microliter is going to get you into the claim. So that doesn't seem like a huge menu of options for the POSA.

MR. WINTNER: Well, your math is correct, Your Honor. I think the problem with Potta Table 1 is there's no -- there's no suggestion that it's ever -- that that was used for anything other than stability. And in fact, I mean,

we cite this in our Patent Owner response. If you look at the priority chain of Potta and you go back to the initial provisional application, it is eminently clear that Table 1, if it was used for anything in Potta other than stability; it was used for sublingual delivery, not for intranasal delivery. So that would be my response to that, Your Honor.

I won't belabor the point that I was talking about Potta Example 6, which is a 6 milligram dose for the pigs. That's shown in Table 57 in the yellow highlights. And then, for Potta Example 8, we've got administration of 3 milligrams and 6 milligrams intranasally to humans. This is the so-called Phase I Proof of Concept Study that is disclosed in Potta.

There are two different clinical formulations -- this is now Slide 16, Your Honors -- they're shown by C1 and C2 in Table 62. One of them is the so-called hydro-alcoholic, it has 40 percent ethanol or dehydrated alcohol, the other one has -- is the so-called aqueous solution, it has just sodium chloride and no ethanol.

So while this -- while Potta says that 3 and 6 milligram doses were given to patients, it only reports data from the 6 milligram arm of the study, as seen in Tables 63 to 65 and Figures 1 to 3. This is from paragraph 268 of Potta.

We're now on Slide 17. And if we go to the figures of Potta, we see the results. Again, this is Example 8. As represented by Figure 2, the four studies in the Potta -- or the four arms of the Potta study, 6 milligrams for the hydro-alcoholic versus the aqueous, and then there were two types of patients, some were given an allergen ahead of time and some were not.

So you have four data points, all 6 milligrams-related. And it's no

surprise that in a continuation of Potta Exhibit 1004, this is Exhibit 2009, cited in the Patent Owner response at 26, Potta actually limits this broad 0.1-to-15 percent range to "wherein administration to a human of 6 milligrams of epinephrine or a salt thereof," and then it goes on to talk about that.

So it's quite clear that Potta's -- the only data in Potta with respect to actual intranasal administration of epinephrine is of 6 milligrams and it's our position that with respect to -- if you're just trying to compare -- putting aside Claim 3 and the whole plasma epinephrine concentration and efficacy requirement, there's simply not enough in Potta even for Claim 1 because of the dose limitation that does exist in Claim 1 of 2.4 milligrams or less.

JUDGE HARDMAN: I think, Counsel, your Patent Owner's papers are asking us to assume Potta administers the 3-milligram formulation and the 6-milligram formulation, but only reports out the data for the 6-milligram formulation, and I think I've seen in your papers that you're asking us to conclude that, therefore, the 3-milligram formulation must not have been efficacious because they didn't bother to report the data.

How can we know that that's the reason why Potta chose not to report out the 3-milligram data? There could be any number of reasons other than it didn't work as to why they chose not to report that data?

MR. WINTNER: You're correct, we do not know. The best evidence of -- that I can think of is sort of the absence of the evidence. If there had been good data at 3 milligrams, one would have assumed that it would have either been reported or reflected in subsequent claims that were drawn by Potta, but we do not know.

So I will now -- I think we've covered the inherent anticipation

arguments and Potta -- I guess the only thing that I will -- this is now Slide 27. I think Slides 27 and 28 and 29, these are all quotes from all three of Petitioner's experts with respect to whether or not with respect to Claim 3 one would expect, based on sort of knowledge in the art, the -- that Junior or Srisawat would be supportive of the Petitioner's argument in terms of anticipation over Potta.

And if you look at these quotes -- and these are all cited in our surreply or our Patent Owner response -- you will see that this is all, at least in my view, anticipation-defeating testimony from each of these experts.

And the last piece of evidence that, interestingly enough, came in at -- and this is now Slide 30 -- came in as -- there were two exhibits that were submitted with Dr. Dyar's declaration in support of the Petitioner's reply, one was kind of a basic primer on pharmacokinetics, what's Tmax, what's Cmax, et cetera; the second was this Oualha reference, Exhibit 1085. The very first statement in that is that the response to exogenous epinephrine is difficult to predict given the multitude of factors involved.

So it's our position that if you're talking about what's actually in the art with respect to treating a patient or treating a mammal with exogenous epinephrine, the answer is it's actually very difficult to predict a pharmacokinetic response. If that's true, then it is impossible to say that either Junior or Srisawat would have (indiscernible) or necessarily land to a low-dose formulation, say the Table 1 formulations in Potta, yielding a plasma epinephrine concentration as claimed in Claim 3 and related claims of the '414 patent.

So, if there are no further questions on that, I was going to turn to

obviousness. These are Grounds 2 and 3. I'm going to focus primarily on Ground 2 as opposed to Ground 3. I think the institution decision correctly explains why using Srisawat as a starting point for Petitioner's obviousness argument is kind of a dead end. So let's focus on Ground 2, which is -- which focuses on Potta as the lead reference in view of Srisawat, Maggio, and Munjal.

So I'm going to focus -- this is now Slide 33 -- I'm going to talk about two issues with respect to motivation and, as is often the case, those will bleed a little bit into reasonable expectation of success, and then I'll finish up with secondary considerations and then I think I'll be finished, unless I run out of time.

There's two sort of important motivations that are in play here. They're both identified by the Petitioner and sort of taken for granted that they would necessarily lead a POSA in the right direction, and it's our position that that's not the case. One is related to dose, would you be motivated -- for an intranasal epinephrine formulation for the treatment of anaphylaxis, would you be motivated to use a lower dose than those disclosed in the art, and the other is related to other excipients that you might use. You know, would you be motivated to add a permeation enhancer and, if so, at what dose and, if so, which one?

So let's start with the dose piece of this argument. And I really want to focus, to start -- I mean, there is some testimony that we've cited from Dr. Weinstein, who's Petitioner's medical expert, who really didn't have any idea what maximum doses in this intranasal epinephrine space would be. This is on Slide 33. "I don't know what the maximum dose is."

"I, frankly, don't know whether [POSAs] could use 10 or 20 or 50 or 100 milligrams."

So the motivation that was so clear or clearly presented in Petitioner's papers is, to some extent, disavowed by their own medical expert.

But let's talk about Potta, and I'm back to Figure 2 in Potta. There are sort of two things that seem to be important, as I understand it, with respect to these epinephrine doses delivered intranasally, and this is probably true with respect to epinephrine doses delivered in a variety of different ways. The one is that you'd like to have rapid onset. There's agreement between the medical experts and even some of the formulators that, generally speaking, if you're going to have your epinephrine be effective, it needs to be delivered to the patient relatively quickly, whether that's three minutes, five minutes, ten minutes, but it's got to be in that sort of sub-ten-minute range. So you need to see a spike in the plasma epinephrine curves.

The second thing is this sort of generic principle that I think every doctor would say for any pharmaceutical, which is that you like to use the lowest effective dose. That's just kind of FDA speak and safety and efficacy speak.

So we'll start with the first one. Potta, Figure 2, 6-milligram formulations do precisely what the Petitioners say you need to do. And Petitioner's expert, who as shown on 34, Slide 34, there's testimony from, at a minimum, Dr. Dyar about how Potta Figure 2 shows rapid onset of epinephrine when delivered intranasally in the 6-milligram dose. It does so primarily for the hydro-alcoholic formulations, but also to some extent for the aqueous 6-milligram formulations.

So --

JUDGE HARDMAN: Counsel, could you remind us if these Potta formulations tested, as shown in Figure 2, did they have a permeation enhancer?

MR. WINTNER: I was going to get to that in the next slide. They did and this is the next point that I wanted to make.

So this is now Slide 35. These are the two formulations that were used. Both of the formulations had EDTA, which Potta defines as a permeation enhancer, and benzalkonium chloride, which Potta also defines as a permeation enhancer.

And C2 also had dehydrated alcohol, which while I don't know if it's listed as a -- expressly listed as a permeation enhancer, it certainly has the effect of being a permeation enhancer given that it leads to a more rapid rise of epinephrine concentrations, at least based on Potta's data.

So you have a 6-milligram formulation that gives you the rapid onset that you want and they've already tried a variety of different permeation enhancers.

JUDGE HARDMAN: Just to go back to the formulations for a moment, EDTA and benzalkonium chloride, I think, are also stabilizers. Do you know if the amounts here are what Potta teaches are useful for permeation enhancement or are these potentially amounts that were only included for stability purposes?

MR. WINTNER: Sitting here today, Your Honor, I'm not a hundred percent sure. I believe that if you look in the Patent Owner's response there's citations to the testimony of Dr. Smyth. I know there's at least one

admission, if not in this case, from a prior case where benzalkonium chloride, where he testified that benzalkonium chloride at 0.01 percent, as it's shown in these clinical formulations, would be a permeation enhancer.

It is true that EDTA and benzalkonium chloride have multiple functions in formulations, I'm not so sure about the dehydrated alcohol.

The -- I'm now skipping to Slide 37. It is telling that -- and, again, this is where I think it's important to look at the closest prior art, also for the obviousness determinations -- this is paragraph 20 of Potta, which specifically lays out -- and, again, this is Potta in 2018, with the benefit of all of the prior art that is cited by Petitioner in that timeline with respect to DDM, alkyl glycosides and so on.

So Potta is looking at epinephrine, talking about epinephrine, talking about intranasal delivery of epinephrine, has the opportunity to talk about which permeation enhancers would be useful or could be used with an epinephrine intranasal formulation, and there are, I don't know, 20 or 30 listed in paragraph 21, not one of them is DDM, not one of them is even within the class of alkyl glycosides or alkyl saccharides, of which DDM is one.

And, in fact, Potta's preferred permeation enhancers, beyond the ones that it appears to already be using in Example 8 -- and this is now paragraphs 19 and 86 of Potta, shown on Slide 38 of Petitioner's -- excuse me, Patent Owner's demonstratives -- paragraph 19 of Potta says, preferably, caprylic acid is used as a permeation enhancer; and Slide 86 lists a smaller subset of permeation enhancer, of which it repeats the preference for caprylic acid, and also adds menthol or a combination of menthol and caprylic acid.

So, if Potta is teaching anything with respect to permeation enhancers, it says use my list on paragraph 20 and, if you really want to know what to use in addition to what I've already tried, use caprylic acid and menthol.

Of course, we're going back a slide now to Slide 36, Srisawat provides a motivation not to decrease the dose, but to increase the dose. It suggests at the very end of the study that its study, which only included five patients, should be repeated in a larger sample size and at the intranasal doses of 5 milligrams or higher.

So the motivation to decrease the dose, if we look at the closest prior art, is simply not there, it's not there in Potta and it's not there in Srisawat.

Let me now just turn to the motivation to use DDM, which is sort of the second motivation piece. Again, we've talked a little bit about that already with respect to Potta, a couple of other references.

The Fleming reference, which, again, is a reference, it's quite -- it doesn't have any data, it's pretty prophetic in its examples, but it has an even longer laundry list of permeation enhancers, starting in paragraph 42 of Fleming and going to paragraph 45. This is Exhibit 1010. There is mention amidst this long list of alkyl glycosides, but that's it, no mention -- no preference for it, no mention of DDM as a specifically good one.

So, again, the three pieces of prior art that actually deal with intranasal epinephrine don't say use DDM, two of them don't even mention it.

And Patent Owner's expert, Dr. -- this is now Slide 40 -- Dr. Weis, he filed a declaration, which is Exhibit 2014, and in paragraphs 36 to 37 of that declaration he put together a chart from just, I think, six references cited by the -- I believe they were all cited by the Petitioner in the petition -- and

came up with about 200 different permeation enhancers that were known in the art for intranasal formulations.

This chart on Slide 40 is actually from the Davis reference, which is Exhibit 1018, and this is a smaller list, although it's still about 50 permeation enhancers strong. And, again, the title of this is "Absorption Enhancers for Nasal Drug Delivery."

DDM is listed here, it's on the left-hand column. So I don't want to make it sound like DDM is not here, but it's only one of many, it's not singled out. If any absorption enhancer is singled out in Davis, which is a reference relied on by Petitioner, it's actually the chitosan and chitosan-related molecules used as an absorption enhancer.

None of the experts, as you've seen in our papers, had in their close to a hundred years of combined experience, either with formulation or medical work with epinephrine, had ever once used DDM or alkyl glycoside. That testimony is shown on Slides 41 and 42, from all three of Petitioner's experts. And, as we discussed in the Patent Owner response -- and I recognize this is not dispositive, but I think it's informative when you take a look at that large prior art chart that is Petitioner's Demonstrative 2, they cite to a 1997 patent from -- I believe it's '130 patent from Pillion and Meezan -- and that patent is, I believe, the first time that dodecyl maltoside was at least claimed in a patent as a useful permeation enhancer.

So you've got DDM and alkyl glycosides, you know, from that moment onward disclosed in the art as useful permeation enhancers, and yet you have all of these experts not using them. You have the FDA never

approving an intranasal drug or in fact any drug prior to the priority date using DDM, and you don't even have DDM showing up or any alkyl glycosides showing up on the FDA inactive ingredients list. And that's in Dr. Weis' expert report.

I'll just talk briefly on reasonable expectation of success. Like a lot of reasonable expectation of success arguments, it's a numbers game. Our argument is exemplified by the large chart in Dr. Weis' report with over 200 different permeation enhancers.

And, again, I think that the Board got it right when they looked in the institution decision as to what we're actually looking at. For Claim 3, the question is, you know, if you were targeting a low-dose epinephrine formulation, something within the claims, the range of the '414 patent, would you have a reasonable expectation of success if you added DDM to, say, the formulations in Potta Table 1 that would yield a measurable plasma epinephrine concentration that elicits a biological effect. When you consider all the different possible permeation enhancers, when you consider all the different possible effects that those permeation enhancers can have, not just with the active ingredient, but with the formulation as a whole, it's our position that there's no reasonable expectation of success. That's the institution decision at page 38.

And you don't really need to take Dr. Weis' word for it. And I'll say right now what I'm going to be talking about is one of the exhibits that Petitioner has filed a motion to exclude on. This is an application by Amphastar Pharmaceuticals, the Petitioner, it is directed to and specific to intranasal delivery of epinephrine, and it's -- so this is post-priority date

language that I'm reading from, Slide 45. In that application in paragraph 8, right at the beginning, Amphastar says, "The choice of enhancer is important, because each candidate enhancer can have its own unique physiochemical interactions with the active pharmaceutical ingredient (e.g. epinephrine) as well as the mucosa."

We're not using this as statutory prior art, we're simply using this to confirm everything else that we've said in the petition that's based on prior art references with respect to the difficulty when you're talking about formulations generally and intranasal formulations in particular in terms of predicting what effect a particular enhancer would have. And so this notion that, again, the use of DDM with intranasal epinephrine at a low dose would ineluctably lead to this conclusion that you would get good absorption, get a measurable epinephrine concentration, get a biological effect, that's a bridge too far.

I am going to -- I don't think there's too much else. There's one other Amphastar application, which I will not focus on here. I think I'm going to finish up with the time that I have remaining. I just want to talk about secondary considerations and so I'm going to flip -- oh, I will point out this one side before I get to secondary considerations.

This is the Gradauer reference, it's Exhibit 2028. This is a paper that tests an in vivo -- excuse me, in vitro system, a commonly used in vitro system for self-permeability, the use of DDM with two different small molecules, one is mannitol, the other is -- which is a sugar, the other is propranolol. Both of these are small molecules of 300 molecular weight or less. DDM was successful in enhancing mannitol in this system, it was not

successful in enhancing the penetration with propranolol.

So the notion that DDM works with all small molecules is not true. I recognize this is not an in vivo system, I recognize this is not a nasal delivery system, but it undercuts the notion that DDM works the same way with all small molecules.

And I'll just turn to -- we have two secondary consideration arguments, one is a long-felt, but unresolved need question, the other one is an unexpected results issue. I think, if we look at the -- again, if we look at the prior art timeline, I think it actually makes very clear that there was a long-felt and unresolved need for an intranasal dosage of epinephrine.

JUDGE HARDMAN: Why though --

MR. WINTNER: Our focus --

JUDGE HARDMAN: Sorry. Why wouldn't the Potta formulation, for example, 2018, that was disclosed, the 6 milligram formulation, which I think Patent Owner conceded had no toxicity problems, the optimization was sort of, you know, good to go, why wouldn't that formulation satisfy this long-felt need?

MR. WINTNER: I see that I'm over time, is it okay if I --

JUDGE HARDMAN: Please, go ahead, yeah.

MR. WINTNER: Okay. Well, my answer there is it wouldn't satisfy the lower dose range that's claimed in the '414 patent; it would, of course, for a higher dose, but it wouldn't for the lower dose.

And I'll reserve the rest of my time. Our last argument is unexpected results, that really dovetails with the arguments that we just talked about with respect to -- so I'll reserve the remainder of my time.

JUDGE HARDMAN: Thank you, Counsel.

MS. GREB: So I'd like to start by talking about anticipation. Again, there are a couple things that Patent Owner said about anticipation that I'd like to address, the first is this administration issue.

You know, I think as one of Your Honors' questions suggested, Patent Owner is wrong on the law here. The Federal Circuit is very clear that Potta did not actually have to administer the anticipatory formulations. Potta provides significant direction that its claim formulations are to be administered. And I would point the Court to BMS v. Ben Venue Labs, 246 F.3d 1868, where the Federal Circuit specified that anticipation does not require actual performance of suggestions in a disclosure. And so, even though Potta did not administer those anticipatory formulations, that just doesn't matter to the analysis.

The other thing I'd like to mention is Counsel raised this Mylan v. Merck case. Mylan v. Merck doesn't apply here, it's very different. In the Mylan v. Merck case there were a huge, huge number of possible formulations that had to be resolved through trial and error. Here, Potta gives you a formulation in Table 1. And, as Your Honor recognized, that just has to go in the 100 microliters that's also disclosed in the specification. There's not some enormous, bewildering amount of choices in the specification and this isn't -- this isn't really an immediately-envisioned case. An immediately-envisioned case would require significantly more picking and choosing from the specification compared to what we have here.

Counsel also talked about stability. So, you know, he put up the slide of the formulations and made the suggestion that the formulations disclosed

in Potta were really about stability.

You know, certainly, there is stability data there, but that's not what Potta is about. Potta discloses formulations for administration. Over and over and over in the Potta specification they direct the reader that these are for administration and that's what they're supposed to be used for.

And, in particular, I would note in Dr. Smyth's reply report at paragraph 46 he talks about an issue that Patent Owner raised, which was that in related patent applications, the Potta reference talks about sublingual epinephrine sprays, that's not in -- that's not in the Potta we're talking about. And so it's clear they're not for sublingual, but this is important because in that stability test the removal of the word "sublingual" suggests that this isn't about stability testing, this is about treatment, and they're administered either way and, certainly, the entirety of the specification. This isn't, for example, a formulation patent where they're claiming things related to stability. Just because there's stability tests in there doesn't mean that's the only thing that those formulations are disclosed for.

Another thing that came up in Patent Owner's argument, there was a question related to the 3-milligram formulations in Potta.

And, Judge, you asked what -- if Patent Owner was asking us to assume something about the 3-milligram doses, and it's true that there's no information about that that's in the Potta patent applications, but what Patent Owner didn't mention is that on page 51 of Dr. Smyth's report he talks about this. And there's post-filing art, Exhibit 2022, that was filed by Patent Owner, an Insys poster, and when you match up the Insys poster with the Potta data, it appears to match up.

And, interestingly, that poster tells us that the 3-milligram doses were not included in the PK analysis due to unexpected sample process issues.

And so we do actually have some information, while not in the prior art, about why that 3-milligram data was included. And this is addressed by Dr. Smyth in his reply report and, interestingly, Patent Owner chose not to examine him based on his reply report, they only took his deposition once.

I also wanted to talk about the argument that Patent Owner made with respect to chitosan. This is another area that Dr. Smyth talked about in his reply report. I would point the Board to paragraph 122. And DDM has been shown to be a better absorption enhancer, you know, paragraph 122 describes why that would be the case.

Patent Owner also talked about Exhibit 1085, the Oualha reference that we filed with our reply papers with Dr. Dyar.

So Dr. Dyar relied on that reference for the proposition that plasma concentration following administration of epinephrine should be measured and compared to baseline because there's endogenous epinephrine in the body. That's what he cited it for.

You know, Patent Owner put up a sentence in there that, you know, Potta is very much cherry-picked. That paper is really about determining a very specific dose of epinephrine that would lead to a specific hemodynamic response in children to prevent post-operative low cardiac output syndrome following cardiopulmonary bypass in children undergoing open heart surgical repair, which is not what we're talking at all about here. Any difficulty that they were addressing was related to looking at the specific dose relevant to treating children with that specific issue and looking for a

particular PK curve.

As we talked about earlier, here, the only efficacy that's relevant is showing -- you know, is potentially showing a minimal increase over baseline, which is a very, very different question than trying to determine some sort of specific dose of epinephrine to treat very ill children undergoing heart surgery.

Patent Owner also raised the Amphastar patent applications. And, as Mr. Wintner mentioned, those are part of our motion to exclude. They're not prior art. And I would just mention, you know, in relation to our motion to exclude, Patent Owner posits in their response to our motion to exclude that they somehow made an argument in their opening papers about how these patent applications inform what a person of skill in the art would think about at the time of the invention, that's not the argument that they make. They pointed to them as evidence in the case without any reference to what they would have shown at the time and it's only in response to the motion to exclude that they made any argument about these being relevant to actually what was known in the prior art at the time.

But setting that issue aside, I want to address the specific quotes they talked about. On their Slide 45, they talk about choice of enhancers being important. Well, that quote doesn't change anything about Petitioner's case.

There was a lot already known about DDM with small molecules. For example, we know from Kee that DDM increased absorption across ocular mucosa, and it was also known that molecular size was an indication of success with DDM.

And then they also had up on Slide 47 a comment about, to date, no

safe absorption enhancer for nasal and pulmonary administration of drugs having translated into a commercial product. That, again, you know, if the Board -- if the Board keeps these exhibits in the case, that really doesn't matter either. Making a commercial product is certainly not the standard for obviousness and here it's even less so, again, given the low bar of efficacy required for finding a reasonable expectation of success.

Counsel also raised their Gradauer paper, Exhibit 2028. As Counsel mentioned, Gradauer looked at transport markers across cells. Any difference in the movement of transport markers doesn't matter. We already have data in this case showing DDM moves epinephrine across the epithelium. That's the Kee reference I just talked about. Kee was a patent application where DDM was specifically combined with epinephrine. There was also a suggestion in Kee that DDM should be used with epinephrine for nasal delivery. The data that they have, though, has it in the ocular formulation, moving across the epithelium with increased absorption.

And so we already know that epinephrine and DDM move together across the epithelium.

And then also the Danielson paper, which Dr. Smyth discusses in paragraph 133 of his response report, and Dr. Dyar discusses as well. Danielson is a paper that Patent Owner brought up and it shows that there's multiple (indiscernible) related to tight junctions and that, based on that, molecular weight matters.

So, again, epinephrine is a small molecule, well understood to work well with DDM, and we have Kee that already shows that DDM moves epinephrine across the epithelium.

And I'd like to talk also again about the motivation here for obviousness case. Patent Owner talked about motivation a fair bit. I'm going to go to Slide 45.

(Pause)

MS. GREB: Okay. So Slide 45, this is a topic that the Patent Owner talked a bit about.

So, as of the priority date, skilled artisans were absolutely investigating low doses of intranasal epinephrine, it was not just sort of higher doses. And Potta shows that, Srisawat shows that, and Fleming shows that as well. And these are doses within -- right within the range of what is in the range of the '414 patent.

In terms of, you know, Patent Owner commented about what the maximum dose is. The maximum dose doesn't particularly matter here. There was significant reason for skilled artisans to look to lower doses. And, you know, ironically, at the end of Mr. Wintner's argument he mentioned their position on secondary considerations and said that the niche that the patent filled was this low doses, but somehow they're simultaneously arguing you wouldn't go lower, which is a bit of a disconnect. But in any event, skilled artisans were absolutely looking for low doses.

Epinephrine -- and this is Slide 46 -- was known to have a narrow therapeutic window and skilled artisans would certainly want to stay well below doses with serious side effects. And this is particularly relevant here when we're looking to add something like dodecyl maltoside.

As we've talked about, DDM has a rapid absorption profile and, once you add DDM to an epinephrine nasal spray, this narrow therapeutic

window is going to require you to lower the dose. You're not just going to be motivated because you want to, but once you have a high enough dose of epinephrine you can get into some serious trouble with adverse events if you're adding an absorption enhancer that you're expecting to shoot rapid absorption very, very high.

And, you know, Dr. Kleiner, who was Patent Owner's expert and also happens to be on Aegis' scientific advisory board, agrees with this. He said at his deposition, you know, that skilled artisans would be motivated to lower the dose. He also said in his declaration that more rapid administration of epinephrine which can occur in higher doses can increase serious side effects.

JUDGE HARDMAN: Counsel, if you have this 6-milligram Potta formulation that was sort of equivalent to or as good as the intramuscular, why not just stick with that? Why would you go to the alternative of dropping the dose and putting in the permeation enhancer to get you to the same place that the 6 milligram was already at?

MS. GREB: Certainly, Your Honor. So Dr. Smyth offered testimony on this. The hydro-alcoholic would be very irritating to the nasal passageway and it was the hydro-alcoholic formulation in Potta that, you know, provided a decent response. And so if a skilled artisans is looking to develop a drug that patients would prefer, they would want to remove the alcohol to not irritate the nasal passageway, which leads to the motivation, opens up these absorption enhancers, of which DDM is right there.

And I would also take this opportunity to mention that Mr. Wintner talked about Dr. Weis' table. Dr. Weis had a table in his report with a lot of

absorption enhancers, he said there were 200, and suggested that skilled artisans would just be bewildered by these choices and wouldn't clue in to dodecyl maltoside. But he was sort of put to ask at deposition on that chart and, you know, he had some errors in his chart that he corrected at deposition. And it actually showed, when the errors were corrected, that dodecyl maltoside was referenced in more of the art than in his original chart. And when you sort of put them in order then, dodecyl maltoside was one of only 13 that was cited in four or more articles. And so most of the things that Dr. Weis listed in his chart were cited one or two times in articles and then, when you really look at the art on the whole that Dr. Weis brought into the case, the choice of dodecyl maltoside, you're really looking at one of the top 13, which meets the bar of obviousness. A skilled artisan would not be bewildered here once they sort of take Potta and say, all right, we need to move away from the hydro-alcoholic because that would be irritating, looking at adding absorption enhancers, dodecyl maltoside is a top choice.

JUDGE POLLOCK: Counsel, just for clarity, the evidence on these DDM and other permeation enhancers, is the argument that they increase the rate of absorption or they increase total bioavailability, or both?

MS. GREB: The part, I think, that's most important from the motivation perspective is that dodecyl maltoside increases the rate of absorption. Because part of the motivation here is to actually make a product that treats anaphylaxis, you have to have rapid absorption, and all the experts agree that that's true. You can't treat an anaphylaxis reaction if you have a delayed response with the epinephrine and so really driving the decision to choose dodecyl maltoside would be that rapid absorption, and I

haven't seen Patent Owner come forward with evidence that these other absorption enhancers that they're worried about even do that.

And so increasing the rapid absorption, I think, is certainly the most important thing. With sumatriptan, the evidence does show that the AUC, I think, was also increased in Munjal, but I think the rapid absorption is the critical component to this case.

JUDGE POLLOCK: Thank you for the clarification.

MS. GREB: So and I guess the last few minutes I'll take to mention, in terms of Ground 3, it hasn't been talked about a lot today, but I think it bears mentioning. You know, Srisawat does provide direction to go to lower doses and add an absorption enhancer. Srisawat reported that the 5 milligram and saline did not provide rapid absorption, but Srisawat also points skilled artisans towards surfactants. There's a passage in Srisawat where Srisawat specifically says, you know, use a surfactant to increase absorption, DDM is one of those surfactants. I think that part of Srisawat is important.

Looking at secondary considerations briefly, you know, as Your Honor mentioned, any long felt, but unmet need was met by Potta. The long felt, but unmet need, you know, would be met by the Potta 6 milligram or, you know, any of the other disclosures of Potta.

Patent Owner's unexpected results argument, I don't know that I fully understand it. They don't identify the closest prior art or do any comparison to it as you're supposed to with respect to unexpected results. They talk about toxicity, but at this point DDM had already been used in a number of clinical trials. And so I don't think there's any real dispute in the art that

DDM was not toxic. It was used with sumatriptan, it was used with hydromorphone, and I don't think that those -- that art would exist if there was a real concern as to the priority date that DDM was somehow toxic.

And the rest of their unexpected results case just seems to be the same as they're non-obviousness case, and so the answer to that is it's all the same.

And I guess I would just close by noting, again, that, you know, to the extent the Board has any reservations about anticipation of Claim 3, certainly any efficacy required by the patent was obvious with the addition of dodecyl maltoside.

Thank you very much for your time today.

JUDGE HARDMAN: Thank you, Counsel.

MR. WINTNER: Your Honors, I just have a few points in surrebuttal.

The first point, Counsel for Petitioner mentioned something about the Insys poster, Exhibit 2022, and what Dr. Smyth said about that, that's a poster that they moved to exclude in their motion to exclude. So I would just say I don't know which one they want. Obviously, if it comes in, it can be used. It is -- Insys is where Potta worked, so there is data. We would maintain that, if that comes in, it supports the notion that these 3 milligram or 6 milligram and higher doses were the ones that were being used not just at the priority date, before the priority date primarily, but even afterwards, notwithstanding the contention that there would have been motivation to use a lower dose.

With respect to the Oualha paper, Exhibit 1085, Petitioner talked about -- Petitioner's counsel talked about endogenous epinephrine. This is a

point that is made in Patent Owner's papers, it didn't come up too much during argument, but since it was raised by Petitioner's counsel, I'll talk about it.

Endogenous epinephrine is actually one of the confounding things that makes it hard to know when you've got a measurable epinephrine concentration, which is the reason -- and typically you have to subtract that out. And so that's precisely what's going on and that's why you have a control in the Srisawat experiment. You could, for example, have a patient who simply by virtue of having a needle stuck in them gets an elevated heart rate, you have to figure out whether that elevated heart rate is due to that and the sort of that fear, which probably results from endogenous epinephrine being created and the exogenous epinephrine that's being delivered.

With respect to the Kee reference, which was raised as an intraocular delivery of epinephrine, that's Exhibit 1021, I'll say two things about that. One, it is a reference that talks about delivering epinephrine across the rabbit cornea, it's a very different system from the nose of a mammal, and there's testimony from both sides' experts that the mode of delivery can certainly affect the absorption. That exhibit and the table that's referenced in that exhibit by Petitioner, there's actually only one table, those sort of successful formulations that included DDM also included HPMC as a viscosity enhancer.

There's no data in Kee to suggest that there's any control there where there was, say, in DDM without HPMC or no HPMC at all. So that effect could be entirely due to the viscosity enhancer of HPMC, we simply do not know when we look at Kee.

JUDGE HARDMAN: If you want to distinguish the Kee system because it's ocular and not nasal, what about your reliance on the Gradauer paper, which is looking at a system that I think is like intestinal cells?

MR. WINTNER: Well, I would say it kind of -- the only reason why we're talking about the Gradauer paper is to say that DDM doesn't always act in the same way for two different molecules. I think the way in which Petitioner is trying to use the Kee paper is to say, well, this is an example of epinephrine and DDM being effective together. Our point is you cannot say that that kind of a delivery, you know, through the rabbit cornea is the same as what is actually claimed, which is an intranasal spray delivered to a mammal in a particular dose. The doses don't match up, the method of delivery doesn't match up.

And so I guess, you know, to the extent that one doesn't want to rely on Gradauer, then I would say the arguments against mixing and matching modes of delivery would trump the Gradauer reference, but I think you can actually square both of those arguments together.

There was one point that Petitioner made with respect to -- you know, you had asked, Judge Hardman, sort of, if you're looking at Potta, why would you be motivated to make a lower-dose formulation of Potta and deliver that lower dose intranasally with DDM. And the answer that I believe I heard Petitioner's counsel give said, well, you would want to use -- well, they ultimately referred back to this very narrow therapeutic window and the desire to use lower doses.

The narrow therapeutic window, I think, is very important to understand. That's a situation where, if you have too much epinephrine

that's delivered into the system in circulation, it can lead to really, really bad things like death. And so, if you have a penetration enhancer that, you know, does too much, you can, in theory, you know, overwhelm the system.

And so, if you're looking at Potta, the only downside to which at least I heard from Petitioner's counsel say was you get a little bit of nasal irritation and the alternative is, well, let's add a permeation enhancer where we could potentially mess with the pharmacokinetics and create a bigger problem. So if the question is, well, what would I rather have, irritation or death, I'd much rather have irritation.

So I don't think the mere fact that Dr. Smyth said that a hydro-alcoholic formulation could be irritating is a reason to say that POSAs wouldn't have looked at the Potta formulations and used those as kind of their primary formulations at that dosage or had a desire to reduce them.

I'm not going to use the full ten minutes. Unless there are any further questions from the panel, the final point I would make would be I think it's important, again, to zoom this case back out and the timelines that are provided in Petitioner's demonstratives provide an ability to do that.

It's very clear -- Petitioner said persons of ordinary skill were investigating lower-dose formulations of epinephrine delivered intranasally and they set it to Srisawat. Well, that's the whole point. Srisawat is the very paper that the patent distinguishes over in the patent specification; it's the basis for our unexpected results argument. So the point was there were those lower-dose epinephrine formulations being delivered and, unless they were adding a second active ingredient, nobody was able to make those work. And so it was, in fact, unexpected that in the low-dose claimed range

of the '414 patent the inventors were able to get something that actually delivered a measurable plasma epinephrine concentration that for purposes of Claim 3 was efficacious for treating anaphylaxis.

If there are no further questions, I thank the panel for its time.

JUDGE HARDMAN: Any questions?

Okay. Thank you, Counsel.

MR. WINTNER: Thank you, Your Honors.

JUDGE HARDMAN: Well, thank you to both sides for your helpful presentations today. This case is now submitted for preparation of the final written decision. We are adjourned.

I do ask Counsel to hang on for a minute to see if Mr. Murphy has any questions about spelling.

Thank you.

**(Whereupon, the proceeding was concluded.)**

PETITIONER:

Emily Greb
Courtney Prochnow
Nathan Kelley
Brandon M. White
PERKINS COIE
greb-ptab@perkinscoie.com
prochnow-ptab@perkinscoie.com
kelley-ptab@perkinscoie.com
bmwhite@perkinscoie.com

PATENT OWNER:

Kenneth Jenkins
Leslie Overman
Thomas Wintner
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
kjenkins@mintz.com
lboverman@mintz.com
twintner@mintz.com