# PUBLIC EXHIBIT 11

8713924

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*May 04, 2026*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** ***18/049,936***
**FILING DATE:** ***October 26, 2022***
**PATENT NUMBER:** ***11717571***
**ISSUE DATE:** ***August 08, 2023***

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

Certified by

DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

***Electronically Filed On: April 25, 2023***

PATENT
WSGR Docket No. 55358-701.306

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Application | ) | |
| | ) | |
| Inventors: Richard LOWENTHAL, *et al.* | ) | Confirmation No.: 2657 |
| | ) | |
| Application No.: 18/049,936 | ) | Art Unit: 1623 |
| | ) | |
| Filed: October 26, 2022 | ) | Examiner: Yi-Horng Shiao |
| | ) | |
| Title: INTRANASAL EPINEPHRINE FORMULATIONS AND METHODS FOR THE TREATMENT OF DISEASE | ) | Customer No. 21971 |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**AMENDMENT AND RESPONSE TO NON-FINAL OFFICE ACTION**

Dear Commissioner:

This paper is in response to the Non-Final Office Action dated January 25, 2023, setting an initial due date of April 25, 2023. Accordingly, this response is timely filed, and no fees are believed to be due.

**Amendments to the Claims** begin on page **2** of this paper.
**Remarks** begin on page **10** of this paper.
**Conclusion** begins on page **16** of this paper.

## AMENDMENTS TO THE CLAIMS

This listing of claims will replace all prior versions, and listings of claims in this application. Applicant reserves the right to pursue any canceled subject matter in this or any other appropriate patent application.

Listing of Claims:

1. **(Currently Amended)** A method of treating a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a nasal spray pharmaceutical formulation to the human ~~with a type-1~~ with the type-1 hypersensitivity reaction, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises:

   a) between 0.1 mg and about 2.4 mg of epinephrine, wherein epinephrine is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;

   b) one or more other agents as excipients selected from the group consisting of: absorption enhancement agents, isotonicity agents, stabilizing agents, antioxidants, preservatives, and pH adjustment agents; and

   c) water;

   wherein the nasal spray pharmaceutical formulation has a pH between about 3.0 and about 5.0;

   wherein the volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is between 25 μL and 250 μL;

   wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human; or

   wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human.

2. **(Currently Amended)** The method of claim 1, wherein the symptoms of the type-1

hypersensitivity reaction ~~comprise:~~ comprise at least one of generalized hives, pruritis, flushing, angioedema, a burning sensation of the skin, swelling of the tongue or throat, shortness of breath, wheezes, stridor, coronary artery spasm, myocardial infarction, dysrhythmia, cardiac arrest, tachycardia, bradycardia, and a Bezold-Jarisch reflex~~, or combinations thereof~~.

3. **(Previously Presented)** The method of claim 1, wherein the type-1 hypersensitivity reaction is chosen from allergic asthma, allergic conjunctivitis, allergic rhinitis, anaphylaxis, angioedema, urticaria, eosinophilia, drug allergy or food allergy.

4. **(Previously Presented)** The method of claim 1, wherein the type-1 hypersensitivity reaction comprises anaphylaxis.

5. **(Previously Presented)** The method of claim 1, wherein the type-1 hypersensitivity reaction comprises anaphylaxis; and the symptoms of anaphylaxis are selected from the group consisting of hives, generalized itching, nasal congestion, wheezing, difficulty breathing, cough, cyanosis, lightheadedness, dizziness, confusion, slurred speech, rapid pulse, palpitations, ~~nausea and vomiting,~~ nausea or vomiting, abdominal pain or cramping, skin redness or skin inflammation, nasal flaring, and intercostal retractions.

6. **(Previously Presented)** The method of claim 1, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 0.5mg, about 0.6mg, about 0.7 mg, about 0.8 mg, about 0.9 mg, about 1.0 mg, about 1.1 mg, about 1.2 mg, about 1.3 mg, about 1.4 mg, about 1.5 mg, about 1.6 mg, about 1.7 mg, about 1.8 mg, about 1.9 mg, about 2.0 mg, about 2.1 mg, about 2.2 mg, about 2.3 mg, or about 2.4 mg, in a volume of about 100 μL.

7. **(Previously Presented)** The method of claim 4, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 0.3 mg, about 0.5 mg, about 1.0 mg, or about 2.0 mg of epinephrine.

8. **(Previously Presented)** The method of claim 1, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 1.0 mg of epinephrine.

9. **(Previously Presented)** The method of claim 1, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 2.0 mg of epinephrine.

10. **(Previously Presented)** The method of claim 1, wherein:

the absorption enhancement agents are selected from the group consisting of surfactants, fatty acids, bile salts, cyclodextrins, phospholipids, and alcohols;

the isotonicity agents are selected from the group consisting of dextrose, glycerin, mannitol, potassium chloride, and sodium chloride;

the antioxidants are selected from the group consisting of alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid, isoascorbic acid, butylated hydroxyanisole, citric acid monohydrate, potassium metabisulfite, sodium bisulfite, sodium metabisulfite, and sodium sulfite.

11. **(Previously Presented)** The method of claim 1, wherein:

the absorption enhancement agents are selected from the group consisting of dodecyl maltoside, polysorbate 20, polysorbate 80, oleic acid, sodium lauryl sulfate, sodium glycocholate, sodium taurocholate, and sodium taurodihydrofusidate;

the isotonicity agents are selected from the group consisting of dextrose, glycerin, mannitol, potassium chloride, and sodium chloride;

the antioxidants are selected from the group consisting of alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid, isoascorbic acid, butylated hydroxyanisole, citric acid monohydrate, potassium metabisulfite, sodium bisulfite, sodium metabisulfite, and sodium sulfite.

12. **(Previously Presented)** The method of claim 11, wherein the stabilizing agent is ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof; and the preservative is benzalkonium chloride.

13. **(Previously Presented)** The formulation of claim 12, wherein the pH adjustment agents are selected from the group consisting of adipic acid, ammonium chloride, citric acid, acetic acid, hydrochloric acid, lactic acid, phosphoric acid, propionic acid, sulfuric acid, tartaric acid, sodium hydroxide, sodium citrate, sodium bicarbonate, and sodium carbonate.

14. **(Previously Presented)** The method of claim 13, wherein the volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is about 50 µL, about 75 µL, about 100 µL, about 125 µL, about 150 µL, about 175 µL, about 200 µL,

or about 250 µL.

15. **(Previously Presented)** The method of claim 9, wherein the volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is about 100 µL.

16. **(Currently Amended)** A method of treating a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a nasal spray pharmaceutical formulation to the human ~~with a type-1~~ with the type-1 hypersensitivity reaction, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises:

a) ~~comprises~~ about 0.5mg, about 0.6mg, about 0.7 mg, about 0.8 mg, about 0.9 mg, about 1.0 mg, about 1.1 mg, about 1.2 mg, about 1.3 mg, about 1.4 mg, about 1.5 mg, about 1.6 mg, about 1.7 mg, about 1.8 mg, about 1.9 mg, about 2.0 mg, about 2.1 mg, about 2.2 mg, about 2.3 mg, about 2.4 mg, or about 2.5 mg of epinephrine in a volume of about 100 µL, wherein epinephrine is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;

b) one or more absorption enhancement agents as excipients selected from the group consisting of surfactants, fatty acids, bile salts, cyclodextrins, phospholipids, and alcohols;

c) one or more isotonicity agents as excipients selected from the group consisting of dextrose, glycerin, mannitol, potassium chloride, and sodium chloride; ~~and~~

d) a stabilizing agent as an excipient that is ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof;

e) benzalkonium chloride as an excipient; and

f) water;

wherein the nasal spray pharmaceutical formulation has a pH between about 3.0 and about 5.0;

wherein the type-1 hypersensitivity reaction comprises anaphylaxis;

wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the elimination of one, more than one, or

all of the symptoms of the type 1 hypersensitivity reaction in the human; or

wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human.

17. **(Previously Presented)** The method of claim 16, wherein the absorption enhancement agents are selected from the group consisting of dodecyl maltoside, polysorbate 20, polysorbate 80, oleic acid, sodium lauryl sulfate, sodium glycocholate, sodium taurocholate, and sodium taurodihydrofusidate.

18. **(Currently Amended)** The method of claim 16, wherein the pharmaceutical formulation further comprises one or more antioxidants as excipients selected from the group consisting of alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid, isoascorbic acid, butylated hydroxyanisole (BHA), citric acid monohydrate, potassium metabisulfite, sodium bisulfite, sodium metabisulfite, and sodium sulfite<u>; and wherein the pharmaceutical formulation further comprises one or more pH adjustment agents as excipients selected from the group consisting of adipic acid, ammonium chloride, citric acid, acetic acid, hydrochloric acid, lactic acid, phosphoric acid, propionic acid, sulfuric acid, tartaric acid, sodium hydroxide, sodium citrate, sodium bicarbonate, and sodium carbonate</u>.

19. **(Canceled)**.

20. **(Canceled)**.

21. **(Previously Presented)** The method of claim 16, wherein the pharmaceutical formulation further comprises one or more pH adjustment agents as excipients selected from the group consisting of hydrochloric acid and sodium hydroxide.

22. **(Currently Amended)** A method of treating a type-1 hypersensitivity reaction in a human comprising an intranasal administration of a nasal spray pharmaceutical formulation to the human ~~with a type-1~~ <u>with a type-1</u> hypersensitivity reaction, wherein a single intranasally administered dose of the nasal spray pharmaceutical formulation comprises:

a) between about 0.4 mg and about 2.4 mg of epinephrine, and wherein epinephrine is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;

b) one or more absorption enhancement agents as excipients selected from the group consisting of: surfactants, fatty acids, bile salts, cyclodextrins, phospholipids, and alcohols; ~~and~~

c) a stabilizing agent as an excipient that is ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof;

d) benzalkonium chloride as an excipient; and

e) water;

wherein the nasal spray pharmaceutical formulation has a pH between about 3.0 and about 5.0;

wherein the total volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is between about 50 µL and about 250 µL;

wherein the type-1 hypersensitivity reaction comprises anaphylaxis;

wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human; or

wherein the intranasal administration of the nasal spray pharmaceutical formulation to the human with a type-1 hypersensitivity reaction provides a plasma epinephrine concentration in the human that is efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human.

23. **(Previously Presented)** The method of claim 22, wherein the absorption enhancement agents are selected from the group consisting of dodecyl maltoside, polysorbate 20, polysorbate 80, oleic acid, sodium lauryl sulfate, sodium glycocholate, sodium taurocholate, and sodium taurodihydrofusidate.

24. **(Previously Presented)** The method of claim 22, wherein the pharmaceutical formulation further comprises:

one or more isotonicity agents as excipients selected from the group consisting of dextrose, glycerin, mannitol, potassium chloride, and sodium chloride;

one or more antioxidants as excipients selected from the group consisting of alpha tocopherol, D-α-tocopherol polyethylene glycol 1000 succinate, ascorbic acid, isoascorbic acid, butylated hydroxyanisole (BHA), citric acid monohydrate, potassium metabisulfite, sodium bisulfite, sodium metabisulfite, and sodium sulfite; and

one or more pH adjustment agents as excipients selected from the group consisting of adipic acid, ammonium chloride, citric acid, acetic acid, hydrochloric acid, lactic acid, phosphoric acid, propionic acid, sulfuric acid, tartaric acid, sodium hydroxide, sodium citrate, sodium bicarbonate, and sodium carbonate.

25. **(Currently Amended)** The method of claim 22, wherein the pharmaceutical formulation further comprises ~~ethylenediaminetetraacetic acid (EDTA) or disodium salt thereof, and benzalkonium chloride as excipients~~ <u>one or more pH adjustment agents as excipients selected from the group consisting of hydrochloric acid and sodium hydroxide</u>.

26. **(Previously Presented)** The method of claim 22, wherein the single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 0.5 mg, about 1.0 mg, or about 2.0 mg of epinephrine.

27. **(Previously Presented)** The method of claim 22, wherein the single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 1.0 mg of epinephrine.

28. **(Previously Presented)** The method of claim 22, wherein the single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 2.0 mg of epinephrine.

29. **(Currently Amended)** The method of claim 22, wherein the volume of the single intranasally administered dose of the nasal spray pharmaceutical formulation is about ~~about~~ 50 μL, about 75 μL, about 100 μL, about 125 μL, about 150 μL, about 175 μL, about 200 μL, or about 250 μL.

30. **(Previously Presented)** The method of claim 22, wherein the single intranasally administered dose of the nasal spray pharmaceutical formulation comprises about 0.5mg,

about 0.6mg, about 0.7 mg, about 0.8 mg, about 0.9 mg, about 1.0 mg, about 1.1 mg, about 1.2 mg, about 1.3 mg, about 1.4 mg, about 1.5 mg, about 1.6 mg, about 1.7 mg, about 1.8 mg, about 1.9 mg, about 2.0 mg, about 2.1 mg, about 2.2 mg, about 2.3 mg, or about 2.4 mg of epinephrine in a volume of about 100 μL.

31. (**New**) A method of treatment of a type-1 hypersensitivity reaction in a mammal comprising administering intranasally to the mammal in need thereof a nasal spray pharmaceutical formulation comprising between about 0.1 mg and about 2.4 mg of epinephrine, or a salt thereof, in a single dose;

wherein epinephrine is the only pharmaceutically active ingredient in the nasal spray pharmaceutical formulation;

wherein the type-1 hypersensitivity reaction comprises anaphylaxis; and

wherein intranasal administration of the single dose of the nasal spray pharmaceutical formulation to the human provides a plasma epinephrine concentration in the human that is efficacious for the elimination of one, more than one, or all of the symptoms of anaphylaxis in the human; or

wherein intranasal administration of the nasal spray pharmaceutical formulation to the human provides a plasma epinephrine concentration in the human that is efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of anaphylaxis in the human.

32. (**New**) The method of claim 31, wherein:

wherein about 100 μL of the nasal spray pharmaceutical formulation comprises about 0.5 mg, about 0.6 mg, about 0.7 mg, about 0.8 mg, about 0.9 mg, about 1.0 mg, about 1.1 mg, about 1.2 mg, about 1.3 mg, about 1.4 mg, about 1.5 mg, about 1.6 mg, about 1.7 mg, about 1.8 mg, about 1.9 mg, about 2.0 mg, about 2.1 mg, about 2.2 mg, about 2.3 mg, or about 2.4 mg of epinephrine; and

about 100 μL of the nasal spray pharmaceutical formulation is delivered to the mammal in one actuation of a nasal spray device.

**REMARKS**

The following remarks are in response to the Examiner's Office Action mailed on January 25, 2023. Claims 19 and 20 are canceled without prejudice. Applicant reserves the right to pursue canceled subject matter in this or any other appropriate application.

Claims 1, 2, 16, 18, 22, 25, and 29 are amended.

New claims 31 and 32 have been added. No new matter is added. Upon entry of the claim amendments and new claims, claims 1-18 and 21-32 will be under examination. Reconsideration is respectfully requested in light of the following remarks.

**Priority**

This application is a continuation of U.S. patent application no. 17/396,044 filed on 08/06/2021, which is a continuation of U.S. patent application no. 16/869,461 filed on 05/07/2020, now U.S. Patent no. 11,191,838, which is a continuation of U.S. patent application no. 16/420,044 filed on 05/22/2019, now U.S. Patent no. 10,682,414, which is a continuation of international patent application no. PCT/US2019/016918 filed on 02/06/2019, which claims benefit of U.S. provisional application no. 62/784,057 filed on 12/21/2018.

**Final Written Decision *inter partes* review (IPR) of U.S. Patent no. 10,682,414 ('414 patent)**

Claims 1-20 of Applicant's corresponding U.S. Patent No. 10,682,414 B2 ('414 Patent) was challenged in an *inter partes* review (IPR) (see Final Written Decision of IPR2021-01324 dated February 9, 2023; a copy was submitted in the Information Disclosure Statement submitted on April 24, 2023). The PTAB concluded that claims 3-6, and 18-20 remain patentable in view of Potta (US 2018/0289617; referred herein as Potta '617) and the other references cited therein. A copy of the Final Written Decision is submitted herewith in the accompanying Information Disclosure Statement.

**New Claims 31 and 32**

New claims 31 and 32 find basis in the application as filed, sharing the same basis as claims 3-6 of the '414 Patent.

**Claim Objections**

Claims 1, 5, 16, 19, 22, 25, and 29 are objected to because of a number of reasons. As requested by the Office, appropriate correction of the claims is made. Reconsideration and removal of the objections to the claims is respectfully requested.

**Claims Rejections Under 35 U.S.C. §112**

Claim 2 is rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor (or for applications subject to pre-AIA 35 U.S.C. 112, the applicant), regards as the invention.

Applicant has amended claim 2 are recommended by the Office. Removal of this rejection is respectfully requested.

**Claims Rejections Under 35 U.S.C. §102**

Claims 1-8, 10-27, 29, and 30 are rejected under 35 U.S.C. 102(a)(1) as being anticipated by US 2018/0289617 (Potta '617). The Office states that "[w]ith regard to structural limitations "a method comprising an intranasal administration of a nasal spray pharmaceutical formulation to a human with a type-1 hypersensitivity reaction"... Potta '617 disclosed a method of treating anaphylaxis comprising administering to a subject in need thereof an epinephrine spray formulation.... these teachings of Potta '617 anticipate Applicant's claims 1-8, 10-27, 29, and 30 because... would achieve the same intended results, including "a plasma epinephrine concentration in the human that is efficacious for the elimination (or the prevention of the further progression) of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction", required by claims 1, 16, and 22." (see Office Action dated 1/25/2023, pages 4 to 7). Applicant respectfully disagrees.

**The Instant Claims**

The instant claims have four independent claims, namely independent claims 1, 16, 22 and 31. Each independent claim recites that the intranasal administration of the nasal spray

pharmaceutical formulation to the human for treatment of a type 1 hypersensitivity reaction and provides a plasma epinephrine concentration in the human that is: 1) efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human; or 2) efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human.

Thus, the plain language of independent claims 1, 16, 22 and 31 requires, at a minimum, that intranasal administration "provides a plasma epinephrine concentration" that is efficacious for treatment.

**Potta '617**

The Office points to Table 1 of Potta '617 for exemplifications of epinephrine spray formulations and concludes that Potta '617 allegedly anticipates the instant claims because administration of the Potta '617 epinephrine spray formulations would allegedly achieve the same intended results of the instant claims, including "a plasma epinephrine concentration in the human that is efficacious for the elimination (or the prevention of the further progression) of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction."

**Potta '617 Does Not Disclose Actual Administration of the Formulations the Office Relies on for Anticipation**

The Office relies on a theory of inherent anticipation to conclude that Potta '617 satisfies the limitations of independent claims 1, 16, and 22 of providing a plasma epinephrine concentration. "[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation…" (*Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002)). "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." (*Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002)). Therefore, if the teachings of the prior art can be practiced in a way that yields a product lacking the allegedly inherent property, the prior art in question does not inherently anticipate. (See *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995)).

Potta '617 does not disclose actual administration of the formulations the Office relies on for anticipation, and thus does not disclose any information on whether their administration

*necessarily* provides a plasma epinephrine concentration. Applicant describes in the instant specification that that not every attempt at intranasal epinephrine administration results in a plasma epinephrine concentrations. For example, paragraphs [0082] to [0084] and Table 1 states that: "Srisawat showed that significant systemic absorption of epinephrine via the IN route was observed only at 5 mg" and that "Srisawat *et al*. observed no blood level of epinephrine at the intranasal dose level of 2.5 mg and below." Therefore, Potta '617 does not and cannot anticipate independent claims 1, 16, and 22. As a result, Potta '617 does not and cannot anticipate the claims that are dependent upon independent claims 1, 16, and 22.

**The PTAB Concluded that Potta '617 Does Not Inherently Disclose "Plasma Epinephrine Concentrations"**

The PTAB concluded that claim 3 of the '414 Patent, which recites "*provides a plasma epinephrine concentration that is efficacious for the treatment of anaphylaxis*" is not anticipated by Potta '617 (see pages 35 and 36 of the Final Written Decision of IPR2021-01324). Therefore, for the same reasons that the PTAB articulated in the Final Written Decision of IPR2021-01324, Potta '617 does not and cannot anticipate independent claims 1, 16, 22 and new independent claim 31. As a result, Potta '617 does not and cannot anticipate the claims that are dependent upon independent claims 1, 16, 22 and 31.

Removal of the anticipation rejection is respectfully requested.

**Claims Rejections Under 35 U.S.C. §103**

Claims 1-30 are rejected under 35 U.S.C. 103 as being unpatentable over US 2018/0289617 (Potta '617). The Office states that "Potta '617 disclosed a method of treating anaphylaxis comprising administering to a subject in need thereof an epinephrine spray formulation…. However, it would have been prima facie obvious to one of ordinary skill in the art at the time the invention was filed to select 2.0 mg epinephrine as taught by Potta '617, who also teaches an epinephrine formulation comprising from about 0.1 % w/w to about 15% w/w epinephrine, including 1.0 mg, 3.0 mg, and 7.5 mg, above. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation."" (see Office Action dated 1/25/2023, pages 8 to 10). Applicant respectfully disagrees.

The Office's obviousness rejections are premised on the assumption that Potta '617 discloses the limitation recited in independent claims 1, 16, and 22, namely a plasma epinephrine concentration that is 1) efficacious for the elimination of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in a human; or 2) efficacious for the prevention of the further progression of one, more than one, or all of the symptoms of the type 1 hypersensitivity reaction in the human. Without this premise, the Office's obviousness rejections fail.

As described in detail above, Potta '617 does not disclose actual administration of the formulations the Office relies on for anticipation, and thus Potta '617 does not disclose actual administration of the formulations the Office relies on for obviousness. Also, the PTAB in its Final Written Decision of IPR2021-01324 concluded that claim 3 of the '414 Patent is not obvious in view of Potta '617.

Therefore, removal of the obviousness rejection of claims 1-18, 20-24, and 26-30 is respectfully requested.

**<u>Double Patenting</u>**

Claims 1-30 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-8, 12, 13, 15, 17, 18, and 20 of U.S. Patent No. 10,682,414. While not agreeing with the grounds of this rejection, and solely to expedite prosecution to allowance, Applicant submits an e-terminal disclaimer over U.S. Patent No. 10,682,414, thereby rendering this nonstatutory double patenting rejection moot.

Claims 1-30 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1, 2, 10, and 18 of U.S. Patent No. 11,191,838. While not agreeing with the grounds of this rejection, and solely to expedite prosecution to allowance, Applicant submits an e-terminal disclaimer over U.S. Patent No. 11,191,838, thereby rendering this nonstatutory double patenting rejection moot.

Claims 1-30 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 21, 22, 25-30, 35-37, 39, and 42 of copending Application No. 17/396,044. While not agreeing with the grounds of this rejection, and solely to expedite

prosecution to allowance, Applicant submits an e-terminal disclaimer over copending Application No. 17/396,044, thereby rendering this nonstatutory double patenting rejection moot.

***

**CONCLUSION**

In light of the remarks set forth above, Applicants believe that the pending claims are under condition for allowance. Applicants respectfully solicit the Examiner to expedite the prosecution of this patent application to issuance. Should the Examiner have any questions, the Examiner is encouraged to telephone the undersigned at 858-350-2211.

The Commissioner is authorized to charge any underpayment or credit any overpayment to Deposit account No. 23-2415 (Attorney Docket No. 55358-701.306).

Respectfully submitted,

Date: April 25, 2023 By: /Valentin Zunic/
Valentin Zunic, Reg. No. 74,394

WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
Phone: (858) 350-2211
Customer No. 21971